RAMZI ABADOU (#222567)
ramzi.abadou@ksfcounsel.com
KAHN SWICK & FOTI, LLP
505 Montgomery Street, 10th Floor
San Francisco, CA 94111
Telephone: (415) 874-3047
Facsimile: (504) 455-1498

*Lead Counsel for Lead Plaintiff
Deepak Gupta and the Class*

LIONEL Z. GLANCY (#134180)
lglancy@glancylaw.com
MICHAEL GOLDBERG (#188669)
mgoldberg@glancylaw.com
GLANCY BINKOW & GOLDBERG LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Liaison Counsel for Plaintiffs*

[Additional counsel on signature page.]

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA
(WESTERN DIVISION)

|  |  |
|---|---|
| IN RE CYTRX CORPORATION SECURITIES LITIGATION | Docket No.: 2:14-CV-01956-GHK (PJWx) |
|  | <u>CLASS ACTION</u> |
|  | CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAW |
|  | **DEMAND FOR JURY TRIAL** |

I.      NATURE OF THE ACTION .................................................................1

II.     SUMMARY OF THE ACTION ...........................................................3

III.    JURISDICTION AND VENUE .........................................................11

IV.     PARTIES ..........................................................................................12

V.      VIOLATIONS OF THE EXCHANGE ACT .....................................21

        A.    Substantive Allegations..........................................................22

              1.    CytRx Hires DreamTeam to Tout Its Stock on
                    Financial News Websites ...............................................22

        B.    CytRx and the Insider Defendants Had Strong Motive to
              Commit Fraud...........................................................................29

              1.    The Insider Defendants Consummated the
                    Secondary Offering to Exploit the Artificial
                    Inflation in the Company's Common Stock ....................29

              2.    The Stock Option Grants the Insider Defendants
                    and Compensation Committee Awarded
                    Themselves Could Not Have Been More Perfectly
                    Timed ..............................................................................32

        C.    The Class Period Ends..............................................................35

        D.    Post Class Period Events .........................................................37

        E.    Defendants Materially False and Misleading Class Period
              Statements and Omissions........................................................39

              1.    The Promotional Articles Were Materially False
                    and Misleading When Published Because they
                    Omitted Material Facts about the Exchange Act
                    Defendants' Stock Touting Efforts .................................39

              2.    The September 18-19, 2013 Promotional Articles
                    and MissionIR Blog Post Are Actionable.......................41

              3.    The December 5, 2013 Promotional Article Is
                    Actionable .......................................................................45

              4.    The December 11-13, 2013 Promotional Articles
                    Are Actionable ................................................................46

              5.    The December 18-19, 2013 Promotional Articles
                    and Blog Post Are Actionable..........................................50

              6.    The December 27, 2013 Promotional Article Is
                    Actionable .......................................................................51

i

7.    The January 22, 2014 Promotional Article Is Actionable ........................................................53

8.    The February 4, 2014 Promotional Article Is Actionable ........................................................54

9.    The February 10, 2014 Promotional Article Is Actionable ........................................................55

F.    The Company's Press Releases and SEC Filings Were Materially False and Misleading ..........................56

1.    The Company's November 20, 2013 Press Release on Form 8-K Was Materially False and Misleading ...............57

2.    CytRx's December 11, 2013 Press Release on Form 8-K Was Materially False and Misleading ...................57

3.    CytRx's January 30, 2014 Press Release on Form 8-K was Materially False and Misleading .................61

4.    CytRx's 2013 Annual Report and March 5, 2014 Press Release Were Materially False and Misleading ........................................................63

G.    Defendants Kriegsman's and Caloz's Knowingly False Representations Concerning Cytrx's Internal Controls ....................65

VI.    VIOLATIONS OF THE SECURITIES ACT ............................................67

VII.    LOSS CAUSATION ........................................................71

VIII.    APPLICABILITY OF PRESUMPTION OF RELIANCE ..........................72

IX.    NO SAFE HARBOR ........................................................74

X.    CLASS ACTION ALLEGATIONS ........................................74

XI.    CLAIMS FOR RELIEF ........................................................75

ii

*"[T]ake the money when you can get it…"*
Office of CytRx CEO, Steven A. Kriegsman (¶¶80-81)

## I.   NATURE OF THE ACTION

1.   This is a putative class action for violation of the federal securities laws.  Lead Plaintiff Deepak Gupta and named plaintiffs Randall S. Pettit and Diane D. Pettit (together, "Plaintiffs"), by and through their undersigned counsel, bring this action pursuant to the Securities Exchange Act of 1934 (the "Exchange Act") and the Securities Act of 1933 (the "Securities Act"), individually and on behalf of all similarly situated persons and entities.

2.   Plaintiffs' allegations are based upon the investigation of Lead Counsel, except as to the allegations specifically pertaining to Plaintiffs, which are based upon their personal knowledge.[1]  Lead Counsel's investigation included, *inter alia*, a review of: (i) CytRx, Corporation's ("CytRx" or the "Company") filings with the Securities and Exchange Commission ("SEC"); (ii) press releases and other public statements issued by CytRx and the other defendants; (iii) analyst, media and news reports about the Company; (iv) documentary materials Lead Counsel obtained from whistleblower Richard Pearson; (v) interviews with third parties, including Mr. Pearson and John Mylant; and (v) CytRx's publicly-available trading data.

3.   Plaintiffs' Exchange Act claims are brought on behalf of all persons who purchased or otherwise acquired the publicly traded securities of CytRx between November 20, 2013 and March 13, 2014 (the "Class Period") and were damaged by the conduct asserted herein (the "Class").  Plaintiffs assert violations of §§10(b) and 20(a)-(b) of the Exchange Act, and SEC Rule 10b-5(a)-(c), promulgated thereunder.  The defendants named in Exchange Act Counts I-IV are

---

[1]   Lead Counsel is herein defined as Kahn Swick & Foti, LLP and/or its agents.

1

(i) CytRx; (ii) CytRx Chief Executive Officer ("CEO") Steven A. Kriegsman ("Kriegsman"); (iii) CytRx Chief Financial Officer ("CFO") John Y. Caloz ("Caloz"); (iv) CytRx Executive Officer and Vice President of Business Development, David J. Haen ("Haen"); and (v) writer Thomas ("Tom") Michael Meyer (together, the "Exchange Act Defendants").

4.    At all relevant times, the Exchange Act Defendants either knew or were deliberately reckless in not knowing that: (i) CytRx had retained marketing firm The DreamTeam Group and its affiliate, Mission Investor Relations ("MissionIR") (together, "DreamTeam"), to tout the market price of the Company's securities; (ii) Defendants Kriegsman and Haen surreptitiously reviewed, edited and approved the materially misleading articles and their content prior to their public dissemination; (iii) the writers of the articles – Defendant Meyer and Mr. Mylant – were being paid to tout CytRx's securities without disclosing payment; and (iv) as a result of the foregoing, the Company's press releases, promotional articles, SEC filings and other public statements were materially false and misleading when made.

5.    Separately, Plaintiffs assert violations of §§11(a), 12(a)(2) and 15 of the Securities Act for the materially misleading statements and omissions contained in: (i) the shelf Registration Statement on Form S-3 that CytRx filed with the SEC on December 6, 2012; and (ii) Prospectus Supplement on Form 424(b)(2) ("Prospectus") that CytRx filed with the SEC pursuant to the Registration Statement on January 31, 2014 (together, the "Registration Statement"). Plaintiffs' Securities Act claims are based on their purchases of CytRx common stock pursuant to and/or traceable to the Registration Statement used in connection with the spot secondary offering the Company announced on

January 31, 2014 (the "Secondary Offering").[2]   The defendants named in Securities Act Counts V-VII are: (i) the underwriters for the Secondary Offering as defined in ¶¶53-57, *infra*; and (ii) the CytRx officers and directors who signed the Company's Registration Statement as described in ¶¶30-32, 43-48, *infra* (together, the "Securities Act Defendants").   These claims arise out of the Securities Act Defendants' negligent conduct as set forth in §VI, *infra*.   Plaintiffs disclaim any reference to or reliance upon fraud allegations for their Securities Act claims.

## II.   SUMMARY OF THE ACTION

6.     CytRx is a developmental stage microcap biotechnology company.  At all relevant times, the Company was heavily dependent on its primary drug, aldoxorubicin.  In turn, the Company's share price was extremely sensitive to key developments, either positive or negative, about aldoxorubicin.  These conditions led CytRx and Defendants Kriegsman, Haen and Caloz to engage in conduct to promote aldoxorubicin and its prospects in violation of the federal securities laws.

7.     The federal securities laws require online communications touting or recommending stocks to disclose the person or entity that paid for the communication, including the amount and type of payment.  The "failure to disclose that [someone] [i]s being compensated for making material statements is a material omission under these circumstances."[3]   An investor bulletin by the SEC explains that:

> **Paid Promoters:** Some microcap companies pay stock promoters to recommend or "tout" the microcap stock in supposedly independent and unbiased investment newsletters, research reports, or radio and

---

[2]     A spot secondary offering is performed more quickly than other types of secondary offerings.

[3]     *SEC v. Curshen*, 372 Fed. Appx. 872, 881 (10th Cir. 2010) (citing *Basic, Inc. v. Levinson*, 485 U.S. 224, 232 (1988)).

television shows.… The federal securities laws require the *publications* to disclose who paid them for the promotion, the amount, and the type of payment. ***But many fraudsters fail to do so and mislead investors into believing they are receiving independent advice***.[4]

8. This case involves one such group of fraudsters. In the fall of 2013, CytRx and its most senior executive officers retained DreamTeam to initiate a campaign to tout aldoxorubicin's prospects to boost the price of the Company's securities. The undisclosed scheme was as crude as it was, at least for a time, effective. First, DreamTeam would have a news article or research report drafted that was then edited and approved by CytRx's executive officers – including Defendants Kriegsman and Haen. Second, DreamTeam writers, Defendant Meyer and Mr. Mylant, would then publish the misleading articles on investor websites, like *Seeking Alpha* and *Forbes*, touting the purported strength of CytRx and aldoxorubicin without disclosing payment.[5] Third, when the Company's share price reached sufficient heights, CytRx and Defendants Kriegsman, Haen and Caloz would: (i) consummate the Secondary Offering with artificially inflated shares of CytRx's common stock; and (ii) award themselves and members of CytRx's Board of Directors ("Board") with massive amounts of ***perfectly***-timed stock option grants.

9. Over the period of the scheme, while DreamTeam and the Exchange Act Defendants were misrepresenting that "CytRx may be on the verge of altering

---

[4] All emphasis is added.

[5] *Seeking Alpha's* "Terms of Use" expressly prohibit writing about a company's stock with the intention to boost or reduce the stock's price, and require authors to disclose any material relationships with companies whose stocks an author covers.

4

the cancer landscape," and was poised to "revolutionize the future of cancer treatment," the Company's stock price nearly quadrupled from approximately $2.25 on November 1, 2013 to $8.35 on January 30, 2014 – the day before CytRx announced the Secondary Offering on January 31, 2014.

10.   None of CytRx's Class Period filings with the SEC, investor presentations or press releases disclosed the Company's relationship to DreamTeam.  Similarly, all of the misleading promotional articles described in detail in §V.E., *infra*, concealed that CytRx had solicited and paid for the articles. Combined, the Exchange Act Defendants published more than a dozen misleading articles about CytRx online between September 2013 and February 2014, significantly altering the total mix of information in the marketplace about CytRx. Reasonable investors reading the paid articles would have found it important to their investment decision to know that CytRx had solicited the articles, and that they were not the work of independent journalists. In addition, any reasonable investor reading the Company's SEC filings would have expected to know that CytRx had not only paid a third party to tout the Company's stock, but that the Company's own executive officers had been actively involved in surreptitiously editing and approving the materially misleading promotional articles prior to their publication.

11.   Not only did the Exchange Act Defendants tout CytRx and its prospects with phony online "news" stories – but they published stories attacking *legitimate* news reports about the Company during the Class Period.  On December 16, 2013, for instance, *TheStreet* published an authentic news report headlined, "CytRx Directors Are $3M Richer with Well-Timed Stock Option Grants," criticizing the timing of certain stock option grants to CytRx's insiders.  *See* ¶¶V.B.2., *infra*.  Then, just two days later, on December 18, 2013, the other Exchange Act Defendants had an article published on *Wall St. Cheat Sheet* called

"Inaccurate Article Sends CytRx Shares Lower" misleadingly defending the Company, in part, as follows:

> Unfortunately, an inaccurate report was published on Monday, December 16 by *The Street's* Adam Feuerstein. The report contained several inaccuracies, which caused shares of CytRx to sell off by more than 10 percent…. ***The Street's article seemed to imply that CytRx management purposefully issued option grants to insiders knowing that a press release would cause the shares to spike shortly after. That is inaccurate***…. Additionally, let's keep the option grants in perspective. Mr. Feuerstein seems to take offense with CytRx insiders being wealthier by a cumulative $3 million. ***That is a pittance*** compared to the increased value of the business …With all the stories of corporate excess in today's world, this hardly qualifies as an example of that.

12.     CytRx's insiders also sought to, and did, personally benefit from their Class Period wrongdoing.  During the same period that CytRx had retained DreamTeam to tout the Company, the Compensation Committee of CytRx's Board ("Compensation Committee") granted a total of 2.9 million "spring-loaded" stock option awards – options granted just prior to a company's release of material information reasonably expected to lift the market price of a company's shares higher – to themselves, CytRx's other directors and Defendants Kriegsman and Caloz.[6]  Given that the Company had only 3.4 million options outstanding as of

---

[6]     The option grant awards at $2.39 were as follows: (i) Director Louis Ignarro, 180,000; (ii) Director Max Link, 180,000; (iii) Director Joseph Rubinfeld, 180,000; (iv) Director Marvin Selter, 180,000; (v) Director Richard Wennekamp, 180,000; Officer/Director Steven Kriegsman, 925,000; (vi)  Officer John Caloz, 150,000; Officer Ben Levin, 300,000; (vii) Officer Daniel Levitt, 500,000; and (viii) Officer Douglas Wieland, 150,000.

September 30, 2013, the 2.9 million option grant awards represented 85% of the Company's then outstanding options. The magnitude of the grants was unprecedented in CytRx's history as a publicly-traded Company. The timing of the option grant awards was also highly suspicious.

13. The Compensation Committee granted the spring-loaded stock option awards on December 10, 2013, the *day* before CytRx announced its "top-line efficacy results [of its] global Phase 2b clinical trial" relating to aldoxorubicin – information which Defendant Kriegsman described as "the most important news in our company's history." Accordingly, the day before announcing the most important news in the Company's history, the Board shamelessly awarded CytRx's insiders more than 85% of the number of options it had outstanding while the Company was actively engaged in a classic "pump-and-dump" scheme. *See* ¶¶V.B.2., *infra*.

14. Specifically, on December 10, 2013, CytRx's stock price closed at $2.39 which was the strike price assigned to stock option awards, and, after the market closed that day, CytRx disclosed the positive results of the Phase 2b clinical trial for aldoxorubicin. On December 11, 2013, CytRx's stock price rose to $4.02 – an increase of over 68% from the previous day's closing price. Director Defendants Max E. Link ("Link"), Marvin R. Selter ("Selter"), Joseph Rubinfeld ("Rubinfeld"), Louis J. Ignarro ("Ignarro") and Richard L. Wennekamp ("Wennekamp") generated *$3 million in just one day* as a result of this exceedingly well-timed insider transaction. The Company's December 11 Phase 2b announcement was then *amplified* by a same-day, and highly misleading, promotional article touting CytRx called "CytRx Corporation Soars on Positive Phase 2b Sarcoma Data." After two more materially misleading promotional articles amplifying the Company's December 11, 2013 announcement were

7

published by Defendant Meyer and Mr. Mylant on December 12 and 13, 2013, the price of CytRx's common stock ended that week ***127% higher***.

15.     The scheme began to unravel a short time later in January 2014 when Adam Feuerstein, a senior columnist at website *TheStreet.com*, discovered several similar articles on finance website *Seeking Alpha* all recommending shares of former CytRx subsidiary, Galena Biopharma ("Galena"). CytRx CEO Defendant Kriegsman is, and was at all relevant times, a member of Galena's Board of Directors.  According to Mr. Feuerstein's February 12, 2014 report, the author of the articles used one of three different aliases but appeared to be written by the same person.  The author was unveiled as Defendant Meyer who later unwittingly admitted that he and Mr. Mylant had been paid to write articles about CytRx without disclosing payment.

16.     At roughly the same time that Mr. Feuerstein began connecting Galena's and CytRx's simultaneous stock promotion efforts, Defendant Meyer contacted former stock analyst Richard Pearson in January 2014 to recruit him as a stock promoter for CytRx.  Mr. Pearson later described this encounter in his March 13, 2014 investigative report (hereinafter, the "Pearson Report"), in part, as follows:

> A few weeks ago I received an email and subsequent phone calls asking me to be a paid stock tout for an IR firm called The Dream Team Group.  The sender first informed me about an article he wanted on CytRx Corp.… He clearly had no idea what he just stumbled into by contacting me of all people.  ***The individual ultimately revealed his name to be Tom Meyer.***  He later informed me that the IR form he works for was the Dream Team and that he worked closely with the head of Dream Team, Michael McCarthy.… I was offered $300 per article, but was also told there were two conditions.  ***First,***

*management [] would have to sign off (and edit) the articles. Second, I would not be allowed to disclose that I was getting paid.*

17.    Rather than reject Defendant Meyer's solicitation, Mr. Pearson initiated an investigation to, in his words, "determine how involved management from [CytRx was] in this undisclosed paid promotion scheme."  On March 13, 2014, the last day of the Class Period, Mr. Pearson published his exhaustive report on *Seeking Alpha* called "Behind the Scenes with Dream Team, CytRx and Galena," providing a detailed firsthand account of the Exchange Act Defendants' stock manipulation scheme.  *See* ¶¶94-96, *infra*.

18.    The fallout from the publication of the Pearson Report was swift and severe.  On March 13, 2014, CytRx's share price fell approximately 13% in a single day to close at $4.17 on unusually heavy trading volume:[7]



19.    Almost immediately following the Class Period, the SEC began interviewing witnesses, including Defendant Meyer, Mr. Pearson and Mr. Mylant, and issuing subpoenas to third parties connected to the scandal.  In addition, the

_____

[7]    CytRx's common stock is currently trading back at its pre-manipulated levels – *i.e.*, less than $3.00 per share.

promotional articles were removed from *Seeking Alpha*, *Forbes* and *Wall St. Cheat Sheet* for violating their "terms of use" which: (i) prohibited writing about a company's stock with the intention to boost or reduce its stock's price; and (ii) required contributing authors to disclose any material relationships with companies whose securities they covered.  Similarly, after Mr. Pearson published his report, DreamTeam was instructed to remove the online evidence of its relationship to CytRx from DreamTeam's websites.  A March 20, 2014 article titled "At Financial News Sites, Stock Promoters Make Inroads," on *Fortune* summed up these events, in part, as follows:

> While not all of the facts are clear, **the websites admit that they were duped**. In the past few weeks, more than 100 articles have been pulled from Seeking Alpha, Wall St. Cheat Sheet, and other websites that have been caught up in the **stock promotion scheme**.

> *              *              *

> **In some cases, the stock promoters were successful**. In late December, Forbes.com published an article by Tom Meyer called "The race to develop a brain cancer treatment takes an interesting turn." The article said a small biotech company called CytRx had "remarkable results" in a recent drug trial and "appears poised for a significant run in the months and years ahead as the company's platform continues to be validated by science."

> Within days of the article's publication, **CytRx's stock rose nearly 50%** to $6.90.

20.     Then, on May 27, 2014, *Seeking Alpha* was forced to run an editorial apologizing to its readers for the Exchange Act Defendants' misconduct called, "What Seeking Alpha Is Doing to Prevent Paid Stock Promotion."  In an effort to

"identify and prevent *stock manipulation* on Seeking Alpha in response to recent discoveries," Eli Hoffman, *Seeking Alpha's* Editor-In-Chief, explained that:

> Recently, our editors were forced to remove a number of articles from Seeking Alpha after we discovered that their authors had been compensated by stock promoters to publish positive articles on specific stocks. In their disclosures, *the authors lied - explicitly stating that they were not receiving third-party payment for their articles*. To be clear: Seeking Alpha does not allow paid stock promoters or IR firms to submit articles about stocks with which they have a relationship.
>
> *We are grateful to Richard Pearson for his outstanding undercover work in unearthing foul play* on Seeking Alpha and other investing websites, and for sharing his research with us proactively so that we could deal promptly with non-compliant authors. You can read Richard's recent articles on this topic here and here.

21.    Not only did the Exchange Act Defendants lie to and engage in foul play with prominent financial news websites like *Seeking Alpha*, in doing so, they also misled the Company's shareholders in violation of the federal securities laws as alleged throughout herein.

## III.    JURISDICTION AND VENUE

22.    The claims asserted herein arise under Sections 11(a), 12(a)(2) and 15 of the Securities Act, (15 U.S.C. §77k) and Sections 10(b) and 20(a)-(b) of the Exchange Act, (15 U.S.C. §78j(b), §78t(a) and §78t(b)), and Rule 10b-5(a)-(c) promulgated thereunder (17 C.F.R. §240.10b-5).  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, Section 22 of the Securities Act and Section 27 of the Exchange Act.

11

23.     Venue is proper in this District pursuant to Section 22 of the Securities Act and Section 27 of the Exchange Act.  CytRx's headquarters are located within this District, the Company conducts substantial business in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

24.     In connection with the acts, conduct and other wrongs alleged herein, defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications and national securities markets.

## IV.     PARTIES

### Plaintiffs

25.     Lead Plaintiff Deepak Gupta purchased CytRx securities during the Class Period as described in the Certification attached hereto, and incorporated herein by reference, and suffered damages thereon.

26.     Named plaintiffs Randall S. Pettit and Diane D. Pettit purchased CytRx common stock during the Class Period, including pursuant to and/or traceable to the Secondary Offering as described in their Certifications attached hereto, and incorporated herein by reference, and suffered damages thereon.

27.     Mr. and Ms. Pettit purchased over 9000 shares of CytRx common stock on February 5, 2014 at the Secondary Offering price of $6.50.  The Pettit's purchased their Secondary Offering shares before CytRx announced the closing of the Secondary Offering on February 5, 2014.

### Company Defendant

28.     CytRx is a Delaware corporation, incorporated in 1985.  Its shares trade on the NASDAQ exchange under the ticker symbol "CYTR," and its corporate offices are located at 11726 San Vicente Boulevard, Suite 650, Los Angeles, California 90049.

29.    CytRx engages in biopharmaceutical research and development and specializes in oncology.    The Company has only seventeen employees and is currently focused on the clinical development of its primary drug, aldoxorubicin

**Insider Defendants**

30.    Defendant Steven A. Kriegsman is, and was at all relevant times, CytRx's President and CEO, and also a Director on CytRx's Board.  He has served in those capacities since 2002.  During the Class Period, Defendant Kriegsman signed: (i) the Registration Statement; (ii) the Annual Report on Form 10-K CytRx filed with the SEC on March 5, 2014 ("2013 Annual Report"); and (iii) the Company's Form 8-K announcing the the Secondary Offering dated January 31, 2014.  He also signed the January 31, 2014 "Underwriting Agreement" CytRx filed with the SEC as Exhibit 1.1 to a same day press release which misrepresented that the "***Company has not taken***, ***directly or indirectly***, ***any action designed to or that might cause or result in stabilization or manipulation of the price of the [s]hares***…"[8] Defendant Kriegsman also participated on the Company's Class Period investor conference calls with investors, including the call held on December 11, 2013, and made statements at investor conferences and in connection with the Company's March 5, 2014 press release on Form 8-K.

31.    During the Class Period, Defendant Kriegsman reviewed, edited and approved articles he understood would be published online by DreamTeam, Defendant Meyer and/or Mr. Mylant.  Because of his senior position with the Company and CytRx's material relationship with DreamTeam, Defendant Kriegsman possessed the power and authority to control the contents of the promotional articles, press releases, investor and media presentations and all filings CytRx made with the SEC during the Class Period.

---

[8]    "Shares" are defined in the "Underwriting Agreement" as shares of the Company's common stock.

13

32.     Defendant John Y. Caloz is, and was at all relevant times, the Company's CFO and Treasurer.  During the Class Period, Defendant Caloz signed: (i) the Registration Statement; (ii) 2013 Annual Report; and (iii) the Company's press releases filed with the SEC on Forms 8-K.  Because of his senior position with the Company and CytRx's material relationship with DreamTeam, Defendant Caloz possessed the power and authority to control the contents and publication of the promotional articles, press releases, investor and media presentations and all filings CytRx made with the SEC during the Class Period.

33.     Defendant David J. Haen joined the Company in 2003 after working for Defendant Kriegsman at Kriegsman Capital Group LLC.  He is a member of the Company's "Management Team" and is Vice President, Business Development. Defendant Haen is also listed in the Company's Annual Reports as an "Executive Officer" of CytRx.  During the Class Period, Defendant Haen reviewed, edited and approved articles he understood would be published online by DreamTeam, Defendant Meyer and/or Mr. Mylant.  Because of his senior position with the Company and CytRx's material relationship to DreamTeam, Defendant Haen possessed the power and authority to control the contents and publication of the promotional articles, press releases, investor and media presentations and all other filings CytRx made with the SEC during the Class Period.

34.     Defendants Kriegsman, Caloz and Haen, are referred to collectively herein as the "Insider Defendants."

35.     Defendants Kriegsman and Caloz, as CytRx's CEO and CFO respectively, were especially aware of their federal securities law disclosure obligations because the Company's own "Code of Business Conduct and Ethics" mandate that:

> SEC regulations impose upon our Chief Executive Officer and
> Chief Financial Officer various obligations in connection with annual

and quarterly reports that we file with the SEC, including responsibility for:

Establishing and maintaining ***disclosure controls*** and procedures and internal control over financial reporting that, among other things, ensure that material information relating to the Company is made known to them on a timely basis[.]

                    *        *        *

This Code ***requires*** our Chief Executive Officer and Chief Financial Officer to carry out their designated responsibilities in connection with our annual and quarterly reports, and this Code requires you, if asked, to assist our executive officers in performing their responsibilities under these SEC regulations.

36.    In addition, at all relevant times, CytRx's "Code of Business Conduct and Ethics" expressly prohibited the Company and its executive officers from paying any "bribes, kickbacks ***or other similar remuneration or consideration*** … ***to any person or organization in order to attract or influence business activity***." The Insider Defendants violated this provision by retaining DreamTeam to attract and influence business activity related to aldoxorubicin and the Company's publicly-traded securities – including by raising money from the investing public in the Secondary Offering.

37.    Each of the Insider Defendants was intimately involved with and aware of all aspects of the Company's operations, particularly given CytRx's small size.  Moreover, because of the Insider Defendants' positions within the Company, they each had access to the adverse undisclosed information about CytRx's business, operations and practices through access to internal corporate documents, conversations and contact with other corporate officers and employees, attendance at meetings and through reports and other information provided to them.  Each of

15

the Insider Defendants, by virtue of their high-level position, was directly involved in the day-to-day operations of CytRx at the highest levels and was privy to confidential information concerning the Company, its business, operations and practices, including the material misstatements and omissions as alleged herein.

38.     Their positions of control and authority as officers and/or directors of CytRx enabled them to control the contents of the Company's SEC filings, press releases, presentations to securities analysts, and other public statements made to CytRx shareholders during the Class Period.  Accordingly, each of the Insider Defendants bears responsibility for the accuracy of the promotional articles, public reports and press releases detailed herein, and is therefore primarily liable for the misrepresentations and omissions contained therein.

39.     The Insider Defendants substantially participated in and had exclusive authority and control over the content and public dissemination of CytRx's false and misleading statements, and how they were communicated to investors. Defendants also engaged in conduct in furtherance of a fraudulent scheme and course of business and were involved in the preparation and dissemination of CytRx's misleading statements, all of which made it necessary or inevitable that material misrepresentations and omissions would be communicated to, and mislead, investors.

40.     The Insider Defendants were prohibited from using the instrumentalities of interstate commerce or the mails to: (i) employ any device, scheme, or artifice to defraud; (ii) make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engage in any act, practice, or course of business which operates or would operate as a fraud upon any person.  The Exchange Act Defendants' conduct violated the

16

Exchange Act and SEC regulations promulgated thereunder in connection with the purchase or sale of CytRx's securities.

41.    Defendants' scheme deceived the investing public regarding CytRx's operations and the intrinsic value of CytRx's securities, and caused Plaintiffs and other members of the class to be damaged as a result of their purchases of CytRx securities at artificially inflated prices.

42.    The Company's press releases and SEC filings were group-published documents, representing the collective actions of the Company management.  The Insider Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, and were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.  Each Insider Defendant was provided with copies of the reports, promotional articles and press releases alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance, or cause them to be corrected.

**Director Defendants**

43.    Defendant Louis J. Ignarro is, and was at the time of the Secondary Offering, a Director of the Company.   Defendant Ignarro signed the Registration Statement.

44.    Defendant Max E. Link is, and was at the time of the Secondary Offering, a Director of the Company.  Defendant Link signed the Registration Statement.  Defendant Link was at all relevant times a member of the Board's Audit Committee which is responsible for the oversight of, *inter alia*: (i) the quality and integrity of the Company's public financial statements and reports, (ii) the Company's independent accountant and auditor; and (iii) the Company's financial reporting process and internal controls.  Defendant Link is also a member

17

of the Compensation Committee which is responsible for determining the compensation of the Company's officers and outside directors.

45.    Defendant Joseph Rubinfeld is, and was at the time of the Secondary Offering, a Director of the Company.  Defendant Rubinfeld signed the Registration Statement. Defendant Rubinfeld is a member of the Compensation Committee. Defendant Rubinfeld is also a member of the Board's Nomination and Governance Committee which is responsible for, *inter alia*, overseeing the Company's corporate governance as well as the compensation and evaluation of the Board members.

46.    Defendant Marvin R. Selter is, and was at the time of the Secondary Offering, a Director of the Company. Defendant Selter signed the Registration Statement.  Defendant Selter is also a member of the Board's Audit Committee, Compensation Committee and Nomination and Governance Committee.

47.    Defendant Richard L. Wennekamp is, and was at the time of the Secondary Offering, a Director of the Company.  Defendant Wennekamp signed the Registration Statement.  Defendant Wennekamp is also a member of the Board's Audit Committee, Compensation Committee and Nomination and Governance Committee.

48.    Defendants Ignarro, Link, Rubinfeld, Selter, and Wennekamp are referred to collectively as the "Director Defendants."

**Defendant Meyer**

49.    Defendant Thomas ("Tom") Michael Meyer is a freelance writer who worked for DreamTeam during the Class Period.  In that capacity, he drafted and, after obtaining approval from CytRx's management, published promotional articles touting CytRx without disclosing payment.   Defendant Meyer acted as an intermediary between DreamTeam and the Insider Defendants in an effort to

18

conceal the Insider Defendants' direct involvement in editing and approving the promotional articles described in ¶¶69-75, *infra*.

50.     During the Class Period, Defendant Meyer, along with the other Exchange Act Defendants, had the following twelve materially false and misleading articles published online – each of which failed to disclose that Defendant Meyer had been paid to publish them on CytRx's behalf:

(1) "Aldoxorubicin: The Drug CytRx Investors Should Be Watching" at *Motley Fool* (Feb. 10, 2014) by "James Johnson" [actually Defendant Meyer]; (2) "CytRx Is Heading to a Pivotal Trial" at *Wall St. Cheat Sheet* (Feb. 4, 2014) by "John Rivers" [actually Defendant Meyer]; (3) "3 Newsworthy Biotech Stocks: BioDelivery, CytRx, TG Therapeutics" at *Wall St. Cheat Sheet* (Feb. 3, 2014) by "James Ratz" [actually Defendant Meyer]; (4) CytRx Corp. Is a High-Flying Stock" at *Wall St. Cheat Sheet* (Jan. 22, 2014) by "James Ratz" [actually Defendant Meyer]; (5) "CytRx Corporation Poised for Success in 2014" at *Seeking Alpha* (Dec. 31, 2013) by "Equity Options Guru" [actually Defendant Meyer]; (6) "The Race To Develop A Brain Cancer Treatment Takes An Interesting Turn" at *Forbes* (Dec. 27, 2013) by Defendant Meyer; (7) "Inaccurate Article Sends CytRx Shares Lower" at *Wall St. Cheat Sheet* (Dec. 18, 2013) by Defendant Meyer; (8) "Is CytRx Corporation the Next Pharmacyclics?" at *Wall St. Cheat Sheet* (Dec. 13, 2013) by "James Ratz" [actually Defendant Meyer]; (9) CytRx Corporation Soars on Positive Phase 2b Sarcoma Data at *Wall St. Cheat Sheet* (Dec. 11, 2013) by Defendant Meyer; (10) "CytRx Corporation Offers Hope for Brain Cancer Patients" at *Wall St. Cheat Sheet* (Dec. 5, 2013) by Defendant Meyer; (11) "CytRx Surges Ahead With Positive Drug Data" at *Seeking Alpha* (Nov. 1, 2013) by "Equity Options Guru" [actually Defendant Meyer]; (12) "CytRx Corporation Remains an Undiscovered Opportunity in the Cancer Space" at *Seeking Alpha* (Sep. 18, 2013) by "Equity Options Guru" [actually Defendant Meyer].

51.     As depicted above, Defendant Meyer used various aliases to release articles for CytRx, including "James Ratz," "Christine Andrews," "John Rivers,"

"James Johnson" and "Ted Mayer." At *Wall St. Cheat Sheet*, Defendant Meyer even included a phony biography for his "Christine Andrews" alias, misrepresenting that:

> Christine Andrews is an analyst and fund manager with almost 20 years of investment experience. She covers a variety of industries, with a special focus on technology, and likes to write about value stocks, poorly understood or under-followed situations, and contrarian perspectives.

52.    With the other Exchange Act Defendants' knowledge and consent, Defendant Meyer used these aliases to: (i) create the false appearance that numerous objective stock analysts were writing positive stories about CytRx; and (ii) to circumvent the publishers' terms of use which, as alleged in ¶¶62, 76, *infra*, prohibited such misconduct.  At no point during the Class Period did the Insider Defendants, who were either aware of or willfully blind to the scheme, correct the misimpression created among investors by Defendant Meyer or about his material connection to CytRx.

**Underwriter Defendants**

53.    Defendant Jefferies LLC ("Jefferies") was an underwriter for the Secondary Offering, the sole book-running manager, served as a financial advisor and assisted in the preparation and dissemination of the Registration Statement.  Its global headquarters are located at 520 Madison Avenue, 10th Floor, New York, NY 10022.

54.    Defendant Oppenheimer & Co., Inc. ("Oppenheimer") was an underwriter for the Secondary Offering, served as a financial advisor and assisted in the preparation and dissemination of the Registration Statement. Its global headquarters are located at 85 Broad Street, New York, NY 10004.

55.   Defendant Aegis Capital Corporation ("Aegis") was an underwriter for the Secondary Offering, served as a financial advisor and assisted in the preparation and dissemination of the Registration Statement.  Aegis also sells analyst reports on CytRx for its clients.  Its corporate offices are located at 810 7th Avenue, 18th Floor, New York, NY 10019.

56.   Defendant H.C. Wainwright & Co., LLC ("Wainwright") was an underwriter for the Secondary Offering, served as a financial advisor and assisted in the preparation and dissemination of the Registration Statement. Wainwright sells analyst reports on CytRx for its clients.  Its headquarters are located at 430 Park Avenue, New York, NY 10022.

57.   Defendants Jefferies, Oppenheimer, Aegis and Wainwright are collectively referred to herein as the "Underwriter Defendants." The Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective in connection with offers and sales thereof, including to Plaintiffs and the Class.  The Underwriter and Director Defendants are not alleged to have engaged in fraudulent conduct and are liable here only under the non-fraud provisions of the Securities Act.  *See* §VI., *infra*.

## V.   VIOLATIONS OF THE EXCHANGE ACT

58.   Throughout the Class Period, the Exchange Act Defendants either knew or were deliberately reckless in not knowing that: (i) the statements and omissions alleged in ¶¶102-163, *infra*, were materially false and misleading; (ii) such statements would adversely affect the integrity of the market for CytRx securities; and (iii) such statements would deceive investors into purchasing CytRx securities at artificially inflated prices, including in the Secondary Offering.  The Exchange Act Defendants also either knew, or were reckless in not knowing, that investors visited investment websites like *Forbes*, *Seeking Alpha* and *Wall St. Cheat Sheet* to make their investment decisions about CytRx.

### A.    Substantive Allegations

59.    DreamTeam runs a series of websites, including MissionIR, which publish articles, produce newsletters or post stories on blogs and internet investor chat rooms.[9]  DreamTeam's stated "objective is to create and execute a customized strategy that produces measurable results and attracts a wider following of investors to improve each client's overall market valuation."  DreamTeam was co-founded by Michael McCarthy who, at all relevant times, served as DreamTeam's and MissionIR's Managing Director.

60.    According to DreamTeam, MissionIR is a strategic communications company.  MissionIR purports to have a network of web sites that have established a "significant presence among the investment community."  Throughout the Class Period, DreamTeam and MissionIR paid Defendant Meyer and Mr. Mylant to publish laudatory stories on financial news websites on CytRx's behalf.

### 1.    CytRx Hires DreamTeam to Tout Its Stock on Financial News Websites

61.    In the fall of 2013, Defendant Meyer and Mr. Mylant began placing articles touting CytRx and its prospects on prominent finance websites *Forbes*, *Seeking Alpha* and *Wall St. Cheat Sheet* without disclosing payment.  The promotional articles were published through the websites' contributor networks which run articles written by guest contributors to expand news coverage.  Most contributors have experience in financial markets and websites like *Forbes*, *Seeking Alpha* and *Wall St. Cheat Sheet*, and rely on disclosure policies that prohibit undisclosed paid stock touting.

---

[9]    The corporate address DreamTeam Group provides is either a vacant storefront next to a nail salon or a UPS store branch in a largely-abandoned strip mall in Indianapolis.  *See* http://www.dreamteamgroup.com/.  DreamTeam Group's headquarters are located at 7399 North Shadeland Avenue, Suite 123, Indianapolis, IN 46256.

62.     *Seeking Alpha*, for instance, provides the following "Terms of Use" before contributors, like the Exchange Act Defendants, can publish articles on its website:

> When you post any User Submission on the Site, you also agree to abide by the following disclosure rules:
>
> *       *       *
>
> - ***You may not write about a stock with the intention to boost or reduce the stock's price*** and sell (or buy) the stock into the resulting strength or weakness.
>
> *       *       *
>
> - ***You will disclose any material relationships with companies whose stocks you write about*** in a User Submission or parties that stand to gain in any way from the viewpoint you are outlining.  Examples: You must disclose if you are employed by a company whose stock you are writing about; perform consulting for a company you write about; receive paid advertising revenue or any other form of sponsorship fee from a company you write about.[10]

63.     After the Class Period ended, *Seeking Alpha, Wall St. Cheat Sheet* and *Forbes* highlighted the Exchange Act Defendants' deceptive conduct by summarily removing the promotional stories they had published about CytRx from their websites.  On March 20, 2014, Mia Carbonell, a spokesperson for *Forbes*, for instance, stated that the articles had been removed, and that Defendant Meyer would no longer contribute to the site because, "[a]fter careful consideration, we determined that the content did not meet *Forbes'* editorial guidelines."  Similarly,

---

[10]     These terms of use mirror the federal securities laws' prohibitions against stock touting as described in ¶7, *supra*.

23

following the disclosure of the Exchange Act Defendants' scheme in March 2014, William Inman, *TheStreet's* Editor-In-Chief, disclosed that Defendant Meyer had tried to publish an article on *TheStreet* under a woman's name which was never published.

64.   The paid promotional articles touting CytRx sometimes, but not always, coincided with CytRx's news releases and SEC filings.  This facilitated the stock promotion scheme in three principal ways.  First, on days where CytRx itself made an announcement, the articles were used to highlight and amplify the news the Company released.  Second, during quiet periods where the Company was not making public statements, the promotional articles maintained the artificial inflation in the price of the Company's securities.  Third, the materials were used to artificially inflate the price of the Company's securities prior to the Secondary Offering.

65.   As plainly demonstrated by the sharp rise in the Company's share price and volume immediately after the start of the Class Period on November 20, 2013, the promotional articles had a substantial price impact on CytRx's securities:



### 2.    Two Independent Sources Uncover and Unravel the Scheme

66.   As alleged above, in early January 2014, Mr. Feuerstein discovered several similar articles on finance website *Seeking Alpha* that all recommended shares of former CytRx subsidiary, Galena.  According to Mr. Feuerstein, the

24

author used one of three different aliases but appeared to be written by the same person.  That person was later revealed by Mr. Pearson to be Defendant Meyer (whom Mr. Pearson flew to Chicago to meet in person for his investigation).  On February 12, 2014, Mr. Feuerstein published his findings online in a story called "Galena Biopharma Pays for Stock-Touting Campaign While Insiders Cash Out Millions."

67.   Mr. Feuerstein described how the promotional articles he had uncovered had been commissioned by Galena through an arrangement with DreamTeam, which Galena had retained to promote its stock.  At all relevant times, CytRx CEO Defendant Kriegsman was also a Director of Galena.  In fact, Mr. Feuerstein was able to report how Galena "Director Steven Kriegsman, who's also the CEO of Cytrx, *pocketed $2.1 million from the sale of Galena stock in the same month*, according to SEC filings.…  *Cytrx is also a DreamTeam Group client*, paying $65,000 for a year's worth of stock promotion...."[11]

68.   In response to Mr. Feuerstein's published report on *TheStreet*, CytRx's stock price fell 8.5% on February 12, 2014 to $6.04 per share on heavy trading volume.

69.   At approximately the same time that Mr. Feuerstein began covering CytRx's connection to DreamTeam, on January 18, 2014, Defendant Meyer contacted (former Deutsche Bank analyst, writer and short-seller) Mr. Pearson to ask whether he was interested in drafting articles touting CytRx "without disclosing payment."  Thereafter, Mr. Pearson initiated an investigation to, in his words, "determine the level of involvement of management of these companies in

---

[11]   CytRx and Galena also share the same independent registered auditor – BDO USA, LLP ("BDO").  In 2012, BDO admitted that it was part of a fraud that generated $6.5 billion in phony tax losses and was convicted criminal R. Allen Stanford's longtime auditor.

reviewing and editing articles. To me, this was of far greater significance than the (already troubling) non-disclosure by various authors and IR firms who might be getting paid." One of the emails Mr. Pearson received from Defendant Meyer on January 18, 2014 stated that:

> We typically cover biotech companies but occasionally will have some others as well. When I give you an assignment, you will type up the draft and then send back to me *so I can get the company's approval*. I will send you back the edited version and *then you can publish*. Once published, *I will pay you* …

70. After receiving Defendant Meyer's email, which Meyer sent under the false name "Jim Johnson" at jjohnson19000@outlook.com, Mr. Pearson led Defendant Meyer to believe that he had accepted the proposal and was actively participating in the stock promotion scheme. As part of his investigation, Mr. Pearson began submitting dummy articles to Defendant Meyer that he had no intention of ever publishing. In turn, Defendant Meyer passed the draft articles to Defendants Haen and Kriegsman for their review. Mr. Pearson later revealed how, "[d]uring the course of [his] investigation [he] exchanged dozens of emails with individuals who admit to promoting CytRx [ ] in exchange for undisclosed payments."

71. The Pearson Report later revealed that Defendants Kriegsman and Haen were directly involved in editing the promotional articles prior to approving them for publication. Mr. Pearson obtained fully edited copies of the articles he drafted which bore the electronic signature of Defendant Haen and the executive assistant to CytRx CEO, Defendant Kriegsman.[12] Mr. Pearson determined who

---

[12] According to an online profile, Defendant Kriegsman's "executive assistant" – Lauren Terrado – provides administrative and secretarial support to Defendant Kriegsman, and was previously an administrative assistant at CytRx. According to

made the actual edits to his draft articles simply by using the "Track Changes" feature in Microsoft Word.  It was a crude scheme.  In Mr. Pearson's words, "[d]ocuments show that CYTR [] management edited, changed and approved the paid articles."  And they do.

72.     On January 29, 2014, for instance, after Mr. Pearson had provided one of his dummy articles to Defendant Meyer for the Company's review, Defendant Meyer emailed Mr. Pearson, writing: "Please see the revised CYTR draft.  Please make the changes to yours and *then* submit.  FYI, CYTR is picky about articles so don't read too much into the changes.  Happens to me as well.  Thanks, Tom [Meyer]."  In response, Mr. Pearson asked: "[w]ho was it from CYTR that revised it?"  Defendant Meyer then responded, "I think the guy who makes the changes is [Defendant] ***David Haen***, Biz Development.  He can be a pain."  The same day, Defendant Haen had revised the article to, *inter alia*, characterize the "global market" for aldoxorubicin from $500 million to a "multi-billion opportunity."

73.     In an effort to illicit further details about the Exchange Act Defendants' scheme, Mr. Pearson played along, writing: "man oh man....those were extensive changes. [H]e basically re-wrote about 25% of the article."  Defendant Meyer then replied that "[e]very once in a while a company will be really picky. CYTR is one of them. Our other companies aren't nearly as bad. Let me know when you submit. Thx."  The Company's changes to the articles were run by Defendant Meyer to the Company through Michael McCarthy, the co-founder and Managing Director of DreamTeam, in an effort to conceal the Insider Defendants' direct involvement in the stock manipulation scheme.

---

her profile, Ms. Terrado's responsibilities include "scheduling appointments and conference calls [and] coordination of all business and personal travel of the CEO [], management of expenses and monthly reconciliation."

74.     Prior to publishing his March 13, 2014 report, Mr. Pearson contacted Defendant Haen to disclose his investigation and to give him an opportunity to comment.  Defendant Haen initially tried to minimize the Company's relationship to DreamTeam by misrepresenting that CytRx had stopped using DreamTeam several months ago, "when the stock was a $2.00 stock."  This was false.  In truth, DreamTeam had published a story for CytRx only a month earlier on February 10, 2014 (*see* ¶¶141-142, *infra*).  After being pressed by Mr. Pearson, Defendant Haen relented that it might have been "earlier this year."  In fact, CytRx's relationship with DreamTeam lasted until early March 2014 when CytRx learned that the Pearson Report was forthcoming.  Ultimately, during the course of their conversation, Defendant Haen also conceded that CytRx had provided "some new or original content" to DreamTeam's writers, including Defendant Meyer and Mr. Mylant.

75.     Mr. Pearson also contacted Mr. Mylant before posting his March 2014 report.  Mr. Mylant, too, confirmed that he had been paid by DreamTeam to publish articles touting CytRx without disclosing payment during the Class Period, and "that [CytRx] management had signed off on them ***because that is what they are paying for***."  In a separate email communication between Mr. Pearson and Mr. Mylant dated February 21, 2014, Mr. Mylant again confirmed that he had ghost-written articles for CytRx during the Class Period.  Indeed, Mr. Mylant had researched and drafted the promotional articles about CytRx and submitted them to Defendant Meyer, who told Mr. Mylant that he needed to get them approved by CytRx management.

76.     The Pearson Report (*see* ¶¶94-96, *infra*) was published with the full support of *Seeking Alpha's* lead editor, who added the following preface to the Pearson Report:

28

Upon reviewing Mr. Pearson's article, we removed articles from *Seeking Alpha* that were in violation of our policies. **We take integrity very seriously** and appreciate Richard[] [Pearson's] work in helping us identify authors who were in breach of our contributor's Terms of Use.

77.    Like *Seeking Alpha*, a publication where many of CytRx's misleading promotional articles appeared, other online financial news publications – including *Forbes*, *Motley Fool*, and *Wall St. Cheat Sheet* – also took immediate remedial action and removed articles that CytRx had solicited and paid for during the Class Period.  At least thirteen such articles touting CytRx vanished two days after the Pearson Report was published.

**B.    CytRx and the Insider Defendants Had Strong Motive to Commit Fraud**

**1.    The Insider Defendants Consummated the Secondary Offering to Exploit the Artificial Inflation in the Company's Common Stock**

78.    The Exchange Act Defendants' stock promotion scheme enabled CytRx to raise capital using artificially inflated shares of the Company's common stock in not just one, but *two* public offerings.  Just prior to the Class Period, on October 10, 2013, and just after CytRx had retained DreamTeam to publish a phony "news" story touting CytRx on September 18, 2013 (*see* ¶¶105-109, *supra*), CytRx announced a spot secondary offering pursuant to a prospectus filed with the SEC on Form 424(b)(2) that generated $25.9 million in illicit proceeds for the Company.  As alleged in §V.B.2., *infra*, the same prospectus assured investors that the Company expected to report its global Phase 2b clinical trial for aldoxorubicin no later than December 2013.  Then, after the Exchange Act Defendants' promotional articles had driven the Company's stock to a Class Period high of $8.35 per share on January 30, 2014, CytRx suddenly announced its Secondary

Offering of more than 11 million shares on January 31, 2014, at $6.50 per share, enabling the Company to misappropriate more than $80 million from investors.

79.     The same day that CytRx announced the Secondary Offering on January 31, 2013, Mr. Pearson – who was then being pressured by the Company to publish a promotional article prior to the announcement of the Secondary Offering – emailed Defendant Meyer suggesting that he was "surprised that they [CytRx] did an offering … do you think that this offering is why they wanted the article out before?" In response, Defendant Meyer admitted:

> Could have been. I had a long conversation with Michael [McCarthy of DreamTeam] about it. *I don't like the fact that the company wanted your article out before the offering*. I explained to him that it would make the writers look bad and he agreed. *He had a conversation with the company about it*. Regardless, *it worked out for us* … I might include a section on the capital raise … just say something like this is a great time to do it as the *company can take advantage of a favorable share price*.

80.     The Company's scheme to defraud, however, went even further than boosting CytRx's share price just prior to consummating the public secondary offerings. After a negative news article about the Secondary Offering called "CytRx Flushed Its Shareholders, Even if It Needed the Capital" ran on *24/7 Wall St.* on February 1, 2014, the next day, Defendant Kriegsman's office included the following insert, which bore his executive assistant's electronic signature, for a story they believed Mr. Pearson intended to publish:

1

2

Last Friday, CytRx Corp (CYTR) raised $75 million in an offering priced at $6.50 per share. The offering was priced at roughly 25% below the closing price of the previous trading day, leading some less sophisticated investors to gripe that they somehow had the rug pulled out from under them.

3

4

The reality is that in early December, CytRx was just barely a $2 stock. The entire company was worth just over $80 million. The fact that the company is in a position to raise $75 million in a 1 day offering at $6.50 per share should be a delight for those who have a holding period of longer than one day.

5

6

7

Wall St. has one simple rule: take the money when you can get it (don't wait until you need it). And CytRx now finds itself incredibly well financed, having an extra $75 million in the bank. The high share price of $6.50 in the offering helped to ensure that overall dilution to shareholders was minimized, despite the fact that the company was able to pull in a large nominal amount of cash.

8

9

10

Those with a longer term interest in CytRx are immediately aware that when a stock has run up substantially, investors in the deal will always require a bigger discount. In the case of CytRx, the stock had nearly quadrupled since early January. The other factor which necessitates a decent sized discount is the fact that CytRx was offering an amount of nearly 25% of its market cap at the time. The compares to average deal sizes which seldom exceed ~~10~~20%. As a result, the discount was certainly within market guidelines.

11

12         81.   By the foregoing, Defendant Kriegsman knowingly, or with deliberate

13   recklessness, sought to mislead investors by using a third-party whom the Insider

14   Defendants believed was being paid to publish promotional stories without

15   disclosing payment to: (i) defend the Secondary Offering against a legitimate, but

16   negative, news story; (ii) attack CytRx's own shareholders for "griping" about the

17   Secondary Offering; and (iii) announce Wall Street's purported rule to "***take the***

18   ***money when you can get it***."  Worse yet, in the "Underwriting Agreement" for the

19   Secondary Offering that CytRx filed with the SEC on January 31, 2014, Defendant

20   Kriegsman specifically represented that the "***Company has not taken, directly or***

21   ***indirectly, any action designed to or that might cause or result in stabilization or***

22   ***manipulation of the price of the [s]hares*** …" This statement, which was made by

23   the Company's own CEO – whose own Company had been pressuring Mr. Pearson

24   to publish a promotional story ***before*** the Secondary Offering – was either

25   knowingly, or with deliberate recklessness, misleading when made.

26

27

28

### 2. The Stock Option Grants the Insider Defendants and Compensation Committee Awarded Themselves Could Not Have Been More Perfectly Timed

82. During the Class Period, the Compensation Committee and Defendant Kriegsman, who attended all meetings of the Compensation Committee, violated CytRx's shareholder-approved equity plan, the 2008 Stock Incentive Plan (the "2008 Plan," or "Amended Plan"), to take personal advantage of the stock manipulation scheme alleged herein.

83. On November 21, 2008, the Board adopted the 2008 Plan which the Company's shareholders approved at the Company's 2009 annual meeting.  On March 22, 2012, the Board adopted the first two amendments to the 2008 Plan to set: (a) the aggregate number of shares of common stock subject to the 2008 Plan at 5,000,000 shares; and (b) the limitation on awards of stock options during any twelve-month period to any one participant at 500,000 shares. The Company's shareholders approved these amendments at the Company's 2012 annual meeting held on May 14, 2012.

84. On May 3, 2013, the Board adopted, subject to shareholder approval, the third and fourth amendments to the 2008 Plan to set: (a) the aggregate number of shares of common stock subject to the 2008 Plan at 10,000,000 shares; and (b) *increase* the limitation on awards of stock options during any twelve-month period to any one participant to 1,000,000 shares.  The Company's shareholders later approved these amendments at the 2013 annual meeting held on July 11, 2013.

85. On December 11, 2013, CytRx filed a Form 8-K with the SEC disclosing that, on December 9, 2013, the Compensation Committee approved grants made the previous day to themselves and Director Defendant Ignarro of nonqualified stock options to purchase 180,000 shares of CytRx's common stock at an exercise price equal to the closing market price of CytRx's common stock on December 10, 2013.  On December 12, 2013, Defendants Ignarro, Rubinfeld,

Wennekamp, Link and Selter disclosed that they each received on December 10, 2013, a grant of 180,000 stock options at an exercise price of $2.39. Then, on December 11, 2013, CytRx announced its historic aldoxorubicin Phase 2b results which caused the Company's share price to jump 68%, and generating an instantaneous $3 million for the Director Defendants.

86. In addition to the nonemployee Director Defendant grants, the Compensation Committee also granted stock option awards to Defendants Kriegsman and Caloz on December 10, 2013. Defendant Kriegsman alone was awarded **925,000** stock options at an exercise price of $2.39 on December 10, 2013 (more than double the amount awarded to him in all of 2012, which generated over $3 million for Defendant Kriegsman in one day), and Defendant Caloz was granted 150,000 stock options on December 10 at an exercise price of $2.39.

87. The Company's 2013 Annual Report filed March 5, 2014 later revealed that the Compensation Committee awarded stock option awards totaling **2.9 million** shares to the Company's highest-ranking insiders – including the Director Defendants and Defendants Kriegsman and Caloz – at an exercise price of $2.39.

88. Hence, while the Company had only **3.4 million** options outstanding as of September 30, 2013, the day before announcing the most important news in the Company's history on December 11, 2013, the Board issued more than 85% of the number of those options to its officers and directors. As of May 17, 2013, 2.5 million total options had **ever** been issued pursuant to the 2008 Plan and Amended Plan.

89. The Proxy Statement on Form 14A that CytRx filed with the SEC on May 1, 2014 (the "Proxy") demonstrate how the Insider Defendants knew about the Phase 2b clinical trial results prior to the massive December 2013 options grants. The Proxy represented that one of the Company's performance goals for no

later than December 2013 was to "complete the aldoxorubicin Phase 2b STS clinical trial." By granting the spring-loaded options on December 10, 2013, the Compensation Committee and Defendant Kriegsman granted awards which they knew would be "in the money" after the positive news regarding the global Phase 2b clinical trial was disclosed that day.

90. Despite all of the foregoing, the 2013 Annual Report, misleadingly represented that the Compensation Committee had never timed the release of material information for the purpose of affecting the value of stock option awards:

> We have no program, practice or plan to grant stock options to our executive officers, including new executive officers, in coordination with the release of material nonpublic information. **We also have not timed the release of material nonpublic information for the purpose of affecting the value of stock options or other compensation to our executive officers, and we have no plan to do so**.

91. This representation was horribly false. At the time the Compensation Committee granted the stock option awards on December 10, 2013, the Insider Defendants knew about the positive results of the Phase 2b aldoxorubicin clinical trial, and timed the grants to coincide perfectly with the "most important news" in the Company's history. In fact, as evidenced by the Company's October 10, 2013 statement made in a prospectus filed with the SEC that "[w]e *expect to report in December 2013 final, top-line data for the global Phase 2b clinical trial*," the Board and Insider Defendants were actively monitoring the aldoxorubicin trial and knew, or deliberately disregarded, that CytRx would obtain the results of the aldoxorubicin trial in December 2013.

92. The 2013 Annual Report also misrepresented that the Compensation Committee did not make option grants on preset dates, but rather on or about the end of each fiscal year in conjunction with regular annual executive compensation

determinations.  Previously, in conjunction with recent annual meetings of CytRx shareholders, each nonemployee director whose term as a director was to continue following the meeting was granted nonqualified stock options to purchase only 50,000 shares of CytRx common stock at an exercise price equal to the market value of CytRx common stock on the grant date.  However, in December 2012, the year before the spring-loaded grants were made, the Board suspiciously modified the timing of nonemployee director grants to coincide with year-end compensation decisions.  The Compensation Committee and other directors profited handsomely as a result thereof.

93.     Ultimately, the December 10, 2013 spring-loaded option awards were the largest director grants *ever* made to CytRx insiders and nearly doubled the amount of compensation that each of the directors had received in 2012, and were *four times* the compensation each director had received in 2011.  In addition, on March 4, 2014 – right before the Pearson Report appeared online – Defendant Kriegsman increased his base salary from $700,000 to $850,000 and awarded himself a handsome sudden "retention" bonus of $300,000 to compliment the 925,000 stock options grants he was awarded.  In effect, Defendant Kriegsman awarded himself a "performance" bonus along with massive stock option grants for using Company funds to pay DreamTeam to boost the Company's share price and, in turn, his performance level which was tied to the Company's share price performance.

## C.     The Class Period Ends

94.     On March 13, 2014, the last day of the Class Period, Mr. Pearson published his exhaustive report on finance website *Seeking Alpha* called "Behind the Scenes with DreamTeam, CytRx and Galena."  Prior to publishing the report, Mr. Pearson: (i) notified the SEC about his findings; (ii) contacted Defendants Haen and Meyer, Mr. Mylant and Michael McCarthy of Dream Team; and (iii) sent

an email to a neutral third party and to his attorney advising them about his investigation.  Mr. McCarthy declined to comment.

95.  Confirming the Insider Defendants' knowledge and/or willful blindness to the stock manipulation scheme, the Pearson Report concluded that CytRx's "[m]*anagement will have a very difficult time convincing investors that 'we didn't know*.' The articles were provided from Dream Team directly to CytRx … Management then edited and approved the articles and ***would have seen the lack of disclosure***.  When they appeared in final publication there was again ***no disclosure***.  And it seems no coincidence that there appears to have been ***great urgency to get these articles in almost exact proximity to sales/issuances of stock by insiders*** …"  In addition to confirming that the Insider Defendants knew about the lack of payment disclosure in the draft promotional articles, the Pearson Report also detailed, in part, how:

> [A]rticles were provided from Dream Team directly to CytRx[]…. When they appeared in final publication there was again no disclosure…. [And there was] ***great urgency to get these articles in almost exact proximity to sales/issuances of stock by…CytRx*** [in the Secondary Offering].

> The promotional articles and the paid retention of the Dream Team Group were coordinated with the release of news and data from [CytRx] such that they ***coincided with the*** [***Company's***] ***share prices*** [] ***rising dramatically***.  News events included items like the completion of Phase 2 trials, the inception of new trials and the receipt of an SPA from the FDA. Clearly these would all normally be expected to have a positive effect on their own. Yet ***management used coordinated articles in the media to interpret and amplify the effect of the news which it had released***.

The promotional campaigns by Dream Team extended to various websites including Forbes, TheStreet.com, Motley Fool, Wall Street Cheat Sheet and Seeking Alpha.  Multiple aliases were used, some of which pretended to be hedge fund managers.  At least 13 articles on CytRx alone have now been removed, most of those during the past two days alone.

96.     In response to the publication of the Pearson Report, CytRx's share price immediately fell approximately 13% in one day to close at $4.17 on March 13, 2014, on unusually heavy trading volume of over 11 million shares.  As investors continued to digest the gravity of the disclosures over the next several days, the Company's shares continued to fall closing at $3.97 on March 20, 2014.  To this day, the Company's share price has yet to recover from the materialization of the risk that the Exchange Act Defendants' scheme inflicted on the Company during the Class Period.

**D.      Post-Class Period Events**

97.     On March 15, 2014, a story appearing on *Barron's* called "An Insider's Tale of a Stock Promotion Plan: An Investor Explains How He Was Recruited to Boost Two Biotech Stocks with Articles on Websites," elaborated on the suspect relationship between the virtually simultaneous stock promotion schemes at Galena and CytRx, in part, as follows:

In many respects, CytRx and Galena have much in common.  Both companies are developing treatments for various types of cancer and both are far from turning a profit.  Gelana [sic] was originally a ***subsidiary of CytRx*** but was spun off from the company. ***CytRx CEO Steven A. Kriegsman, also on Galena's board, sold shares of Galena in January before the stock faltered following negative press related to the online-article controversy***.

And the two companies' shares have moved in similar fashion. Last November, both stocks were hovering near $2 but then had big moves in the next two months, possibly helped by favorable press attention.  Shares in Galena hit $7.77 a share in late January.  A slew of corporate directors actively sold shares that month.

Meanwhile, shares of CytRx rose to $8.35 in late January. ***Executives were able to benefit from the high share price with an $86 million equity offering*** on January 31.  Today, Galena and CytRx are trading at roughly $3 and $4 a share, respectively.

98.    On March 24, 2014, the *Los Angeles Business Journal* noted that "CytRx Corp. was involved in a questionable stock promotion case made investors skittish last week.  The company's stock took a dive after Richard Pearson, a writer for investor website Seeking Alpha, reported he was concerned that the company was involved in unethical touting of its stock. The Seeking Alpha report sent shares down 15 percent to close at $4.05 for the week ended March 19, making CytRx the biggest loser on the LABJ Stock Index."

99.    On June 27, 2014, the *Los Angeles Business Journal* again highlighted that the "week's biggest loser was CytRx Corp., a Los Angeles biopharmaceutical firm. CytRx shares fell 19 percent to $4.02."  Bereft of its stock touting scheme, CytRx's stock continues to trade far below its previous artificially inflated figures at $2.50 per share.

100.    On August 21, 2014, Mr. Pearson wrote a follow-up report about his findings appearing on *Seeking Alpha* with several poignant "lessons" about CytRx's stock touting scheme as alleged herein:

First, investors need to realize that their views on the ***company's prospects were undeniably shaped by a distorted paid promotion***. Investors then need to seriously reconsider if they really

38

understand the drug's prospects at all or if they were actually heavily persuaded by the promo campaign.

Second, if the drug did have such fantastic prospects, then there should have been no need to conduct a *risky and illegal stock promotion campaign*.

Third, involvement in an undisclosed promotion campaign speaks heavily to the *character of management*.  This is very important.

101.  The same day, in the article "Galena CEO Fired Following Stock-Promotions Scandal," Mr. Feuerstein reported that Galena's CEO, Mark Ahn, has been "fired by the board of directors at a special meeting" for his role in the stock manipulation scheme.  In a subsequent report, Mr. Feuerstein highlighted how:

Galena CEO *Ahn pocketed $2.8 million* from the sale of Galena stock.  At the same time, [Defendant] *Kriegsman hauled in $2.1 million* for himself by selling Galena shares. We still don't know how Galena and DreamTeam connected, but CytRx was also a DreamTeam client. DreamTeam employees, *writing under false names, published misleading and promotional articles about CytRx and its experimental cancer drug aldoxorubicin* – the same tactics used for Galena.

**E.    Defendants' Materially False and Misleading Class Period Statements and Omissions**

    **1.    The Promotional Articles Were Materially False and Misleading When Published Because they Omitted Material Facts**

102.  The Exchange Act Defendants had at least fourteen promotional "news" stories published touting CytRx before and during the Class Period.  The articles were drafted by Defendant Meyer or John Mylant and then reviewed,

edited and approved by Defendants Haen and Kriegsman prior to their dissemination to the investing public, including the following:

(1) "Aldoxorubicin: The Drug CytRx Investors Should Be Watching" at *Motley Fool* (Feb. 10, 2014) by "James Johnson" **[actually Defendant Meyer]**;

(2) "CytRx Is Heading to a Pivotal Trial" at *Wall St. Cheat Sheet* (Feb. 4, 2014) by "John Rivers" **[actually Defendant Meyer]**;

(3) "3 Newsworthy Biotech Stocks: BioDelivery, CytRx, TG Therapeutics" at *Wall St. Cheat Sheet* (Feb. 3, 2014) by "James Ratz" **[actually Defendant Meyer]**;

(4) CytRx Corp. Is a High-Flying Stock" at *Wall St. Cheat Sheet* (Jan. 22, 2014) by "James Ratz" **[actually Defendant Meyer]**;

(5) "CytRx Corporation Poised For Success In 2014" at *Seeking Alpha* (Dec. 31, 2013) by "Equity Options Guru" **[actually Defendant Meyer]**;

(6) "The Race to Develop a Brain Cancer Treatment Takes an Interesting Turn" at *Forbes* (Dec. 27, 2013) by Defendant Meyer;

(7) "Inaccurate Article Sends CytRx Shares Lower" at *Wall St. Cheat Sheet* (Dec. 18, 2013) by Defendant Meyer;

(8) "Is CytRx Corporation the Next Pharmacyclics?" at *Wall St. Cheat Sheet* (Dec. 13, 2013) by "James Ratz" **[actually Defendant Meyer]**;

(9) "CytRx Surges as Aldoxorubicin Dominates Doxorubicin in Phase IIB Tests" at *Seeking Alpha* (Dec. 12, 2013) by John Mylant;

(10)  "CytRx Corporation Soars on Positive Phase 2b Sarcoma Data" at *Wall St. Cheat Sheet* (Dec. 11, 2013) by Defendant Meyer;

(11)  "CytRx Corporation Offers Hope for Brain Cancer Patients" at *Wall St. Cheat Sheet* (Dec. 5, 2013) by Defendant Meyer;

(12)  "Aldoxorubicin Continues to Prove Itself as a Viable Cancer Treatment" at *Seeking Alpha* (Nov. 19, 2013) by John Mylant;

40

(13)   "CytRx Surges Ahead With Positive Drug Data" at *Seeking Alpha* (Nov. 1, 2013) by "Equity Options Guru" **[actually Defendant Meyer]**;

(14)   "CytRx Corporation Remains an Undiscovered Opportunity in the Cancer Space" at *Seeking Alpha* (Sep. 18, 2013) by "Equity Options Guru" **[actually Defendant Meyer]**.

103.   The foregoing articles were each materially false and misleading, and were known by the Exchange Act Defendants to be misleading, or were deliberately disregarded as such, at the time they were disseminated to the market because they failed to disclose that: (i) CytRx had paid DreamTeam to tout CytRx's current performance and future prospects; (ii) Defendants Kriegsman and Haen directly reviewed, edited and approved the articles prior to their publication; (iii) Defendant Meyer used false aliases and he and Mr. Mylant failed to disclose their material relationship to CytRx in the articles; and (iv) as a result of the foregoing, the promotional articles were materially misleading at all relevant times.

104.   In addition to misleading investors by omitting the material facts referenced above, the promotional articles and follow-up MissionIR blog posts referenced in ¶¶105-142, *infra*, also made **affirmatively** materially false and misleading Class Period statements about CytRx and its prospects.

### 2.   The September 18-19, 2013 Promotional Articles and MissionIR Blog Post Are Actionable

105.   On September 18, 2013, the Exchange Act Defendants published an article promoting CytRx under Defendant Meyer's alias "Options Equity Guru" on *Seeking Alpha*.   The article, "CytRx Corporation Remains an Undiscovered Opportunity in the Cancer Space," misleadingly featured CytRx alongside far larger and more established biopharmaceutical companies Celldex Therapeutics, Inc. ("Celldex") and Seattle Genetics, Inc. ("Seattle Genetics").   Celldex, for instance, has a market capitalization of approximately $1.3 billion, and Seattle Genetics traded at nearly $50 per share on September 18, 2013 with a market

capitalization of around $5 billion.  CytRx's market capitalization, by contrast, is roughly $155 million and its common stock then traded at approximately $3.00 per share.

106.   In the article, the Exchange Act Defendants described CytRx as a once-in-a-lifetime investment opportunity with "world class" potential in the oncology market, stating that "it is quickly becoming a diversified **powerhouse** with the potential to treat several illnesses within the oncology space. Given all the potential, it's **surprising that the rest of the market hasn't caught on yet.**" The article added that:

> [T]he companies involved in this space are attempting to create the next breakthrough therapy that can help alleviate suffering for many patients around the world. One such company, CytRx Corporation (CYTR), **appears poised for greatness** but it hasn't participated in the cancer rally over the past few years which begs the question, why not? It appears the market has simply forgotten about CytRx while the major players [like Celldex and Seattle Genetics] continue to soar in value.  Is this a problem or an opportunity? **I believe it's a major opportunity**.
>
> *          *          *
>
> Although CytRx is still a small company in terms of market capitalization, the fact remains that it is quickly becoming a diversified **powerhouse** with the potential to treat several illnesses within the oncology space.  Given all the potential, it's **surprising that the rest of the market hasn't caught on yet**.
>
> *          *          *
>
> **One of the primary risks for micro-cap biotechnology stocks is secondary offerings** which can dilute the holdings of investors.  The

42

cost of conducting trials, especially several of them, can be cash intensive. Since these companies aren't generating revenue, the need for cash can be even more problematic. ***However, CytRx appears to be bucking the trend with an extremely strong cash position***. As of the end of the second quarter 2013, the company had approximately $28 million in available cash and cash equivalents. Currently, the company's monthly cash burn rate appears to be between 1.5 million – 2 million.  If that continues to hold true, the current cash should be able to take the company through ***at least the end of 2014 without having to raise more cash***.  Hopefully, as the company continues to progress, the share price will be much higher at that point and the company won't have to sell as many shares to raise the necessary cash.

*     *     *

CytRx appears to have the makings of a company poised for a significant run over the next couple of years.  The risks appear to be minimal while the potential appears to be enormous particularly if aldoxorubicin works for glioblastoma.  Further, the unique oncology delivery platform could lead to one or more major strategic alliances with a big pharmaceutical or biotech company making it an extremely valuable asset.

*     *     *

I wrote this article myself, and it expresses my own opinions.  ***I am not receiving compensation for it*** … ***I have no business relationship with any company whose stock is mentioned in this article***.

107.   The statements and other representations referenced in ¶¶105-106, *supra*, were materially false and misleading when made because the Exchange Act

43

Defendants either knew or were deliberately reckless in not knowing, *inter alia*, that: (i) the representations about CytRx's "potential" and Defendant Meyer's purported "surpris[e]" were neither objective nor independent; (ii) by comparing CytRx to Celldex and Seattle Genetics, investors were given the misleading impression that CytRx was a large, profitable company when, in truth, CytRx had yet to turn a profit; (iii) the statements regarding the Company's "strong cash position" and capacity to reach the end of 2014 without consummating a secondary offering was false because the Company consummated two secondary offerings before the end of 2014 – one, only a month later on October 10, 2013 and, another, on January 31, 2014; and (iv) by stating that CytRx was a "powerhouse," and that it was "surprising that the rest of the market hasn't caught on yet," investors were being lured into purchasing the Company's securities based on the misrepresentation that Defendant Meyer had not received payment for the article and had no material relationship to CytRx.

108.  An additional feature of the Exchange Act Defendants' scheme was that DreamTeam would then tout the misleading articles on its **own** websites, further adding to the contrivance that they had been written by independent and objective sources.  The day after the September 18 article referenced in ¶106 above was published, for instance, MissionIR misleadingly "covered" it on its blog, misleadingly representing that the author was someone with the name "Equity Options Guru."  In fact, DreamTeam, MissionIR and all of the Exchange Act Defendants knew, or deliberately disregarded, that "Equity Options Guru" was Defendant Meyer.  None of the Insider Defendants took any steps during the Class Period to correct the false impression created among investors by the blog posts or related articles regarding Defendant Meyer's true identity or his material relationship to CytRx.

109.   A short time after the article was published, and while the price of the Company's common stock was artificially inflated, on October 8, 2013, CytRx and the Insider Defendants suddenly announced a spot secondary offering generating $25.9 million in illicit proceeds for the Company after assuring investors that the Company had enough cash "through at least the end of 2014." *See* ¶106, *supra*.

### 3.      The December 5, 2013 Promotional Article Is Actionable

110.   On December 5, 2014, the Exchange Act Defendants published "CytRx Corporation Offers Hope for Brain Cancer Patients" on *Wall St. Cheat Sheet*.  In it, and without any safe-harbor warnings for forward-looking statements, they misleadingly represented that CytRx could "reap big rewards," and that the value of its common stock could soon "rally [ ] because the company recently announced that it was beginning a Phase 2 trial in an attempt to offer a viable treatment for [a] deadly disease."  The article then added, in part, the following materially misleading statements:

> Although investing in a small-cap biotechnology certainly has its risks, CytRx appears to be making ***all the right moves***. Most biotech analysts consider CytRx, Celldex, ImmunoCellular, and Northwest Biotherapeutics to be the leaders for developing an effective treatment for GBM. Given that the latter 3 companies have already seen their rally, it appears to be ***only a matter of time*** before CytRx also has its ***day in the sun***.

111.   In response to the story, CytRx's stock price rose nearly 50% to $6.90 despite the fact that CytRx had not directly released any news since November 20, 2013.

112.   The statements and other representations in the article referenced in ¶110, *supra*, were materially false and misleading when made because the Exchange Act Defendants knew or willfully disregarded that the article failed to

disclose that: (i) CytRx had paid DreamTeam and Defendant Meyer to publish the article; (ii) Defendants Kriegsman and Haen reviewed, edited and approved the article prior to publication; and (iii) as a result of the foregoing, the story "CytRx Corporation Offers Hope for Brain Cancer Patients" was materially false and misleading at all relevant times.   In addition, neither CytRx nor the Insider Defendants took any steps during the Class Period to disclose that Defendant Meyer had been paid to misrepresent that it was "***only a matter of time*** before CytRx also has its day in the sun."

113. On December 9, 2013, market analysts at SADIF published an independent, legitimate due diligence report about CytRx, noting that:

> CytRx Corporation is a low quality company with a negative outlook.
>
> CytRx Corporation has weak business growth and is run by inefficient management.  The trend in CytRx Corporation fair value exchange rate against its closest rated-competitor, StemCells Inc., has been appreciating over the past 2 weeks. When compared to its second closest peer, Vical Incorporated, CytRx Corporation shows greater undervaluation and is equally likely to underperform the market.

114. SADIF added that while, the "company's share price has risen sharply over the past year, [ ] we believe underlying fundamentals to be the primary determinant of long-term performance.… Overall, we believe CytRx Corporation to be an average long-term investment."

### 4. The December 11-13, 2013 Promotional Articles Are Actionable

115. Then, on December 11, 2013, just two days after the negative SADIF report, the Company suddenly announced the "historic" results of its Phase 2b drug testing of aldoxorubicin.  The same day, Defendant Meyer published an article on *Wall St. Cheat Sheet* touting the Company's announcement in "CytRx Corporation

Soars on Positive Phase 2b Sarcoma Data." The story was materially false and misleading for the same reasons set forth in ¶103, *supra*.

116. In response to this news, CytRx shares closed 57% higher on December 12, 2013 at $6.12 on massive volume of 31 million shares traded.

117. On December 12, 2013, the Exchange Act Defendants, *via* Mr. Mylant, published a promotional story called "CytRx Surges as Aldoxorubicin Dominates Doxorubincin in Phase IIB Tests" on *Seeking Alpha*. The story misrepresented that "I continue to educate investors about the potential for this company as a long-term investment and today's clinical findings support *my belief* that aldoxorubicin has the potential to be a *huge* revenue generator for CYTR." These statements were materially misleading because they created the false impression among investors that Mr. Mylant's "belief" was independent and genuine when, in truth, he had been paid by DreamTeam and CytRx to promote the Company's prospects. Again, because these statements did not carry any safe-harbor warning or disclaimer, they are entitled to no such protection.

118. The statements and other representations referenced in ¶117, *supra*, were materially false and misleading because the Exchange Act Defendants knew or deliberately disregarded that the article failed to disclose that: (i) CytRx had paid DreamTeam and Mylant to publish the article; (ii) Defendants Kriegsman and Haen reviewed, edited and approved the article prior to publication; and (iii) as a result of the foregoing, the "CytRx Surges as Aldoxorubicin Dominates Doxorubincin in Phase IIB Tests" was materially false and misleading at all relevant times. Defendants Haen and Kriegsman knew or deliberately disregarded that the Company had omitted these material facts because they were personally editing and approving the articles *via* Defendant Meyer as alleged in ¶¶69-75, *supra*.

47

119.   Then, on December 13, 2013, the Exchange Act Defendants published a *third* consecutive-day article to further amplify the Company's December 11 press release called "Is CytRx Corporation the Next Pharmacylics?" under Defendant Meyer's bogus alias "James Ratz."[13]   The article misleadingly represented that the "*biggest story* this week in biotechnology has been the *explosion* seen in shares of CytRx Corporation.  In fact, the recent move *catapults* CytRx to one of the top performing biotechnology stocks of 2013."[14]  The same article went so far as to misrepresent that, because insiders at the Company were buying Company shares – the "smart money" in Defendant Meyer's words – "it was *only a matter of time* before the *explosion* [in the stock price] occurred."  In truth, not a single Insider Defendant had directly purchased a single share of the Company's common stock in the previous two years and the "explosion" the Exchange Act Defendants promised has not materialized.

120.   The statements and other representations referenced in ¶119, *supra*, were materially false and misleading because the Exchange Act Defendants knew or deliberately failed to disclose that: (i) CytRx had paid DreamTeam and Defendant Meyer to publish the article; (ii) Defendants Kriegsman and Haen reviewed, edited and approved the article prior to publication; (iii) Defendant Meyer used a false alias to publish the story; and (iv) as a result of the foregoing,

---

[13]   Unlike microcap company CytRx, Pharmacylics Inc. has a market capitalization of over $9 billion and traded at approximately $110 per share in December 2013.

[14]   In truth, the "biggest" story in biotechnology that week was likely the announcement by Puma Biotechnology, Inc. that its drug neratinib was effective against forms of breast cancer.  Since then, that company's share price has risen from about $50 per share to close at around $250 per share this past week.  By contrast, CytRx's share price is trading back at its pre-stock touting levels at approximately $3 per share.

48

"Is CytRx Corporation the Next Pharmacylics?" was materially false and misleading at all relevant times.

121.   Moreover, the article was rendered misleading by the Exchange Act Defendants' failure to disclose that the primary reason there had been an "explosion" in CytRx's share price that week was due to the fact that they had published three phony news articles promoting the Company's securities between December 11 and 13, 2013.  Defendants Haen and Kriegsman knew or deliberately disregarded that the Company had omitted these material facts because they were personally editing and approving the articles as alleged in ¶¶69-75, *supra*.

122.   In a follow blog post titled "CytRx Corp. Price Rally, Potential Mirrors Pharmacylics Performance," that covered Defendant Meyer's December 13, 2013 story, MissionIR misleadingly stated that "James Ratz" (actually Defendant Meyer) had written an article highlighting how "CytRx may be *on the verge of altering the cancer landscape*," and that "institution[al] [investors] on board are likely adding to their already *massive* holdings …"  In truth, institutional investors own just 26% of the Company's shares and MissionIR, a DreamTeam affiliate, knew that "James Ratz" was, in fact, Defendant Meyer.  In addition, far from mirroring Pharmacylics performance, CytRx has yet to generate any revenue.

123.   None of the Insider Defendants took any steps during the Class Period to correct the false impression created by the blog post or article regarding Defendant Meyer's true identity or his material relationship to CytRx.  The blog post was also materially misleading for the same reasons set forth in ¶120, *supra*.

124.   The promotional articles and blog posts referenced in ¶¶115-119, 122 *supra*, had a dramatic effect on the Company's stock price and trading volume which reached an extraordinary 31 million shares traded on December 11 and 12, 2013, respectively, and 19 million shares on December 13, 2013.  The Company's average daily trading volume is roughly 800,000 shares.  Moreover, as a direct

49

result of the three misleading articles referenced above in ¶¶115-122, *supra*, CytRx's share price ended that week 127% higher.

### 5.   The December 18-19, 2013 Promotional Articles and Blog Post Are Actionable

125.   On December 16, 2013, *TheStreet* published an independent, legitimate news article called "CytRx Directors Are $3 million Richer with Well-Timed Stock Option Grants." On December 18, 2013, the Exchange Act Defendants responded by publishing the article, "Inaccurate Article Sends CytRx Shares Lower" on *Wall St. Cheat Sheet* to undermine the December 16 report, stating:

> Unfortunately, an inaccurate report was published on Monday, December 16 by *The Street's* Adam Feuerstein.  The report contained several inaccuracies, which caused shares of CytRx to sell off by more than 10 percent…. The Street's article seemed to imply that CytRx management purposefully issued option grants to insiders knowing that a press release would cause the shares to spike shortly after.  That is inaccurate…. Additionally, let's keep the option grants in perspective.  Mr. Feuerstein seems to take offense with CytRx insiders being wealthier by a cumulative $3 million.  ***That is a pittance*** compared to the increased value of the business …With all the stories of corporate excess in today's world, this hardly qualifies as an example of that.

126.   With the Exchange Act Defendants' knowledge and/or their willful blindness, MissionIR then published a misleading blog post covering the December 18 story called "Wall Street Cheat Sheet Contributor Corrects Allegedly 'Inaccurate' CytRx Corp. (CYTR) Article."  In it, MissionIR added that Defendant Meyer had reaffirmed his bullish position on CytRx with the materially misleading representation, unaccompanied by any safe-harbor warning, that the Company was

50

poised to purportedly "***revolutionize the future of cancer treatment***."   By participating in such conduct, the Exchange Act Defendants engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of CytRx publicly-traded common stock.

127.   The statements and other representations referenced in ¶¶125-126, *supra*, were materially false and misleading because the Exchange Act Defendants either knew or deliberately disregarded that the story failed to disclose that: (i) CytRx had paid DreamTeam and Defendant Meyer to publish the article; (ii) Defendants Kriegsman and Haen reviewed, edited and approved the article prior to publication; and (iii) as a result of the foregoing, the promotional story and follow-on blog post referenced in ¶¶125-126 were materially false and misleading at all relevant times.

128.   In addition, Defendants Haen and Kriegsman knew, or deliberately disregarded, that the Company had omitted these material facts because they were personally editing and approving the articles as alleged in ¶¶69-75, *supra*.  None of the Insider Defendants took any steps during the Class Period to correct the false impression created among investors by the article regarding either Defendant Meyer's true identity or his material relationship to CytRx.

### 6.      The December 27, 2013 Promotional Article Is Actionable

129.   On December 27, 2013, the Exchange Act Defendants published "The Race to Develop a Brain Cancer Treatment Takes an Interesting Turn" on *Forbes*. The article represented that CytRx had obtained "remarkable results" in a recent drug trial and, without any safe harbor warning, "appears poised for a significant run in the months and years ahead as the company's platform continues to be validated by science."   The article also misleadingly lured investors "***to consider taking a position before the share price really starts to take off***."

130.   Following the publication of the December 27 *Forbes* article, the Company's stock price rose nearly 50% from $4.62 to close on January 2, 2014 at $6.90 even though CytRx had not made any announcements between December 11, 2013 and January 8, 2014.   The same article then misleadingly added that:

> As of the end of the third quarter, CytRx had approximately $23 million in available cash and short-term investments.   That amount does not include the $25.9 million (less fess) that the company raised from its October offering.   Given the company's monthly burn rate of about $2 million, the company's cash balance should be sufficient to fund operating expenses **well into 2015 (*at a minimum*)**.

131.   Then on January 31, 2014, and while the Company's shares were trading at their highest Class Period levels, CytRx stunned investors by announcing its need to bolster its cash balance in the Secondary Offering stating in an Exhibit to the January 30, 2014 press release on Form 8-K announcing the offering that it intended to "use the net proceeds of the offering to fund clinical trials of its drug candidate aldoxorubicin and for general corporate purposes, which may include working capital, capital expenditures, research and development and other commercial expenditures."   This announcement, of course, directly contradicted the Company-approved representation in Defendant Meyer's December 27, 2013 *Forbes* article that CytRx's cash balance was "sufficient to fund operating expenses well into 2015 (at a minimum)."[15]

132.   Moreover, although statements in the Company's "Code of Business Conduct and Ethics" represented at all relevant times that CytRx sought "to outperform [its] competition fairly and honestly. We seek competitive advantage

---

[15]   The Exchange Act Defendants used this same method to mislead investors about the Company's cash position before the October 10, 2013 secondary offering.   *See* ¶¶106-107, *supra*.

52

through superior performance, never through unethical or illegal business practices," the December 27, 2013 *Forbes* promotional story brazenly attacked CytRx's competitors.   Specifically, the article assailed ImmunoCellular Therapeutics, Ltd. and Northwest Biotherapeutics, Inc. – stating that ImmunoCellular Therapeutics "shouldn't give investors much confidence about the company's future," and that Northwest Biotherapeutics "was a colossal failure." The Exchange Act Defendants then represented that "it appears that ImmunoCellular Therapeutics and Northwest Biotherapeutics aren't quite the players in the GBM race that we once thought. So the question remains, who is?" Of course, the story then surmised that, "[w]ell one company that appears to be making significant strides is **CytRx Corporation**."

133.   The statements and other representations in ¶¶129-132, *supra*, were materially false and misleading because the Exchange Act Defendants either knew or deliberately disregarded that the article failed to disclose that: (i) CytRx had paid DreamTeam and Defendant Meyer to publish the article; (ii) Defendants Kriegsman and Haen reviewed, edited and approved the article; and (iii) as a result of the foregoing, "The Race to Develop a Brain Cancer Treatment Takes an Interesting Turn" was materially false and misleading at all relevant times.

134.   In addition, Defendants Haen and Kriegsman knew or deliberately disregarded that the Company had omitted these material facts because they were personally editing and approving the articles as alleged in ¶¶69-75, *supra*.  None of the Insider Defendants took any steps during the Class Period to correct the false impression created among investors by the articles or about Defendant Meyer's material connection to CytRx.

### 7.   The January 22, 2014 Promotional Article Is Actionable

135.   On January 22, 2014, the Exchange Act Defendants published yet another misleading story under Defendant Meyer's alias "James Ratz" called

"CytRx Corp. Is a High-Flying Stock," representing that the Company "enjoyed a whopping 335 percent return over the past 52 weeks [and that] a *much higher return is likely in store*." Because this forward-looking statement was not accompanied by any safe-harbor warning, it is entitled to no such protection. The now clearly exaggerated misrepresentation that a "much higher return is likely in store" for those who invested in CytRx, like Plaintiffs and the Class, is actionable.

136. The statements and other representations in ¶135, *supra*, were materially false and misleading because the Exchange Act Defendants knew or deliberately disregarded that the article also failed to disclose that: (i) CytRx had paid DreamTeam and Defendant Meyer to publish the article; (ii) the Insider Defendants reviewed, edited and approved the article prior to publication; (iii) Defendant Meyer used a false alias to publish the story; and (iv) as a result of the foregoing, "CytRx Corp. Is a High-Flying Stock," was materially false and misleading at all relevant times.

137. In addition, Defendants Haen and Kriegsman knew or deliberately disregarded that the Company had omitted these material facts because they were personally editing and approving the articles as alleged in ¶¶69-75, *supra*.

**8.     The February 4, 2014 Promotional Article Is Actionable**

138. Then, in a February 4, 2014, article called, "CytRx Is Heading to a Pivotal Trial" published under Defendant Meyer's alias "John Rivers," the Exchange Act Defendants cynically noted that "CytRx's share price is *highly news sensitive*" and, without any safe harbor warning, assured investors that:

> If CytRx's past share performance is any indicator of its future performance, *investors can expect future news releases with respect to milestone achievements in its product portfolio to be highly security sensitive*…. *In anticipation of strong news flow*, CytRx's shares have increased by more than 200 percent since December 10

[2013].  If CytRx delivers positive results for its three clinical trials and manages to get FDA approval for its **blockbuster** product aldoxorubicin, the share price **could run substantially higher**.  The fact that CytRx holds the **exclusive** worldwide rights to aldoxorubicin only adds to the appeal of this **under-followed pharmaceutical play**.

139.  The statements and other representations in ¶138, *supra*, were materially false and misleading because the Exchange Act Defendants either knowingly or deliberately failed to disclose that: (i) CytRx had paid DreamTeam and Defendant Meyer to publish the article; (ii) Defendants Kriegsman and Haen reviewed, edited and approved the article prior to publication; (iii) Defendant Meyer used a false alias to publish the story; and (iv) as a result of the foregoing, "CytRx Is Heading to a Pivotal Trial" was materially false and misleading at all relevant times.  In addition, the representation that "investors can expect future news releases with respect to milestone achievements in its product portfolio to be highly security sensitive.… In anticipation of strong news flow, CytRx's shares have increased by more than 200 percent" was especially misleading given that the Exchange Act Defendants were engaged in a scheme to publish news releases to generate news flow.

140.  Defendants Haen and Kriegsman knew or deliberately disregarded that the Company had omitted these material facts because they were personally editing and approving the articles as alleged in ¶¶69-75, *supra*.  None of the Insider Defendants took any steps during the Class Period to correct the false impression created by the story among investors regarding Defendant Meyer's true identity, or his material relationship to CytRx.

### 9.    The February 10, 2014 Promotional Article Is Actionable

141.  On February 10, 2014, the Exchange Act Defendants published "Aldoxorubicin: The Drug CytRx Investors Should Be Watching" on *Motley Fool*.

The article was published under Defendant Meyer's alias, "James Johnson."  The same day, MissionIR posted a note on its website that "CytRx Corp.'s (CYTR) Aldoxorubicin Demonstrates Blockbuster Potential, Says Motley Fool Contributor."  The blog post included a web link to the promotional story, and quoted Defendant Meyer's story extensively while misleadingly referring to him as "Johnson."

142.   In the same blog post, MissionIR misleadingly touted the "tremendous growth potential" for CytRx.  Once again, the Insider Defendants either knew or were reckless in not knowing that James Johnson was Defendant Meyer, who was being paid to publish the story without disclosing payment.

143.   The statements and other representations in ¶¶141-142, *supra*, were materially false and misleading because the Exchange Act Defendants failed to disclose that: (i) CytRx had paid DreamTeam and Defendant Meyer to publish the article; (ii) Defendants Kriegsman and Haen directly edited and approved the article; (iii) Defendant Meyer used a false alias; and (iv) as a result of the foregoing, the promotional story and follow-on MissionIR blog post referenced  in ¶¶141-142 were materially false and misleading at all relevant times.

144.   In addition, Defendants Haen and Kriegsman knew or deliberately disregarded that the Company had omitted these material facts because they were personally editing and approving the articles as alleged in ¶¶69-75, *supra*.  None of the Insider Defendants took any steps during the Class Period to correct the false impression regarding Defendant Meyer's true identity, or his material relationship to CytRx.

### F.   The Company's Press Releases and SEC filings Were Materially False and Misleading

145.   In addition to the foregoing materially misleading "news" reports touting CytRx during the Class Period, the Company made several filings with the SEC, and published numerous press releases on its website – all of which failed to

disclose the paid promotion scheme and were therefore each materially false and misleading when made.

### 1. The Company's November 20, 2013 Press Release Was Materially False and Misleading

146. On November 20, 2013, CytRx issued a press release entitled, "CytRx Initiates Phase 2 Clinical Trial with Aldoxorubicin in Patients with Unresectable Glioblastoma Multiforme (BrainCancer)," stating, in relevant part:

> "We were highly encouraged by aldoxorubicin's apparent ability to cross the blood-brain barrier, potentially creating a new approach to attacking brain tumors. We are on track with the rapid development of aldoxorubicin for unresectable GBM, and look forward to having preliminary results from this Phase 2 trial in 2014," said CytRx President and CEO Steven A. Kriegsman. "Should the data from this trial be positive, we plan to file for breakthrough therapy designation with the U.S. Food and Drug Administration, which could expedite marketing approval."

147. The statements referenced in ¶146 were materially false and misleading because they failed to disclose the following material facts: (i) that CytRx had retained DreamTeam to publish articles designed to inflate the price of CytRx stock; (ii) Defendants Kriegsman and Haen directly edited and approved the articles prior to publication; (iii) Defendant Meyer used false aliases and failed to disclose his material relationship to CytRx; and (iv) as a result of the foregoing, the Company's November 20, 2013 press release was false and misleading at all relevant times.

### 2. CytRx's December 11, 2013 Press Release on Form 8-K Was Materially False and Misleading

148. On December 11, 2013, CytRx filed a press release on Form 8-K with the SEC titled "CytRx Reports Highly Statistically Significant Positive Results

57

from its Global Phase 2b Clinical Trial" that Defendant Caloz signed.     Therein, the Company, in relevant part, stated:

> CytRx President and CEO Steven A. Kriegsman commented, "Aldoxorubicin is a major advance for treating soft tissue sarcomas. We extend gratitude to the investigators who so adeptly managed the conduct of this trial and to the patients and their families who participated in it. These data prove that by applying our proprietary linker technology to target the release of doxorubicin directly at the site of cancer we are able to safely increase the dosage of doxorubicin by approximately three and one-half to four times with tremendous clinical benefit to the patient."
>
> In the Phase 2b clinical trial aldoxorubicin was found to be safe and well tolerated. All adverse events in subjects treated with aldoxorubicin were consistent with the known side effects of doxorubicin, resolved before the administration of the next dose and did not require treatment discontinuation. There were no treatment-related deaths in the aldoxorubicin group.

149. The statements referenced above in ¶148 were materially false and misleading for the same reasons set forth in ¶147, *supra*.

150. In addition, the Exchange Act Defendants' promotion scheme was well underway prior to the release of Phase 2b data on December 11, 2013, such that the release of that data likely had a greatly exaggerated effect on the price of CytRx's securities which the Insider Defendants failed to disclose.  The same day, Defendant Kriegsman spoke at the Oppenheimer Healthcare Conference where he reiterated the statements about CytRx contained in the press release, stating:

> [H]ere's our top line phase 2b efficacy results. Assuming you read the press release today, we demonstrated 80% to 100% superiority over the

widely used chemotherapeutic doxorubicin in progression-free survival in first-line soft tissue sarcoma. Our median progression-free survival, our six-month progression-free survival, and our overall survival rates all significantly favored aldoxorubicin over doxorubicin. All efficacy results for aldoxorubicin treatment were highly statistically significant, not just statistically significant compared with dox treatment.  And we are the first and only single agent to surpass dox in soft tissue sarcoma. And it was a multi-center randomized open label phase 2 study, the purpose of which was to investigate the preliminary efficacy and safety of aldox compared to dox in subjects with metastatic locally advanced or unresectable soft tissue sarcomas. And Dr. Levitt will take you through the data. Suffice it to say I think you'll be favorably impressed.

151.   In addition, on a December 11, 2013 conference call with investors to discuss the press release, Kriegsman stated "We don't hold many conference calls at CytRx, as we prefer to reserve them for truly important announcements and developments. ***And that certainly applies to what we are discussing today, which is clearly the most important news in our Company's history***," adding:

But in brief, the results of our global Phase 2 clinical trial were truly outstanding. The trial's primary endpoint and all secondary endpoints measured to date were achieved with high statistical significance under two separate sets of analyses. We met and surpassed the gold standard of clinical trial results and proved in a head-to-head trial that aldoxorubicin is vastly superior to doxorubicin.

Based on these results, we believe that aldoxorubicin is becoming established as a major advancement in treating soft-tissue sarcomas, a widespread and deadly form of cancer. There are

59

approximately 50 types of soft-tissue sarcomas, and they can appear nearly anywhere in the body at any age.

*        *        *

We are moving forward with a highly focused clinical development program that includes advancing aldoxorubicin into a pivotal Phase 3 trial as second-line therapy in soft-tissue sarcomas in the first quarter of 2014, and we are doing so under an FDA Special Protocol Assessment.

So we have the FDA's buy-in regarding trial design and expectations for trial success and, in turn, product approvability. In addition, today's trial results highlight our linker technology as an important breakthrough in developing cancer treatments. We have now clearly demonstrated that the linker helps release 3.5 to 4 times the dose of doxorubicin directly at the tumor -- at the site of the tumors.

We can safely increase the dosage of doxorubicin quite significantly and with tremendous clinical benefit to the patient. CytRx holds the worldwide license to this technology. We are actively working to expand our franchise in this technology to a range of other chemotherapeutics.

In very simple terms, we have improved on a drug whose effectiveness has been limited by toxic side effects that occur as the dose is increased.  Doxorubicin is a very effective drug if, and that is a big if, it can safely get to the cancer cells in sufficient quantity. In this case, more drug means more benefit, and that's exactly what we have been able to do by combining doxorubicin with our linker technology to create aldoxorubicin.

60

The power of our drug is proven by the trial results we are presenting today.

152.  The statements in the December 11, 2013 Form 8-K, and made by Defendant Kriegsman during the same day conference call, were materially false and misleading for the same reasons set forth in ¶147, *supra*.

153.  In addition, Defendants Haen and Kriegsman knew or deliberately disregarded that the Company had omitted the material facts described in ¶147 because they had been personally editing and approving the promotional articles as alleged in ¶¶69-75, *supra*.

154.  The following day, Wainwright analyst Andrew S. Fein issued a report that noted: "[y]esterday, CYTR **surprised** investors with an important and statistically significant win in its Phase IIb study of Aldox" called "With Technology Now Further Validated, We Expect Heightened Interest in Under-Followed Name," rating the Company a "Buy" with a price target of $7.00.

### 3.   CytRx's January 30, 2014 Press Releases on Form 8-K Were Materially False and Misleading

155.  On January 30, 2014, CytRx filed a Form 8-K with the SEC titled "Risk Factors," signed by Defendant Kriegsman that failed to disclose the stock promotion scheme as a risk that could materialize for the Company and its shareholders:

> **Risks Associated With Our Common Stock**
> ***We may experience volatility in our stock price, which may adversely affect the trading price of our common stock.***
>
> The market price of our common stock has ranged from a low of $1.83 to a high of $8.24 per share from January 1, 2013 through January 29, 2014, and it may continue to experience significant volatility from time to time. ***Factors that may affect the market price of our common stock include the following:***

61

- announcements of interim or final results of our clinical trials;

- announcements of regulatory developments or technological innovations by us or our competitors;

- changes in our relationship with our licensors and other strategic partners;

- our quarterly operating results;

- litigation involving or affecting us;

- shortfalls in our actual financial results compared to our guidance or the forecasts of stock market analysts;

- developments in patent or other technology ownership rights;

- acquisitions or strategic alliances by us or our competitors;

- public concern regarding the safety of our products; and

- government regulation of drug pricing.

156.  The risk disclosures above were materially false and misleading because they failed to disclose the following material facts, *inter alia*: (i) that one factor that was affecting the market price of the Company's common stock was that CytRx was paying DreamTeam to issue articles designed to inflate the price of CytRx common stock; (ii) Defendants Kriegsman and Haen directly edited and approved the articles; (iii) Defendant Meyer used false aliases and failed to disclose his material relationship to CytRx; and (iv) as a result of the foregoing, the Company's January 30, 2014 risk disclosures were materially false and misleading at all relevant times.

157.  In addition, in an "Underwriting Agreement" that CytRx was caused to file with the SEC in connection with a January 31, 2014 press release on Form 8-K, Defendant Kriegsman specifically misrepresented that the "***Company has not taken, directly or indirectly, any action designed to or that might cause or result in stabilization or manipulation of the price of the [s]hares***…"   Defendant

62

Kriegsman knew or deliberately disregarded that this statement was misleading because he had taken prior actions to stabilize and manipulate the price of the Company's securities by personally editing and approving the articles as alleged in ¶¶69-75, 78-81, 95, *supra*, and by pressuring Mr. Pearson to publish a story touting CytRx before the Secondary Offering as alleged in ¶¶80-81, *supra*.

### 4. CytRx's 2013 Annual Report and March 5, 2014 Press Release Were Materially False and Misleading

158. On March 5, 2014, the Company filed its 2013 Annual Report which was signed by the Insider Defendants and Director Defendants. The 2013 Annual Report was materially false and misleading for the same reasons set forth in ¶147, *supra*.

159. In addition, the 2013 Annual Report misled investors regarding how stock option grants were awarded at CytRx as alleged in ¶¶82-93, *supra*.

160. Defendants Haen and Kriegsman either knew or deliberately disregarded that the Annual Report had omitted material facts about the stock touting scheme because they were personally editing and approving the articles alleged to be materially misleading as set forth in ¶¶69-75, 78-81, 95, *supra*.

161. On March 5, 2014, CytRx file a press release on Form 8-K with the SEC titled "CytRx Reports 2013 Financial Results On Track to Initiate Pivotal Global Phase 3 Clinical Trial of Aldoxorubicin as Second-Line Treatment for Soft Tissue Sarcoma in the First Quarter of 2014" signed by Defendant Caloz. The same day, the Company issued a press release entitled "CytRx Reports 2013 Financial Results," representing, in relevant part:

> "CytRx achieved a number of important clinical milestones in the aldoxorubicin program in 2013, including the announcement of positive top-line results from our global Phase 2b clinical trial in soft tissue sarcoma (STS) and the initiation of two Phase 2 clinical trials in glioblastoma and Kaposi's sarcoma," said Steven A. Kriegsman,

CytRx President and CEO. "We are entering 2014 on firm financial ground, having recently raised approximately $86 million, before deducting expenses, along with a cash balance of $38.5 million at year end 2013. With this strong balance sheet, we are well funded to execute on our corporate objectives for the foreseeable future."

Mr. Kriegsman added: "Looking forward to 2014, we are well positioned to commence our global Phase 3 pivotal trial of aldoxorubicin as a second-line treatment for STS, and are currently screening patients for entry in the trial. We are also expecting data readouts in the second half of the year from the our ongoing Phase 2 clinical trial of aldoxorubicin in glioblastoma as well as updated results from our global Phase 2b trial of aldoxorubicin in first-line STS."

*     *     *

**Strengthened the Corporate Balance Sheet and Leadership Team.**
In October 2013 and February 2014, CytRx *successfully* completed two public offerings of common stock securing gross proceeds of approximately $26 million and $86 million, respectively. CytRx intends to use the net proceeds of the offering to fund clinical trials of its drug candidate aldoxorubicin and for general corporate purposes, which may include working capital, capital expenditures, research and development and other commercial expenditures.

*     *     *

**Full Year 2013 Financial Results**
CytRx reported cash, cash equivalents and short-term investments of $38.5 million as of December 31, 2013. On February 5, 2014, the Company completed a $86.0 million underwritten public offering, in

64

which it sold and issued 13.2 million shares of common stock at a price of $6.50 per share. Net of underwriting discounts, legal, accounting and other offering expenses, ***the Company received proceeds of approximately $80.5 million***.

162.   The statements referenced above in ¶161, *supra* were materially false and misleading for the same reasons set forth in ¶147 *supra*.

### G.   Defendants Kriegsman's and Caloz's Knowingly False Representations Concerning CytRx's Internal Controls

163.   In addition to the materially misleading statements in promotional articles (§V.E.) and SEC filings/conference calls (§V.F.), the 2013 Annual Report expressly assured investors that Defendants Kriegsman and Caloz, as the Company's CEO and CFO respectively, had "performed an evaluation of the effectiveness of [CytRx's] disclosure controls and procedures," and "[b]ased on [that] evaluation…concluded [that CytRx's] disclosure controls and procedures were effective as of December 31, 2013." Separately, they signed sworn SOX Certifications attached to the Annual Report representing, in relevant part, that:

1.   I have reviewed this annual report on Form 10-K of CytRx Corporation;

2.   Based on my knowledge, this annual report does not contain any untrue statement of a material fact ***or omit to state a material fact*** necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the periods covered by this annual report;

3.   Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4.   The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures

(as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) **Designed such disclosure controls and procedures**, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

(b) **Designed such internal control over financial reporting**, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) **Evaluated the effectiveness of the registrant's disclosure controls** and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the periods covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. **The registrant's other certifying officer and I have disclosed**, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting

66

which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) ***Any fraud, whether or not material, that involves management or other employees*** who have a significant role in the registrant's internal control over financial reporting.

164. The statements referenced in ¶163 were materially false and misleading because Defendants Kriegsman and Haen either knowingly or recklessly failed to disclose the following material facts: (i) that CytRx was paying DreamTeam to inflate the price of CytRx securities; (ii) Defendants Kriegsman and Haen directly edited and approved the promotional articles; (iii) Defendant Meyer used false aliases to publish the stories, and failed to disclose his material relationship to CytRx; and (iv) as a result of the foregoing, the Company's SOX Certifications were materially false and misleading at all relevant times.

## VI.   VIOLATIONS OF THE SECURITIES ACT

165. The Registration Statement contained material false and misleading statements and omitted to state other facts necessary to make the statements made not misleading.  Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this claim is based solely on claims of strict liability or negligence under the Securities Act.

166. On December 6, 2012, CytRx filed with the SEC a Form S-3 Registration Statement, which was declared effective by the SEC on December 21, 2012.  On January 30, 2014, CytRx issued a press release entitled "CytRx Announces Proposed Public Offering of Common Stock," announcing that the Company had filed its Registration Statement with the SEC.  On January 31, 2014, the Company filed its Prospectus with the SEC and made it available to investors.  That same day, 11,500,000 shares of CytRx common stock were offered for sale to the public at $6.50 per share.  The Secondary Offering was completed at 12:00 pm EST on February 5, 2014.

67

167.   The Underwriter Defendants exercised their combined option to purchase an additional 1,725,000 shares of CytRx.   On February 5, 2014, CytRx announced that the Company sold 13,225,000 shares of common stock in the Secondary Offering at the price of $6.50 per share, for total gross proceeds of approximately $86 million.

168.   The Registration Statement failed to disclose CytRx's promotion efforts and the extent to which the Company had been involved in reviewing, editing and approving the promotional articles touting CytRx.   The Company failed to inform investors that it was paying DreamTeam to have laudatory articles published that would result in CytRx's securities to trade at artificially inflated levels at the time of the Secondary Offering.

169.   The "Underwriting Agreement" CytRx filed with the SEC in connection with the Secondary Offering incorrectly represented that the Registration Statement "complied in all material respects with the Securities Act" and that the Prospectus "will not[] contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading."   In addition, the Registration Statement provided certain Risk Factors that failed to disclose the risks associated with defendants' undisclosed paid stock promotion scheme.   The Registration Statement purported to discuss the volatility in the Company's stock price without disclosing that it had been significantly and substantially impacted by the paid articles touting CytRx:

**Risks Associated With This Offering And Our Common Stock**

\*     \*     \*

***We may experience volatility in our stock price, which may adversely affect the trading price of our common stock***.

68

The market price of our common stock has ranged from a low of $1.83 to a high of $8.24 per share from January 1, 2013 through January 29, 2014, and it may continue to experience significant volatility from time to time. Factors that may affect the market price of our common stock include the following:

- announcements of interim or final results of our clinical trials;
- announcements of regulatory developments or technological innovations by us or our competitors;
- changes in our relationship with our licensors and other strategic partners;
- our quarterly operating results;
- litigation involving or affecting us;
- shortfalls in our actual financial results compared to our guidance or the forecasts of stock market analysts;
- developments in patent or other technology ownership rights;
- acquisitions or strategic alliances by us or our competitors;
- public concern regarding the safety of our products; and
- government regulation of drug pricing.

170.   These statements were materially misleading when made because they failed to disclose that: (i) the Company was paying DreamTeam to issue articles, coordinated with Company news releases that were designed to inflate the price of CytRx securities; (ii) Defendants Kriegsman and Haen directly edited and approved the DreamTeam articles; (iii) Defendant Meyer used false aliases to publish them.

171.   In addition to the CytRx officers and directors liable for signing the Registration Statement, the Underwriter Defendants are liable for the materially misleading statements contained in the Registration Statement because they failed

to conduct adequate due diligence which was a substantial factor leading to the harm complained of herein.  In fact, had any of the Securities Act Defendants gone to visit DreamTeam at its headquarters in Indianapolis for any routine due diligence on CytRx's new marketing partner, they would have discovered that DreamTeam was located either in a vacated storefront near a nail salon or in a vacant UPS branch store.

172.   The Underwriter Defendants received approximately $4.5 million in fees and options to purchase an additional 1,725,000 shares of CytRx common stock in the Secondary Offering.  In return for their share of the Secondary Offering, they were willing to merchandize CytRx stock in the Secondary Offering. The Underwriter Defendants arranged a road show prior to the Secondary Offering during which they, and certain of the Insider Defendants, met with potential investors, to review the Company's past and current stock performance as well as reports about the Company.

173.   The Underwriter Defendants also assisted CytRx and the Insider Defendants in planning the Secondary Offering and purportedly conducted an adequate and reasonable investigation into the business and operations of CytRx. Adequate due diligence was required of the Underwriter Defendants in order to price the Secondary Offering at $6.50 per share.  During the course of their due diligence, the Underwriter Defendants had continual access to confidential corporate information concerning CytRx's internal controls and its prospects.

174.   In addition to reviewing internal corporate documents, representatives of the Underwriter Defendants met with CytRx's lawyers, management and top executives to determine: (i) the best strategy to accomplish the Secondary Offering;  (ii) the terms of the Secondary Offering, including the price at which CytRx's stock would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about CytRx would be made in the Registration

Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement.  As a result of those contacts and purported communications between the Underwriter Defendants' representatives and CytRx's management and top executives, the Underwriter Defendants should have discovered the material omissions contained in the Registration Statement.

## VII.   LOSS CAUSATION

175.   Over a period of approximately five months, CytRx improperly inflated the value of the Company's securities and performance.   When the Exchange Act Defendants' prior misrepresentations and fraudulent conduct were revealed and became apparent investors, the price of CytRx securities declined precipitously − as the prior artificial inflation in the price of CytRx's securities was removed.   As a result of their purchases of CytRx securities during the Class Period, Plaintiffs and other members of the Class suffered economic losses, *i.e.*, damages under the federal securities laws.

176.   The economic loss, *i.e.*, damages suffered by Plaintiffs and other members of the Class, was a direct result of the Exchange Act Defendants' fraudulent scheme to artificially inflate the price of CytRx's securities and the subsequent significant decline in the value of the Company's securities when their prior misstatements and other fraudulent conduct was revealed.   The timing and magnitude of CytRx's securities price decline negates any inference that the losses suffered by Plaintiffs and the other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or even Company-specific facts unrelated to the Exchange Act Defendants' fraudulent conduct.

177.   At all relevant times, the material misrepresentations and omissions alleged in this Complaint directly or proximately caused, or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class.  As described herein, during the Class Period, the Exchange Act Defendants

made or caused to be made a series of materially false or misleading statements about CytRx's business, prospects, and operations.

178. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of CytRx and its business, prospects, and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period caused Plaintiffs and other members of the Class to purchase the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

179. On February 12, 2014, Mr. Feuerstein published his article describing how CytRx and Galena had engaged in a campaign to boost their share price as alleged in ¶¶66-67, *supra*.   This news partially revealed CytRx's connection to DreamTeam which caused CytRx's share price to fall 8.5% on heavy trading volume.

180. On March 13, 2014, in response to the Pearson Report as alleged in ¶¶94-95, *supra*, CytRx's share price fell 13% to a close of $4.08 per share on March 17, 2014, on unusually heavy volume of over 11 million shares traded as the risk from defendants' Class Period misconduct and paid promotion scheme materialized. The decline in CytRx's securities prices following the March 13, 2014 disclosure was a direct result of defendants' fraud being revealed.   In addition, the March 2013 announcement revealed new, previously unknown details about the Exchange Act Defendants' Class Period misconduct.   As the market continued to digest the gravity of the Exchange Act Defendants' misconduct, CytRx common stock continued to decline to $3.97 on March 20, 2014

## VIII. APPLICABILITY OF PRESUMPTION OF RELIANCE

181. At all relevant times, the market for CytRx's common stock was an efficient market for the following reasons, among others:

72

(a)      CytRx common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)      As a regulated issuer, CytRx filed periodic reports with the SEC and the NASDAQ;

(c)      CytRx regularly communicated with public investors *via* established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)      CytRx was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

182.   As a result of the foregoing, the market for CytRx's securities promptly digested current information regarding CytRx from all publicly available sources and reflected such information in the prices of the stock. Under these circumstances, all purchasers of CytRx's securities during the Class Period suffered similar injury through their purchase of CytRx's securities at artificially inflated prices. The *Basic* presumption of reliance applies.

183.   Plaintiffs and the putative Class are also entitled to the *Affiliated Ute* presumption of reliance due to defendants' failure to disclose the paid stock promotion scheme, which information Plaintiffs would have wanted to know and which would have caused investors to have avoided purchasing shares of CytRx common stock at the prices they traded at during the Class Period.

## IX.   NO SAFE HARBOR

184.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements pleaded in this Complaint.   Many of the specific statements pleaded herein were not identified as and were not "forward-looking statements" when made.   To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

185.   Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, the Insider Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of CytRx who knew that those statements were false when made.

## X.   CLASS ACTION ALLEGATIONS

186.   Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired CytRx publicly traded securities during the Class Period.

187.   The members of the Class are so numerous that joinder of all members is impracticable.   The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.   As of October 2014, CytRx had over 55 million shares of its common stock outstanding, owned by hundreds if not thousands of persons.

188.   There is a well-defined community of interest in the questions of law and fact involved in this case.   Questions of law and fact common to the members

74

of the Class which predominate over questions which may affect individual Class members include:

>(a)   whether defendants violated the federal securities laws;

>(b)   whether defendants omitted and/or misrepresented material facts;

>(c)   whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

>(d)   whether defendants knew or deliberately disregarded that their statements were false and misleading;

>(e)   whether the prices of CytRx publicly traded securities were artificially inflated; and

>(f)   the extent of damage sustained by Class members and the appropriate measure of damages.

189.   Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class sustained damages from defendants' wrongful conduct.

190.   Plaintiffs will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiffs have no interests which conflict with those of the Class.

191.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## XI.   CLAIMS FOR RELIEF

### COUNT I
### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) Against the Exchange Act Defendants

192.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

193.   During the Class Period, the Exchange Act Defendants participated in the preparation of and/or disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

194.   The Exchange Act Defendants made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. The Exchange Act Defendants, individually and together, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal the truth and/or adverse material information about the business, operations and future prospects of CytRx as specified herein.

195.   The Exchange Act Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them.  Defendants' misconduct was engaged in knowingly or with reckless disregard for the truth, and for the purpose and effect of concealing CytRx's true financial condition from the investing public and supporting the artificially inflated price of CytRx's securities.

196.   Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for CytRx publicly traded securities.   Plaintiffs and the Class would not have purchased CytRx publicly traded common stock at the prices they paid, or at all, had they been aware that the market prices for CytRx's securities had been artificially inflated by CytRx and the Insider Defendants' materially false and misleading statements and omissions.

**COUNT II**
**For Violations of Section 10(b) of the Exchange Act and**
**Rule 10b-5(a) & (c) Against Defendants**
**Myer, CytRx, Kriesgman and Haen**

197.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

198.   During the Class Period, Defendants CytRx, Myer, Kriegsman and Haen violated Rules 10b-5(a) & (c) in that they employed devices, schemes and artifices to defraud and engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of CytRx publicly traded common stock during the Class Period as alleged herein.

199.   During the Class Period, Defendants CytRx, Myer, Kriegsman and Haen participated in the preparation of and/or disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

200.   Defendants CytRx, Myer, Kriegsman and Haen made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. Defendants CytRx, Myer, Kriegsman and Haen, individually and together, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal the truth and/or adverse material information about the business, operations and future prospects of CytRx as specified herein.

201.   Defendants CytRx, Myer, Kriegsman and Haen had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or

77

recklessly disregarded the true facts that were available to them. Defendants' misconduct was engaged in knowingly or with reckless disregard for the truth, and for the purpose and effect of concealing CytRx's true financial condition from the investing public and supporting the artificially inflated price of CytRx's securities.

202.   Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for CytRx publicly traded securities.   Plaintiffs and the Class would not have purchased CytRx publicly traded securities at the prices they paid, or at all, had they been aware that the market prices for CytRx's common stock had been artificially inflated by Defendants CytRx's, Myer's, Kriegsman's and Haen's materially false and misleading statements and omissions.

## COUNT III
### For Violations of Section 20(a) of the Exchange Act
### Against Kriegsman, Haen and Caloz

203.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

204.   During the Class Period, the Insider Defendants acted as controlling persons of CytRx within the meaning of Section 20(a) of the Exchange Act.   By reason of their high-level positions with the Company, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, the Insider Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the materially false and misleading statements alleged herein.

205.   By reason of such conduct, Insider Defendants are liable pursuant to Section 20(a) of the Exchange Act.

78

**COUNT IV**
**For Violations of Section 20(b) of the Exchange Act**
**Against Defendants Haen and Kriegsman**

206. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

207. Section 20(b) provides that "[i]t shall be unlawful for any person, directly or indirectly, to do any act or thing which it would be unlawful for such person to do under the provisions of this chapter or any rule or regulation thereunder through or by means of any other person."

208. During the Class Period, Defendants Kriegsman and Haen directly or indirectly promoted CytRx's common stock in a manner they knew would have been unlawful for them to do so directly under the provisions of this title, 15 U.S.C. § 78a *et seq*., by means of Defendant Meyer, DreamTeam and Mr. Mylant. By reason of such conduct, Defendants Haen and Kriegsman are liable pursuant to Section 20(b) for paying DreamTeam, Defendant Meyer and Mr. Mylant to unlawfully tout the Company's securities as alleged throughout herein.

**COUNT V**
**For Violations of Section 11 of the Securities Act**
**Against the Underwriter Defendants, Director Defendants**
**and Defendants Kriegsman and Caloz**

209. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein except for the allegations of fraudulent intent. This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against the Insider Defendants, Director Defendants and Underwriter Defendants in connection with the Secondary Offering with which these defendants were involved as set forth above.

210. The Registration Statement issued in connection the Secondary Offering contained untrue statements of material facts and omitted to state other facts necessary to make the statements made not misleading. The Registration

79

Statement further omitted to state material facts required to be stated therein as set forth above. The facts misstated and omitted would have been material to a reasonable person reviewing the Registration Statement.

211. Defendants' liability under this Count is predicated on the participation of each defendant in conducting the Secondary Offering pursuant to the Registration Statement which contained untrue statements and omissions of material fact. Any allegations or claims of fraud, fraudulent conduct, intentional misconduct and/or motive are specifically excluded from this Count. Plaintiffs assert only strict liability and negligence claims. CytRx is the registrant and, as such, is strictly liable to Plaintiffs and the Class for untrue statements and omissions contained in the Registration Statement.

212. Each of the individual defendants named in this Count is liable as they each signed or authorized the signing of the Registration Statement. By virtue of signing the Registration Statement, they issued, caused to be issued and participated in the issuance of the Registration Statement, which contained untrue statements of material fact, omitted to state other facts necessary to make the statements not misleading and omitted to state material facts required to be stated therein. These defendants failed to conduct a reasonable investigation and did not possess reasonable grounds for believing that the statements contained therein were true and not materially misstated.

213. The Underwriter Defendants each acted as an underwriter with respect to the Secondary Offering pursuant to the Registration Statement which specifically identified the Underwriter Defendants as underwriters for the Secondary Offering. The Underwriter Defendants did not conduct a reasonable investigation of the statements contained in and incorporated by reference into the Registration Statement and did not possess reasonable grounds for believing that the statements contained therein were true and not materially misstated. By reason

of the conduct herein alleged, the Section 11 Defendants named herein violated or controlled a person who violated Section 11 of the Securities Act.

214.   Plaintiffs and the other members of the Class likewise did not know, or in the exercise of reasonable diligence could not have known, of the untrue statements of material fact or omissions of material facts in the Secondary Offering materials, including the registration statements, when they purchased or acquired shares of CytRx's common stock.  Less than one year has elapsed from the time Plaintiffs discovered or reasonably could have discovered the facts upon which this Complaint is based and the time the action was filed.  Less than three years have elapsed since the stock upon which this Count is brought was bona fide offered to Plaintiffs and the Class.

## COUNT VI
### For Violations of Section 12(a)(2) of the Securities Act
### Against CytRx and the Underwriter Defendants

215.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein except for the allegations of fraudulent intent.  For purposes of this Count, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the Securities Act.  This Count is brought pursuant to Section 12(a)(2) of the Securities Act, by Plaintiffs and other members of the class who purchased or otherwise acquired common stock in the Secondary Offering against CytRx and the Underwriter Defendants.

216.   CytRx and the Underwriter Defendants offered, solicited, promoted and/or sold CytRx's common stock to Plaintiffs by the use of means or instrumentalities of interstate commerce by means of the defective Prospectus, for their own financial gain.  By means of the defective Prospectus created and disseminated by CytRx and the Underwriter Defendants in connection with

81

CytRx's Secondary Offering, CytRx and the Underwriter Defendants assisted in the offering of shares of CytRx stock to Plaintiffs and other members of the Class.

217.   The Prospectus contained untrue statements of material fact and omitted to disclose material facts, as detailed above.   The facts misstated and omitted would have been material to a reasonable person reviewing the Prospectus. CytRx and the Underwriter Defendants owed Plaintiffs and the other members of the Class who acquired CytRx stock pursuant to the Prospectus the duty to make a reasonable and diligent investigation of the statements to ensure that such statements were true and that there were no omissions to state a material fact required to be stated in order to make the statements contained therein not misleading.

218.   CytRx and the Underwriter Defendants did not make a reasonable and diligent investigation of the statements contained in the Prospectus and did not possess reasonable grounds for believing that it did not contain an untrue statement of material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.   CytRx and the Underwriter Defendants, in the exercise of reasonable care, should have known of the untrue statements and omissions as set forth above and/or should have updated investors regarding material information about the Secondary Offering. Accordingly, CytRx and the Underwriter Defendants are liable to Plaintiffs who purchased CytRx's common stock in the Secondary Offering.

219.   Plaintiffs purchased or otherwise acquired CytRx securities pursuant to the defective Prospectus, including the prospectuses.   Plaintiffs did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Prospectus at the times Plaintiffs acquired CytRx stock during the Class Period.   Plaintiffs purchased CytRx's common stock pursuant to and/or traceable to the defective Prospectus and, as a direct and proximate result of

such violations, Plaintiffs and the other Class members sustained substantial damages.

220.   Less than one year has elapsed from the time Plaintiffs discovered or reasonably could have discovered the facts upon which this Complaint is based and the time the action was filed.  Less than three years have elapsed since the stock upon which this Count is brought was bona fide offered to Plaintiffs and the Class.

## COUNT VII
### For Violations of Section 15 of the Securities Act
### Against the Insider Defendants and the Director Defendants

221.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein except for the allegations of fraudulent intent.  For the purposes of this Count, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the Securities Act.

222.   This Count is brought pursuant to Section 15 of the Securities Act against the Insider Defendants and the Director Defendants.  At all relevant times, the defendants named herein were controlling persons of the Company within the meaning of Section 15 of the Securities Act.  Each of these defendants served as an executive officer or director of CytRx prior to and at the time of the offerings.  At all relevant times, these defendants had the power, influence and control over the operation and management of the Company and the conduct alleged herein.  Each conducted and participated, directly and indirectly, in the conduct of CytRx's business affairs.  As officers of a publicly owned company, the Insider Defendants, had a duty to disseminate accurate and truthful information with respect to CytRx's financial condition and results of operations.

223.   By reason of the aforementioned conduct, each of the defendants named in this Count is liable under Section 15 of the Securities Act, jointly and

severally with, and to the same extent as the Company is liable under Sections 11 and 12(a)(2) of the Securities Act, to Plaintiffs and the other members of the Class who purchased securities in the Secondary Offering or traceable to it.  As a direct and proximate result of the conduct of these defendants, Plaintiffs and other members of the Class suffered damages in connection with their purchase or acquisition of CytRx common stock.

224.   Less than one year has elapsed from the time Plaintiffs discovered or reasonably could have discovered the facts upon which this Complaint is based and the time the action was filed.  Less than three years have elapsed since the stock upon which this Count is brought was bona fide offered to Plaintiffs and the Class.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment as follows:

A.    Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.    Awarding Plaintiffs and the members of the Class damages, including interest;

C.    Awarding Plaintiffs reasonable costs and attorneys' fees; and

D.    Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury.


Dated:  October 1, 2014                    Respectfully submitted,

KAHN SWICK & FOTI, LLP


By:        /s/ *Ramzi Abadou*

84

Ramzi Abadou (#222567)
ramzi.abadou@ksfcounsel.com
KAHN SWICK & FOTI, LLP
505 Montgomery Street, 10th Floor
San Francisco, California 94111
Telephone: (415) 874-3047
Facsimile: (504) 455-1498

Lewis S. Kahn
lewis.kahn@ksfcounsel.com
Melinda A. Nicholson (*admitted pro hac vice*)
melinda.nicholson@ksfcounsel.com
Michael J. Palestina (*admitted pro hac vice*)
michael.palestina@ksfcounsel.com
KAHN SWICK & FOTI, LLC
206 Covington St.
Madisonville, LA 70447
Telephone: (504) 455-1400
Facsimile: (504) 455-1498

*Lead Counsel for Lead Plaintiff Deepak Gupta and the Class*

LIONEL Z. GLANCY (#134180)
MICHAEL GOLDBERG (#188669)
GLANCY BINKOW & GOLDBERG LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Liaison Counsel for Plaintiffs*

WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP
FRANCIS M. GREGOREK
gregorek@whafh.com
BETSY C. MANIFOLD
manifold@whafh.com
RACHELE R. RICKERT
rickert@whafh.com

85

MARISA C. LIVESAY
livesay@whafh.com

750 B Street, Suite 2770
San Diego, CA 92101
Telephone:  619/239-4599
Facsimile:   619/234-4599

*Attorneys for Named Plaintiffs Randall S.*
*Pettit and Diane D. Pettit*

## PLAINTIFFS' CERTIFICATION

Randall S. Pettit and Diane D. Pettit ("Plaintiffs") declare under penalty of perjury, as to the claims asserted under the federal securities laws, that:

1.     Plaintiffs have reviewed the complaint and authorized the commencement of an action on Plaintiffs' behalf.

2.     Plaintiffs did not purchase the security that is the subject of this action at the direction of plaintiffs' counsel or in order to participate in this private action.

3.     Plaintiffs are willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.     Plaintiffs' transactions in CytRx Corporation securities during the Class Period specified in the Complaint are as follows:

### SEE ATTACHED SCHEDULES A

5.     During the three years prior to the date of this Certificate, Plaintiffs have not sought to serve or served as a representative party for a class in an action filed under the federal securities laws. [Or, Plaintiffs have served as a class representative in the action(s) listed below:]

6.     Plaintiffs will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiffs' pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this ___4th___ day of April, 2014.

_____          _____
Randall S. Pettit                                  Diane D. Pettit

**Schedule A to certification of Randall and Diane Pettit**
**CytRx Corporation**
**Class Period: November 20, 2013 - March 13, 2014**

<u>**Randall Pettit Margin Account**</u>

| Date | # shares | Price/share |
|------|----------|-------------|

**Purchases**

| Date | # shares | Price/share |
|------|----------|-------------|
| 01/03/14 | 1,900 | $6.76 |
| 01/03/14 | 2,100 | $6.65 |
| 01/06/14 | 1,200 | $6.49 |
| 01/31/14 | 1,200 | $6.83 |

**Sales**

| Date | # shares | Price/share |
|------|----------|-------------|
| 03/11/14 | -3,650 | $4.98 |
| 03/13/14 | -6,400 | $4.27 |
| 03/13/14 | -1,350 | $4.27 |

<u>**Randall Pettit IRA Account**</u>

| Date | # shares | Price/share |
|------|----------|-------------|

**Purchases**

| Date | # shares | Price/share |
|------|----------|-------------|
| 12/16/13 | 5,000 | $5.20 |
| 12/17/13 | 2,500 | $5.03 |
| 12/19/13 | 2,500 | $4.95 |
| 01/03/14 | 4,000 | $6.76 |
| 01/14/14 | 2,500 | $7.26 |
| 01/15/14 | 1,500 | $7.13 |
| 01/23/14 | 2,000 | $6.98 |
| 02/03/14 | 6,045 | $6.83 |
| 02/05/14 | 1,476 | $6.50 |
| 02/05/14 | 879 | $6.34 |
| 02/06/14 | 4,000 | $6.65 |
| 02/12/14 | 4,000 | $6.20 |
| 02/18/14 | 3,600 | $5.71 |
| 02/28/14 | 1,300 | $5.94 |
| 03/05/14 | 3,000 | $5.94 |
| 03/05/14 | 1,100 | $6.09 |
| 03/06/14 | 3,000 | $5.67 |
| 03/07/14 | 600 | $5.53 |
| 03/11/14 | 5,050 | $4.97 |

**Sales**

| Date | # shares | Price/share |
|------|----------|-------------|
| 12/11/13 | -7,200 | $4.07 |
| 12/31/13 | -5,000 | $6.20 |
| 01/10/14 | -4,000 | $7.47 |
| 01/31/14 | -2,000 | $7.04 |

**Schedule A to certification of Randall and Diane Pettit**
**CytRx Corporation**
**Class Period: November 20, 2013 - March 13, 2014**

<u>Diane Pettit Margin Account</u>

| Date | # shares | Price/share |
|------|----------|-------------|

**Purchases**

| | | |
|------|----------|-------------|
| 12/13/13 | 1,200 | $5.67 |
| 12/26/13 | 1,200 | $4.61 |
| 01/07/14 | 1,200 | $6.44 |
| 01/15/14 | 1,200 | $6.90 |
| 01/24/14 | 1,400 | $6.79 |
| 02/04/14 | 832 | $6.73 |
| 02/05/14 | 7,547 | $6.50 |
| 02/05/14 | 1,621 | $6.39 |
| 02/12/14 | 2,000 | $6.07 |

**Sales**

| | | |
|------|----------|-------------|
| 12/31/13 | -2,400 | $6.12 |
| 01/29/14 | -1,400 | $7.37 |
| 01/30/14 | -1,200 | $7.87 |
| 01/31/14 | -1,200 | $6.90 |
| 03/13/14 | -12,000 | $4.27 |

<u>Diane Pettit IRA Account</u>

| Date | # shares | Price/share |
|------|----------|-------------|

**Purchases**

| | | |
|------|----------|-------------|
| 01/15/14 | 2,000 | $6.90 |
| 02/04/14 | 2,200 | $6.66 |

**Sales**

| | | |
|------|----------|-------------|
| 12/11/13 | -2,800 | $3.90 |
| 01/31/14 | -2,000 | $7.04 |

**CERTIFICATION PURSUANT TO SECURITIES LAWS**

_DEEPAK GUPTA_____ (name) ("Movant") declares, as to the claims asserted under the federal securities law, that:

1.  Movant has fully reviewed the facts of the complaint(s) filed in this action alleging violations of the securities laws, Movant adopts the allegations of the complaint(s), and Movant retains the firm of Kahn Swick and Foti, LLC, to pursue such action on a contingent fee basis.

2.  Movant did not purchase securities of **CytRx Corporation** at the direction of counsel or in order to participate in a private action under the federal securities laws.

3.  Movant is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.  During the Class Period, Movant has executed transactions in the securities of **CytRx Corporation** as follows.  See attached Schedule.

5.  In the last three years, Movant has not sought to serve as a representative party on behalf of a class in an action filed under the federal securities laws, except as indicated herein.

6.  Movant will not accept payment for serving as a lead plaintiff beyond his/her/its pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: _May 13_____, 2014

_____
Movant Signature

_DEEPAK GUPTA_____
Printed Name

**Class Period Trades of Deepak Gupta in Securities of CytRx Corporation**

**PURCHASES**

| Purchase Date | Number of Shares | Purchase Price |
|---|---|---|
| 12/10/2013 | 9859 | 2.00 |
| 12/11/2013 | 10000 | 3.00 |
| 1/31/2014 | 30453 | 6.94 |
| 1/31/2014 | 28994 | 6.94 |
| 1/31/2014 | 27448 | 6.92 |
| 2/3/2014 | 2642 | 6.76 |
| 2/3/2014 | 4200 | 6.76 |
| 2/3/2014 | 3000 | 6.76 |
| 2/4/2014 | 700 | 6.55 |
| 2/4/2014 | 16863 | 6.60 |
| 2/4/2014 | 500 | 6.59 |
| 2/4/2014 | 100 | 6.59 |
| 2/4/2014 | 100 | 6.58 |
| 2/11/2014 | 1324 | 6.66 |
| 2/11/2014 | 20000 | 6.60 |
| 2/11/2014 | 20000 | 6.60 |
| 2/12/2014 | 100000 | 6.43 |
| 2/12/2014 | 100000 | 6.40 |
| 2/12/2014 | 100000 | 6.36 |
| 2/18/2014 | 1320 | 5.68 |
| 2/18/2014 | 172 | 5.67 |
| 2/19/2014 | 24900 | 5.59 |
| 2/19/2014 | 100 | 5.58 |
| 2/24/2014 | 25000 | 5.53 |
| 3/5/2014 | 19900 | 6.01 |
| 3/5/2014 | 100 | 6.01 |
| 3/5/2014 | 25000 | 5.97 |
| 3/5/2014 | 24500 | 5.95 |
| 3/5/2014 | 500 | 5.95 |
| 3/5/2014 | 25000 | 5.92 |
| 3/7/2014 | 100000 | 5.40 |
| 3/13/2014 | 25000 | 4.43 |

**SALES**

| Sales Date | Number of Shares | Sale Price |
|---|---|---|
| 12/11/2013 | 19859 | 4.25 |
| 2/20/2014 | 12000 | 5.82 |
| 2/20/2014 | 700 | 5.81 |
| 2/20/2014 | 800 | 5.80 |
| 2/20/2014 | 10500 | 5.80 |
| 2/20/2014 | 12816 | 5.80 |
| 2/20/2014 | 12000 | 5.80 |
| 2/20/2014 | 100 | 5.78 |

| | | |
|---|---|---|
| 2/20/2014 | 100 | 5.78 |
| 2/20/2014 | 16800 | 5.77 |
| 2/20/2014 | 2855 | 5.77 |
| 2/24/2014 | 4145 | 5.65 |
| 3/5/2014 | 7000 | 5.94 |
| 3/7/2014 | 400 | 5.40 |
| 3/7/2014 | 2300 | 5.39 |
| 3/7/2014 | 7700 | 5.38 |
| 3/7/2014 | 3283 | 5.37 |
| 3/7/2014 | 4600 | 5.36 |
| 3/7/2014 | 7117 | 5.35 |
| 3/7/2014 | 3100 | 5.36 |
| 3/7/2014 | 17426 | 5.35 |
| 3/7/2014 | 4474 | 5.34 |
| 3/7/2014 | 2700 | 5.37 |
| 3/7/2014 | 100 | 5.33 |
| 3/7/2014 | 9700 | 5.33 |
| 3/7/2014 | 14100 | 5.33 |
| 3/7/2014 | 1100 | 5.32 |
| 3/7/2014 | 5216 | 5.33 |
| 3/7/2014 | 16450 | 5.32 |
| 3/7/2014 | 3334 | 5.31 |
| 3/7/2014 | 12292 | 5.35 |
| 3/7/2014 | 1900 | 5.34 |
| 3/7/2014 | 2650 | 5.33 |
| 3/7/2014 | 1524 | 5.32 |
| 3/7/2014 | 6634 | 5.31 |
| 3/7/2014 | 3803 | 5.32 |
| 3/7/2014 | 500 | 5.32 |
| 3/7/2014 | 41644 | 5.31 |
| 3/7/2014 | 27430 | 5.30 |
| 3/7/2014 | 3500 | 5.29 |
| 3/7/2014 | 440 | 5.28 |
| 3/7/2014 | 300 | 5.27 |
| 3/7/2014 | 984 | 5.26 |
| 3/7/2014 | 21399 | 5.25 |
| 3/7/2014 | 602 | 5.35 |
| 3/10/2014 | 4700 | 5.52 |
| 3/13/2014 | 1500 | 4.47 |
| 3/13/2014 | 4300 | 4.46 |
| 3/13/2014 | 3500 | 4.46 |
| 3/13/2014 | 500 | 4.46 |
| 3/13/2014 | 15200 | 4.45 |
| 3/13/2014 | 4424 | 4.41 |
| 3/13/2014 | 25576 | 4.40 |
| 3/13/2014 | 1200 | 4.41 |
| 3/13/2014 | 4400 | 4.41 |

| 3/13/2014 | 24400 | 4.40 |
| 3/13/2014 | 30000 | 4.60 |
| 3/13/2014 | 25000 | 4.56 |
| 3/13/2014 | 25000 | 4.55 |
| 3/13/2014 | 25000 | 4.53 |
| 3/13/2014 | 100 | 4.23 |
| 3/13/2014 | 24900 | 4.22 |
| 3/13/2014 | 5500 | 4.35 |
| 3/13/2014 | 1095 | 4.21 |
| 3/13/2014 | 3785 | 4.20 |
| 3/13/2014 | 20120 | 4.19 |
| 3/13/2014 | 1300 | 4.20 |
| 3/13/2014 | 5802 | 4.19 |
| 3/13/2014 | 17898 | 4.18 |

**PROOF OF SERVICE VIA ELECTRONIC POSTING PURSUANT TO
CENTRAL DISTRICT OF CALIFORNIA LOCAL RULES
AND ECF GENERAL ORDER NO. 10-07**

I, the undersigned, say:

I am a citizen of the United States and am employed in the office of a member of the Bar of this Court. I am over the age of 18 and not a party to the within action.  My business address is 505 Montgomery Street, 10th Floor, San Francisco, California  94111.

On October 1, 2014, I caused to be served the following document:

**CONSOLIDATED COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS**

By posting the document to the ECF Website of the United States District Court for the Central District of California, for receipt electronically by the parties as listed on the attached Service List.

And on all non-ECF registered parties via U.S. Mail.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on October 1, 2014, at San Francisco, California.


*s/ Ramzi Abadou*
Ramzi Abadou

**Mailing Information for a Case 2:14-cv-01956-GHK-PJW Bangzheng Chen v. Cytrx Corporation et al**

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Ramzi Abadou**
  ramzi.abadou@ksfcounsel.com,melinda.nicholson@ksfcounsel.com,michael.palestina@ksfcounsel.com

- **Patrice L Bishop**
  service@ssbla.com,ssblaservice@gmail.com

- **Peter E Borkon**
  peterb@hbsslaw.com

- **Elaine Chang**
  echang@glancylaw.com

- **Lionel Zevi Glancy**
  lglancy@glancylaw.com

- **Michael M Goldberg**
  mmgoldberg@glancylaw.com,dmacdiarmid@glancylaw.com,info@glancylaw.com

- **Reed R Kathrein**
  reed@hbsslaw.com

- **Betsy C Manifold**
  manifold@whafh.com,davanzo@whafh.com,campurano@whafh.com

- **Melinda A Nicholson**
  melinda.nicholson@ksfcounsel.com

- **Thomas Jerome Nolan**
  tnolan@skadden.com,LAO.LACWORDPROCESSING@skadden.com,peter.morrison@skadden.com,caroline.vanness@skadden.com,allen.lanstra@skadden.com,thomas.haroldson@skadden.com,hillary.hamilton@skadden.com,al.chua@skadden.com,nili.moghaddam@skadden.com,ken.boyd@skadden.com,Stephen.Haydon-Khan@skadden.com,rebecca.isomoto@skadden.com

- **Michael J Palestina**
  michael.palestina@ksfcounsel.com

- **Clifford H Pearson**
  cpearson@pwlaw.com,mpearson@pwlaw.com,mwilliams@pwlaw.com,egrant@pwlaw.com

- **Robert Vincent Prongay**
  rprongay@glancylaw.com,info@glancylaw.com,echang@glancylaw.com

- **Laurence M Rosen**
  lrosen@rosenlegal.com

- **Alexander Robert Safyan**
  asafyan@pwlaw.com,mwilliams@pwlaw.com,egrant@pwlaw.com

- **Evan Jason Smith**
  esmith@brodsky-smith.com

- **Howard G Smith**
  legsd2010@aol.com

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)