*E-FILED*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 14-1956-GHK (PJWx) | Date | July 13, 2015 |
|---|---|---|---|
| Title | *In Re CytRx Corporation Securities Litigation* | | |

**Presiding: The Honorable**   **GEORGE H. KING, CHIEF U. S. DISTRICT JUDGE**

| Beatrice Herrera | N/A | N/A |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiff: | Attorneys Present for Defendant: |
|---|---|
| None | None |

**Proceedings:**   **(In Chambers) Order re:** (1) CytRx Defendants' Motion to Dismiss [Dkt. 83]; (2) Underwriter Defendants' Motion to Dismiss [Dkt. 86]; (3) Plaintiffs' Motion to Substitute Party [Dkt. 98]

This matter is before us on the above-captioned Motions. We have considered the papers filed in support of and in opposition to these Motions and deem this matter appropriate for resolution without oral argument. L.R. 7-15. As the Parties are familiar with the facts, we will repeat them only as necessary. Accordingly, we rule as follows:

## I.   Procedural Background

On October 1, 2014, Plaintiffs Deepak Gupta ("Gupta"), Randall S. Pettit ("Mr. Pettit") and Diane D. Pettit ("Ms. Pettit") (together, "Plaintiffs") filed a Consolidated Class Action Complaint ("CCAC") entitled *In Re CytRx Corporation Securities Litigation*. [Dkt. 60.] Plaintiffs seek to represent a class of shareholders who acquired CytRx Corporation's ("CytRx") publicly traded securities between November 20, 2013 and March 13, 2014 (the "Class Period"). Plaintiffs bring claims for violations of Sections 10(b) and 20(a)-(b) of the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5(a)-(c) against (i) CytRx; (ii) CytRx CEO Steven A. Kriegsman ("Kriegsman"); (iii) CytRx CFO John Y. Caloz ("Caloz"); (iv) CytRx Executive Officer and Vice President of Business Development, David J. Haen ("Haen"); and (v) writer Thomas Michael Meyer ("Meyer") (together, the "Exchange Act Defendants") for issuing "press releases, promotional articles, SEC filings and other public statements [that] were materially false and misleading." (CCAC at ¶ 4.) Plaintiffs refer to Kriegsman, Caloz, and Haen as the "Insider Defendants." (*Id.* at ¶ 34.)

Plaintiffs also assert claims under Sections 11(a), 12(a)(2), and 15 of the Securities Act of 1933 ("Securities Act") against the underwriters for CytRx's January 31, 2014 Secondary Offering, Kriegsman and Caloz, and the directors who signed CytRx's December 6, 2012 Shelf Registration

**E-FILED**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 14-1956-GHK (PJWx) | Date | July 13, 2015 |
|---|---|---|---|
| Title | *In Re CytRx Corporation Securities Litigation* | | |

Statement and January 31, 2014 Prospectus Supplement[1] (together, the "Securities Act Defendants") for the "materially misleading statements and omissions contained in" said disclosures.  (*Id.* at ¶ 5.)  The "Director Defendants" include Louis J. Ignarro ("Ignarro"), Max E. Link ("Link"),[2] Joseph Rubinfeld ("Rubinfeld"), Marvin R. Selter ("Selter"), and Richard L. Wennekamp ("Wennekamp").  The "Underwriter Defendants" include Jefferies LLC ("Jefferies"), Oppenheimer & Co., Inc. ("Oppenheimer"), Aegis Capital Corporation ("Aegis"), and H.C. Wainwright & Co., LLC ("Wainwright").

The CytRx Defendants[3] and Underwriter Defendants separately move to dismiss the CCAC.[4] DreamTeam author Defendant Meyer answered the CCAC on December 8, 2014, asserting his Fifth Amendment Privilege.  [Dkt. 88.]  Plaintiffs filed an "Omnibus Memorandum of Law" in Opposition to both Motions on January 23, 2015.[5]

---

[1] Collectively, these documents are referred to as "the Registration Statement."  (*See* CCAC at ¶ 5.)

[2] We received a Notice regarding Link's death on October 20, 2014.  [Dkt. 73.]  Plaintiffs did not file a Motion to Substitute Party as to Link.

[3] CytRx, Kriegsman, Caloz, Haen, Ignarro, Rubinfeld, and Wennekamp.

[4] Both Motions include Requests for Judicial Notice.  [Dkts. 84, 87.]  The CytRx Defendants request that we take notice of CytRx's January 31, 2014 Prospectus Supplement and the Underwriter Defendants request that we take notice of the (1) January 31, 2014 Underwriting Agreement and (2) Pearson Report.  Plaintiffs do not object.  In securities cases, courts routinely take judicial notice of such documents when considering a motion to dismiss.  *See, e.g.*, *In re Wet Seal, Inc. Securities Litigation*, 518 F. Supp. 2d 1148, 1156 (C.D. Cal. 2007) (citation omitted) ("[T]he court may consider public filings, including SEC filings . . . [, and] matters of public record such as press releases, analyst reports, news articles, and conference call transcripts . . . .").  These Requests are **GRANTED**.

[5] On February 16, 2015, Plaintiffs filed a Notice of Recent Decision, calling our attention to *Stanaford v. Genovese, et al.*, Case No. 13-cv-80923 (S.D. Fl. February 10, 2015).  [Dkt. 101.]  The CytRx Defendants filed an Objection to this Notice on February 23, 2015, requesting that we strike Plaintiffs' Notice as "a thinly disguised attempt . . . to improperly raise further argument after briefing concluded" in violation of Local Rule 7-10.  [Dkt. 102 at 1.]  This Objection is **OVERRULED**.  As the Florida decision was issued on February 10, Plaintiffs could not have raised it in their Opposition.  Plaintiffs' Notice does not include any unnecessary argument and merely notifies us about a case that might be helpful for our analysis.

**E-FILED**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-1956-GHK (PJWx) | Date | July 13, 2015 |
|---|---|---|---|
| Title | *In Re CytRx Corporation Securities Litigation* | | |

## II.   Factual Allegations

CytRx is a biopharmaceutical research and development company with seventeen employees that develops oncology drugs, including its "primary drug" aldoxorubicin. (CCAC at ¶¶ 6, 29.) Plaintiffs allege that CytRx hired marketing firm The DreamTeam Group and its affiliate, Mission Investor Relations ("MissionIR") (together, "DreamTeam"), to promote its stock via a series of misleading articles and comments on investor websites, "touting the supposed strength of CytRx and aldoxorubicin." (*Id.* at ¶ 8.) At times, CytRx also used DreamTeam to combat independent "legitimate news reports about the Company" that had driven down the value of the Company's stock. (*Id.* at ¶ 125.) CytRx's executive officers, including Kriegsman and Haen, allegedly edited and approved the articles before publication. (*Id.* at ¶ 8.) DreamTeam writers Defendant Meyer and John Mylant[6] would then publish their articles, often under different aliases, without disclosing payment from or the involvement of CytRx's management. (*Id.* at ¶¶ 8, 51.) In all, DreamTeam was responsible for approximately fourteen promotional articles, published from September 2013 to February 2014. (*Id.* at ¶¶ 3, 33.) DreamTeam's articles allegedly caused CytRx's stock price to rise from $2.25/share on November 1, 2013 to $8.35/share on January 30, 2014, the day before the Company's Secondary Offering. (*Id.* at ¶ 9.) Once the stock price grew sufficiently, CytRx and the Insider Defendants "consummate[d a January 2014] Secondary Offering with artificially inflated shares of CytRx's common stock; and (ii) award[ed] themselves and members of CytRx's Board of Directors ("Board") with massive amounts of ***perfectly***-timed[7] stock option grants." (*Id.* at ¶ 8 (emphasis in original).)

None of CytRx's SEC filings, investor presentations, or press releases during this period disclosed any information about DreamTeam. (*Id.* at ¶ 10.) Instead, the Company's stock promotion scheme was revealed via two whistleblowers, Adam Feuerstein ("Feuerstein") and Richard Pearson ("Pearson"). On February 12, 2014, Feuerstein published an article called "Galena Biopharma Pays for Stock-Touting Campaign While Insiders Cash Out Millions," which revealed details about former CytRx subsidiary, Galena Biopharma's ("Galena") relationship with DreamTeam.[8] (*Id.* at ¶ 66.) In

---

[6] Mylant is not a Defendant in this action.

[7] CytRx's "Compensation Committee granted the[se] spring-loaded stock option awards on December 10, 2013, the ***day*** before CytRx announced" clinical trial results related to aldoxorubicin, "information which Defendant Kriegsman described as 'the most important news in our company's history.'" (CCAC at ¶ 13 (emphasis in original).) A spring-loaded stock option is one that is timed to precede a positive company announcement, such that the option holder will receive a larger profit. The December 11, 2013 aldoxorubicin announcement was then "***amplified*** by a same-day, and highly misleading, promotional article touting CytRx," causing the price of CytRx's common stock to grow 127% that week. (*Id.* at ¶ 14 (emphasis in original).)

[8] Kriegsman is a member of the Galena Board, and Meyer was later revealed to be the author of the Galena articles. The CCAC labels Feuerstein's article as a "partial disclosure" of the fraud, as it only

*E-FILED*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-1956-GHK (PJWx) | Date | July 13, 2015 |
|---|---|---|---|
| Title | *In Re CytRx Corporation Securities Litigation* | | |

response to this report, CytRx's stock price fell 8.5% on February 12, 2014, to $6.04 per share.  (*Id.* at ¶ 68.)

On March 13, 2014, Pearson published an article describing how he was solicited by DreamTeam to write paid promotional articles regarding CytRx and detailing his investigation into CytRx's management's involvement in the scheme.  (*Id.* at ¶¶ 16-17.)  He stated that in order to be compensated for his articles, "management [] would have to sign off (and edit) the articles [he drafted]" and "[he] would not be allowed to disclose that [he] was getting paid."  (*Id.* at ¶ 16.)  CytRx management rewrote approximately 25% of one of Pearson's proposed articles.  (*Id.* at ¶¶ 71-73 (stating that these changes "bore the electronic signature of Defendant Haen and the executive assistant to CytRx CEO, Defendant Kriegsman").)  The Company's changes were passed through Michael McCarthy, DreamTeam's Managing Director, "in an effort to conceal the Insider Defendants' direct involvement[9] in the stock manipulation scheme."  (*Id.* at ¶ 73.)  CytRx's stock fell to $4.17/share the day Pearson's article came out.  (*Id.* at ¶ 18.)  The promotional articles regarding CytRx were subsequently removed from various websites.  (*Id.* at ¶ 19.)

### III.     Motions to Dismiss

In ruling on a 12(b)(6) motion to dismiss, we must accept all factual allegations in the complaint as true.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  We must consider the complaint in its entirety, materials incorporated into the complaint by reference, and matters of which we may take judicial notice.  *Id.* at 322-23.

### A.      Legal Standard Regarding Exchange Act Claims

Section 10(b) of the Exchange Act and SEC Rule 10b-5 make it "unlawful for any person, directly or indirectly":

(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

---

identified Kriegsman's involvement in the alleged Galena scheme and noted that CytRx was a DreamTeam client.  (*See* CCAC at ¶ 179.)  The fraud was allegedly fully disclosed on March 13, 2014, when Pearson published his report.  (*See id.* at ¶ 180.)

[9] Pearson became aware of CytRx management's alleged involvement via the edited articles' electronic signatures; Meyer, who told Pearson, "'I think the guy who makes the changes is [Defendant] David Haen, Biz Development'"; and Haen himself, who ultimately conceded to Pearson that he "provided 'some new or original content' to DreamTeam's writers."  (*See* CCAC at ¶¶ 72-74 (emphasis omitted).)

**E-FILED**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-1956-GHK (PJWx) | Date | July 13, 2015 |
|---|---|---|---|
| Title | *In Re CytRx Corporation Securities Litigation* | | |

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5; *see also* 15 U.S.C. § 78j(b) (stating it is unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors").

### 1. Rule 10b-5(b)

Count I of the CCAC alleges that the Exchange Act Defendants violated Rule 10b-5(b), which imposes liability for material misstatements or omissions in connection with the sale or purchase of securities. "The required elements of a private securities fraud action [under Rule 10b-5(b)] are: (1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss." *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008).[10] Private plaintiffs must meet the higher, more exacting pleading standards of the Private Securities Litigation Reform Act ("PSLRA"). *See Tellabs*, 551 U.S. at 313-14.

### a. Falsity

"The PSLRA has exacting requirements for pleading 'falsity.'" *Metzler*, 540 F.3d at 1070. "A litany of alleged false statements, unaccompanied by the pleading of specific facts indicating why those statements were false, does not meet this standard." *Id.* Instead, the "complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). This requirement of specificity "prevents a plaintiff from skirting dismissal by filing a complaint laden with vague allegations of deception unaccompanied by particularized explanation stating why the defendant's alleged statements or omissions are deceitful." *Metzler*, 540 F.3d at 1061. The relevant question is "whether the facts alleged are sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *Novak v. Kasaks*, 216 F.3d 300, 314 n.1 (2d Cir. 2000). A statement is misleading if it creates an "impression of a state of affairs that differs in a material way from the one that actually exists." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) (internal quotation marks omitted). An omission is misleading if "a reasonable investor would have viewed the

---

[10] The CytRx Defendants' Motion focuses only on the purported insufficiency of Plaintiffs' falsity and scienter allegations. In their Reply, these Defendants make clear that they do not concede the sufficiency of any other Rule 10b-5(b) elements and instead, "reserve all rights to contest each element of the alleged claim[]" at a later time. (Reply at 2 n.2.)

*E-FILED*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-1956-GHK (PJWx) | Date | July 13, 2015 |
| --- | --- | --- | --- |
| Title | *In Re CytRx Corporation Securities Litigation* | | |

nondisclosed information as having significantly altered the total mix of information made available." *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1312 (2011) (internal quotation marks omitted). "[T]he disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead. . . ." *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 512 (9th Cir. 1991) (internal quotation marks omitted).

       **b.**      **Scienter**

      In order to state a claim for securities fraud, a plaintiff must also allege that the defendant acted with scienter—that the defendant had an intention "to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976). To establish that a corporate defendant, such as CytRx, acted with scienter, a plaintiff must usually show that one or more of its directors or officers acted with scienter. *See Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424, 1435 (9th Cir. 1995). Moreover, when a plaintiff tries "to hold individuals and a company liable on a securities fraud theory" that plaintiff must "allege scienter with respect to each of the individual defendants." *Oregon Pub. Employees Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 607 (9th Cir. 2014).

      Under the PSLRA, plaintiffs "can no longer aver intent in general terms of mere motive and opportunity or recklessness, but rather, must state specific facts indicating no less than a degree of recklessness that strongly suggests actual intent." *Metzler*, 540 F.3d at 1066 (internal quotation marks omitted). The complaint "must state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* (quoting 15 U.S.C. § 78u-4(b)(2)). For such an inference to qualify as "strong," it "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as an opposing inference of nonfraudulent intent." *Id.* (quoting *Tellabs*, 551 U.S. at 314). A court "must engage in a comparative evaluation; it must consider, not only inferences urged by plaintiff . . . but also competing inferences rationally drawn from the facts alleged." *Tellabs*, 551 U.S. at 314. Under this standard, "the court must consider all reasonable inferences to be drawn from the allegations, including those unfavorable to the plaintiffs." *Metzler*, 540 F.3d at 1061 (internal citation and quotation marks omitted). "Where pleadings are not sufficiently particularized or where, taken as a whole, they do not raise a 'strong inference' that misleading statements were knowingly or [with] deliberate recklessness made to investors, a private securities fraud complaint is properly dismissed under Rule 12(b)(6)." *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001). This examination requires us to scrutinize the complaint in its entirety, not just individual allegations in isolation. *See Tellabs*, 551 U.S. at 322-23.

       **2.**      **Rules 10b-5(a) and (c)**

      Count II of the CCAC alleges that Meyer, CytRx, Kriegsman, and Haen violated Rules 10b-5(a) and (c), which impose liability for a fraudulent scheme or conduct in connection with the sale or purchase of securities. To state a "claim under Rule 10b-5(a) and/or (c), a private plaintiff must allege

**E-FILED**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-1956-GHK (PJWx) | Date | July 13, 2015 |
|----------|------------------------|------|---------------|
| Title | *In Re CytRx Corporation Securities Litigation* | | |

facts showing (1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud [in connection with the purchase or sale of securities], (3) with scienter, [] (4) reliance[,]" (5) economic loss, and (6) loss causation. *Abbate v. Wells Fargo Bank, N.A.*, 2011 WL 9698215, at *2 (C.D. Cal. Nov. 17, 2011); *New York City Employees' Ret. Sys. v. Berry*, 616 F. Supp. 2d 987, 995-96 (N.D. Cal. 2009). "A defendant may only be liable as part of a fraudulent scheme based upon misrepresentations and omissions [that form the basis of a Rule 10b-5(b) claim] . . . when the scheme also encompasses conduct beyond those misrepresentations or omissions." *WPP Luxembourg Gamma Three Carl v. Spot Runner, Inc.*, 655 F.3d 1039, 1057 (9th Cir. 2011) (further stating that it is "not permissible" to simply recast "a Rule 10b-5(b) omissions claim . . . as [a] Rule 10b-5(a) or (c) scheme liability claim").

**B.    Exchange Act Claims Analysis**

    **1.    Rule 10b-5(b)**

        **a.    False/Misleading Statements**

Plaintiffs allege that the Exchange Act Defendants "participated in the preparation of and/or disseminated or approved the false statements" and omissions alleged in paragraphs 102 through 163 of the CCAC. (CCAC at ¶ 199.) These false or misleading statements fall into one of two categories: (1) those contained in DreamTeam articles or blog posts and (2) those contained in company press releases, filings, or communications with investors.

        **i.    DreamTeam Articles**

The majority of the false or misleading statements alleged by Plaintiffs are found in news stories that were "allegedly drafted by Defendant Meyer or John Mylant and then reviewed[,] edited[,] and approved by Defendants Haen and Kriegsman prior to their dissemination to the investing public." (*See* CCAC at ¶¶ 102-143.) These include a September 18, 2013 article by "Options Equity Guru" (actually Defendant Meyer) (*id.* at ¶¶ 105-09); a December 5, 2013 article by Meyer (*id.* at ¶¶ 110-12); December 11 through 13, 2013 articles by Meyer and Mylant (*id.* at ¶¶ 115-21); a December 13, 2013 blog post by MissionIR (*id.* at ¶ 122); a December 18, 2013 article by Meyer and December 19, 2013 blog post by MissionIR (*id.* at ¶¶ 125-27); a December 27, 2013 article by Meyer (*id.* at ¶¶ 129-31, 133); a January 22, 2014 article by "James Ratz" (actually Meyer) (*id.* at ¶¶ 135-36); a February 4, 2014 article by "John Rivers" (actually Meyer) (*id.* at ¶¶ 138-39); and a February 10, 2014 article by "James Johnson" (actually Meyer) and a related MissionIR blog post (*id.* at ¶¶ 141-43). Plaintiffs allege that these stories and blog posts were misleading because the authors failed to disclose their real names and that the articles were paid promotions edited and reviewed by CytRx employees. (*Id.* at ¶ 104.)

Plaintiffs can bring a private right of action under Rule 10b-5(b) only against "any person, [who] directly or indirectly, . . . *make[s]* any untrue statement of a material fact" in connection with the purchase or sale of securities. 17 C.F.R. § 240.10b-5(b) (emphasis added). In *Janus Capital Grp., Inc.*

*E-FILED*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 14-1956-GHK (PJWx) | Date | July 13, 2015 |
|---|---|---|---|
| Title | *In Re CytRx Corporation Securities Litigation* | | |

*v. First Derivative Traders*, 131 S. Ct. 2296 (2011), the Supreme Court clarified what it means to "make" a statement under this Rule, holding that "[f]or purposes of Rule 10b-5, the maker of a statement is the person or entity with *ultimate authority* over the statement, including its content and whether and how to communicate it. Without control, a person or entity can merely suggest what to say, not 'make' a statement in its own right." *Id.* at 2302 (emphasis added); *id.* ("This rule might best be exemplified by the relationship between a speechwriter and a speaker. Even when a speechwriter drafts a speech, the content is entirely within the control of the person who delivers it. And it is the speaker who takes credit—or blame—for what is ultimately said."). The Court rejected the argument that "make" and "create" are the same, as this "definition would permit private [securities] plaintiffs to sue a person who [simply] provides the false or misleading information that another person then puts into the statement." *Id.* at 2303-04 (internal quotation marks omitted). The Court ultimately found that Janus Capital Management ("JCM"), an investment advisor and administrator, was not the "maker" of false statements made by Janus Investment Fund in a series of prospectuses because JCM was a legally independent entity and "none of the statements in the prospectuses were attribut[able], explicitly or implicitly, to JCM." *Id.* at 2302, 2305 n.11 ("[I]n the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed.").

Courts since *Janus* have applied it to disallow Rule 10b-5(b) claims against defendants who merely requested, influenced, helped create, or supplied information for the relevant false or misleading statements. *See, e.g.*, *Fulton Cnty. Emps. Ret. Sys. v. MGIC Inv. Corp.*, 675 F.3d 1047, 1051 (7th Cir. 2012) (rejecting claim that "by inviting Williams and Draghi to speak [on investor call] MGIC effectively 'made' their statements itself"); *Ho v. Duoyuan Global Water, Inc.*, 887 F. Supp. 2d 547, 576 (S.D.N.Y. 2012) (finding auditor "had the final authority to decide whether an audit opinion was released to the public" and parent company's "sanctioning power is more consistent with mere influence rather than ultimate authority"). Defendants argue that, under such precedent, statements in DreamTeam articles are not actionable against the CytRx Defendants because Plaintiffs have not sufficiently alleged that they "made" these statements as defined by Rule10b-5(b). (Mot. at 5.) We agree.

Plaintiffs claim that, even after *Janus*, it is enough to allege that CytRx's executives made certain statements with the intent they would be relayed to the public.[11] (Opp'n at 17-18.) But, the

---

[11] As noted above, Plaintiffs filed a Notice of Recent Authority citing *Stanaford v. Genovese, et al.*, Case No. 13-cv-80923 (S.D. Fl. February 10, 2015), which allowed Rule 10b-5 claims regarding an alleged "pump-and-dump" scheme involving "third-party promoters, which included brokers and newsletter writers, [that] were being paid by Defendants to pitch Liberty Silver stock[, but] . . . claim[ed] to be independent third parties." [*See* Dkt. 101-1 at 4.] Problematically, beyond stating that "[s]uch allegations are sufficient to state a claim under section 10(b) of the Securities Exchange Act and SEC Rule 10b-5," the *Stanaford* court made no attempt to reconcile its decision with *Janus* or explain its reasoning. [*See id.*] Accordingly, we do not find this case persuasive.

*E-FILED*

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 14-1956-GHK (PJWx) | Date | July 13, 2015 |
|---|---|---|---|
| Title | *In Re CytRx Corporation Securities Litigation* | | |

cases that they cite in support of this point all involve instances in which the statements made by third parties were explicitly attributed to the defendant. *See, e.g.*, *S.E.C. v. Daifotis*, 874 F. Supp. 2d 870, 880 (N.D. Cal. 2012) ("The record shows that the financial consultant . . . relayed defendant's allegedly false statement about the redemptions and expressly attributed the remarks to defendant by name."); *Lopes v. Viera*, 2012 WL 691665, at *6 (E.D. Cal. Mar. 2, 2012) ("Given the explicit attribution to Defendant, *Janus* does not preclude liability based upon Defendant making an indirect statement to Plaintiffs."); *In re Allstate Life Ins. Co. Litig.*, 2012 WL 1900560, at *4 (D. Ariz. May 24, 2012) ("[G]iven the Official Statements' explicit attribution of the disclosures to the Fain Group, [the Fain Group] appears to have had the requisite 'ultimate authority' over those disclosures.").[12] They also cite inapposite cases that held corporations and corporate executives responsible for the statements of other corporate insiders. *See, e.g.*, *Richardson v. Oppenheimer & Co. Inc.*, 2014 U.S. Dist. LEXIS 43419, at *23 (D. Nev. Mar. 31, 2014) ("[S]tatements of low-level employees can be imputed to executives who exercise authority over their non-casual statements."); *Local 703, I.B. of T. Grocery & Food Empls. Welfare Fund v. Regions Fin. Corp.*, 2011 U.S. Dist. LEXIS 93873, at *3 (N.D. Ala. Aug. 23, 2011) ("[U]nlike the separate legal entities in *Janus*, the defendants here [who signed SOX certifications] are in ultimate authority over their statements.").

Plaintiffs also argue, in a footnote, that the CytRx Defendants might be held liable under a conduit theory of liability.[13]  (Opp'n at 24 n.33.)  Under this theory, defendants can be held liable for "ma[king] false and misleading statements to securities analysts with the intent that the analysts communicate those statements to the market."  *Cooper v. Pickett*, 137 F.3d 616, 623-24 (9th Cir. 1997); *see also Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1235 (9th Cir. 2004) ("When statements in analysts' reports clearly originated from the defendants, and do not represent a third party's projection, interpretation, or impression, the statements may be held to be actionable even if they are not exact quotations.").  But, Plaintiffs have failed to point to any false statements within the

---

[12] Plaintiffs claim that *Scott v. ZST Digital Networks, Inc.*, 896 F. Supp. 2d 877, 890-91 (C.D. Cal. 2012), a case cited by the CytRx Defendants, supports their claim because the court found "that [when] WestPark was instrumental [] in preparing or assisting with the relevant statements, . . . WestPark can, in fact, be said to have 'issued' them."  (Opp'n at 19.)  They are incorrect, as the *Scott* court did not find this sufficient, in and of itself, to conclude WestPark "made" the statements.  The *Scott* plaintiffs also alleged "that WestPark's name was featured prominently on the offering documents."  896 F. Supp. 2d at 890-91.

[13] It is unclear whether this theory of liability survives the *Janus* decision.  *See Janus*, 131 S. Ct. at 2311-12 (Breyer, J. dissenting) (pointing out that the majority's decision is inconsistent with lower courts' approval of a "conduit theory" of liability); *see also* Elizabeth Cosenza, *Is the Third Time the Charm?* Janus *and the Proper Balance Between Primary and Secondary Actor Liability Under Section 10(b)*, 33 Cardozo L. Rev. 1019, 1073-74 (2012) ("The Court's limitation on section 10(b) liability to those entities or individuals with 'ultimate authority' over disclosure arguably forecloses the conduit theory.").

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-1956-GHK (PJWx) | Date | July 13, 2015 |
|----------|------------------------|------|---------------|
| Title | *In Re CytRx Corporation Securities Litigation* | | |

published DreamTeam articles that "clearly originated" from or were controlled by any CytRx
Defendant. Instead, Plaintiffs merely allege that these articles were "drafted by Defendant Meyer
or John Mylant and then reviewed, edited and approved by Defendants Haen and Kriegsman prior to their
dissemination to the investing public." (*See, e.g.*, CCAC at ¶ 102.) Such generalized control allegations
are insufficient when DreamTeam employees drafted the articles, worked for a different company, and
did not explicitly attribute any of their statements to the CytRx Defendants. Without specific allegations
about each CytRx Defendants' purported level of control over the drafting and release of each of the
fourteen published[14] DreamTeam articles, we cannot conclude that these Defendants had ultimate
authority over the potentially actionable false statements or omissions within them. *Cf. Reese v. BP
Exploration (Alaska) Inc.*, 643 F.3d 681, 693 n.8 (9th Cir. 2011) (declining to hold BPXA responsible
for "making" certain statements when there was "no allegation that BPXA made the filings and falsely
attributed them to the [third party publisher] Trust" and the plaintiff only generally alleged that the
"Trust Agreement provides that BPXA is 'authorized to make and shall be responsible for' the Trust's
filings").

Alternatively, Plaintiffs argue that the CytRx Defendants should be liable for the DreamTeam
articles under Rule 10b-5(b) because they had a duty to "correct the misimpression created among
investors and caused by the articles' suggestion that Defendant Meyer was 'not receiving compensation'
and had 'no business relationship' with the Company." (Opp'n at 25; *see also* CCAC at ¶ 52.) But, if
the CytRx Defendants did not "make" the statements in question, they had no such duty. *See MGIC Inv.
Corp.*, 675 F.3d at 1051-52 ("Fulton proposes to get around *Janus Capital* by asserting that MGIC had a
duty to correct any errors Williams or Draghi made. But no statute or rule creates such a duty—if there
were one, *Janus Capital* itself would have come out the other way."); *see also Pomeroy v. GreatBanc
Trust Co.*, 2014 WL 7177583, at *3 (N.D. Ill. Dec. 16, 2014) ("Section 10(b) does not impose liability
for a failure to correct another's misrepresentations."); *Garvey v. Arkoosh*, 354 F. Supp. 2d 73, 83 (D.
Mass. 2005) ("[T]he burden to disclose rests on the person who *publishes* the analyst's report; by
contrast, there is no duty imposed by the statute on the *issuer* who has paid for the puffery."). Plaintiffs
have not convinced us that we should conclude any differently. They cite only cases that found that (1)
stock promoters have a duty to disclose material information such that their own public statements are
not rendered false or misleading[15] or (2) that companies have a duty to correct errors in statements they

---

[14] The Pearson Report mainly focuses on Company involvement in editing and approving
"dummy articles" that Pearson "had no intention of ever publishing." (*See, e.g.*, CCAC at ¶¶ 70, 79-80.)
While the CCAC generally alleges that Mylant, who wrote two of the fourteen DreamTeam articles
about CytRx, needed to get published articles "approved by CytRx management," it does not provide
any details about which articles were implicated, the nature of this purported approval process, who in
"management" was responsible, or which part of any article was changed or edited by CytRx. (*See id.* at
¶¶ 75, 102.)

[15] *See, e.g.*, CCAC at ¶ 7 n.3 (citing *S.E.C. v. Curshen*, 372 F. App'x 872, 881 (10th Cir. 2010)
(concluding that "[a promoter's] failure to disclose that he was being compensated for making material

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-1956-GHK (PJWx) | Date | July 13, 2015 |
|---|---|---|---|
| Title | *In Re CytRx Corporation Securities Litigation* | | |

previously "made." *See, e.g.*, *In re LDK Solar Secs. Litig.*, 2008 U.S. Dist. LEXIS 80717, at *30 (N.D. Cal. Sept. 24, 2008) ("[I]f defendants made false statements unknowingly but learned of the falsity of their statements thereafter, they had a duty to disclose the information necessary to correct the misstatements . . . ."); *S.E.C. v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1095 (9th Cir. 2010) ("Nor do Platforms' subsequent press releases correct, or even attempt to correct, the misleading statements and material omissions in [its] August 2000 press release.").

Accordingly, we **hereby DISMISS** Plaintiffs' claims against the CytRx Defendants based on DreamTeam articles. We do so **with leave to amend**, as we cannot currently say that Plaintiffs will not be able to plead specific allegations about the CytRx Defendants' "ultimate authority" over the content and dissemination of the DreamTeam articles. *Cf. MGIC Inv. Corp.*, 675 F.3d at 1051 (suggesting that a company might have been held liable for the false statements of "independent agents, speaking for themselves" if the plaintiff had alleged that the company "directed [them] to say what they did" or "contend[ed] that, as a condition of participating in [the] earnings call, [the third party publishers] promised to support the [company] party line (if there was one)").

## ii.    Company Statements

Plaintiffs plead the following misstatements or omissions that can be fairly attributed to the CytRx Defendants.[16] The first alleged misstatement is in an Underwriting Agreement signed by Kriegsman that the Company filed with the SEC on January 31, 2014. (CCAC at ¶ 157.) In it, the Company stated that it had not "taken, directly or indirectly, any action designed to or that might cause or result in stabilization or manipulation of the price of the [company's s]hares." (*Id.* (emphasis omitted).) According to Plaintiffs, this statement was false because Kriegsman had in fact "taken prior actions to stabilize and manipulate the price of the Company's securities by personally editing and approving the DreamTeam articles." (*Id.*) The CytRx Defendants argue that under securities law, "manipulation" is a term of art and thus, this statement cannot be false or misleading. (Mot. at 11.) But, they make little effort to explain why this alleged conduct would not constitute securities "manipulation." *See Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931, 938-39 (9th Cir. 2009) ("The term refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity."); *see also Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976) ("[Manipulative] connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities."); *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 477 (1977) ("No doubt Congress meant to prohibit the full range of ingenious

---

statements is a material omission under these circumstances").

[16] The CytRx Defendants argue that these company statements are not pled with sufficient specificity. (Mot. at 7.) We disagree. Plaintiffs have detailed specific statements that are false and misleading, who "made" each statement, the dates these statements were made or became public, where each statement was made, and what about each of the statements was false.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-1956-GHK (PJWx) | Date | July 13, 2015 |
|---|---|---|---|
| Title | *In Re CytRx Corporation Securities Litigation* | | |

devices that might be used to manipulate securities prices."). Further, the CytRx Defendants argue, without citation, that "Plaintiffs can hardly argue that marketing, even by an outside firm, constitutes 'manipulation' of a company's share prices." (Mot. at 11.) However, what Plaintiffs allege is not simple marketing—they allege that the CytRx Defendants engaged in a purposeful campaign to boost the Company's price at certain key points in order to make money for themselves and the Company. If true, such a campaign would certainly be contrary to public statements that the Company or its officers had not taken any actions that might "stabilize" or "manipulate" the Company's stock price. Thus, Plaintiffs' allegations are sufficient to support a reasonable belief that this statement was false when made.

The second alleged affirmative company misstatement is in the Company's 2013 Annual Report, signed by Kriegsman and Caloz and filed with the SEC on March 5, 2014. The Annual Report stated that "[w]e also have not timed the release of material nonpublic information for the purpose of affecting the value of stock options or other compensation to our executive officers, and we have no plan to do so." (CCAC at ¶¶ 90, 158 (emphasis omitted).) Plaintiffs claim that this statement was false in light of the timing of the Company's December 2013 announcement of its Phase 2b aldoxorubicin clinical trial results, which took place one day after the Compensation Committee granted Kriegsman and Caloz over one million shares in stock options. (*Id.* at ¶¶ 87, 91-93.) We agree that, if Plaintiffs' "spring-loaded" options allegations are true, they would render false or misleading this statement denying any attempts to manipulate stock option value via the release of material nonpublic information. The CytRx Defendants do not address this statement in their Motion or Reply. Thus, we conclude that Plaintiffs' allegations regarding this statement are sufficient to survive dismissal.

Finally, Kriegsman and Caloz signed the Company's SOX certification for 2013 Annual Report and certified that "I have disclosed . . . [a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting." (*Id.* at ¶ 163 (emphasis omitted).) This was allegedly misleading because they had not disclosed management's involvement in the DreamTeam promotion scheme. (*Id.* at ¶ 164.) But, in context, this statement plausibly certifies only that Defendants revealed any and all fraud relating to the Company's financial statements. Plaintiffs make no effort to defend these falsity allegations in their Opposition. Thus, we find that this statement is not actionable as pled.

The CCAC also alleges that certain Company statements contained actionable omissions. Most of these are Company press releases and/or conference calls that discuss the positive results of phase two testing of aldoxorubicin. (*See id.* at ¶¶ 146-47 (November 20, 2013 press release by Kriegsman entitled "CytRx Initiates Phase 2 Clinical Trial with Aldoxorubicin in Patients with Unresectable Glioblastoma Multiforme (Brain Cancer)"); *id.* at ¶¶ 148-51 (emphasis omitted) (December 11, 2013 press release signed by Caloz entitled "CytRx Reports Highly Statistically Significant Positive Results from its Global Phase 2b Clinical Trial" and Kriegsman conference call with investors about what he deems "'clearly the most important news in our Company's history'").) Plaintiffs claim that these communications are misleading because they failed to disclose that "(i) CytRx had retained DreamTeam to publish articles designed to inflate the price of CytRx stock; (ii) Defendants Kriegsman and Haen

*E-FILED*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-1956-GHK (PJWx) | Date | July 13, 2015 |
|---|---|---|---|
| Title | *In Re CytRx Corporation Securities Litigation* | | |

directly edited and approved the articles prior to publication; (iii) Defendant Meyer used false aliases and failed to disclose his material relationship to CytRx."[17]  (*Id.* at ¶¶ 147, 152.)  We disagree.  As the CytRx Defendants argue, such statements are not rendered misleading just because they do not mention the DreamTeam promotion scheme.  (*See* Mot. at 9-10.)  "[N]either Section 10(b) nor Rule 10b-5 create[s] an affirmative duty to disclose any and all material information.  Disclosure is required under these provisions only when necessary to make . . . statements made, in the [sic] light of the circumstances under which they were made, not misleading."  *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1054 (9th Cir. 2014) (internal quotation marks omitted).  These statements were about clinical trials, not the company's stock value, marketing efforts, or even press coverage.  It is unclear why any reasonable investor would expect to hear about DreamTeam in this context, even if some DreamTeam articles touted aldoxorubicin's success as a reason to invest in the Company.  *Cf. Brody v. Transitional Hospitals Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (finding omission of possible takeover not misleading when the "press release . . . neither stated nor implied anything regarding a merger"); *In re Yahoo! Inc. Sec. Litig.*, 2012 WL 3282819, at *10 (N.D. Cal. Aug. 10, 2012) (emphasis omitted) (noting that it "is hard to see how a statement" that "says nothing about the value" of a business could "affirmatively create[] an impression that the value is different in a material way than the actual value").

The CCAC alleges only two company statements that would be rendered misleading by the omission of the alleged DreamTeam promotion scheme.  First, on January 30, 2014, CytRx issued an 8-K entitled "Risk Factors," signed by Defendant Kriegsman, "that failed to disclose the stock promotion scheme as a risk that could materialize for the Company and its shareholders."  (CCAC at ¶ 155 (emphasis omitted) (listing factors that "may affect the market price of our common stock").)  Second, on March 5, 2014, CytRx issued a press release called "CytRx Reports 2013 Financial Results" that quoted Kriegsman about the Company's 2013 financials and October 2013 and January 2014 public offerings.  (*Id.* at ¶ 161 (stating, for example, "[w]e are entering 2014 on firm financial ground, having recently raised approximately $86 million").  Plaintiffs allege that these statements were misleading because they did not explain that the Company's stock price was artificially inflated by the DreamTeam.  (*Id.* at ¶ 162.)  The CytRx Defendants counter that since these "generic" and "boilerplate" statements do not specifically mention "CytRx's marketing efforts, let alone third-party promotional techniques" the omission of DreamTeam was not misleading.  (Mot. at 10; Reply at 9.)  We are not convinced.

According to Plaintiffs, the DreamTeam marketing was aimed at artificially inflating company stock, in part, to raise more money in the Company's public offerings.  In fact, Plaintiffs allege that "[t]he promotional articles and the paid retention of the DreamTeam Group were coordinated with the release of news and data from [CytRx] such that they coincided with the [Company's] share prices [] rising dramatically."  (CCAC at ¶ 95 (emphasis omitted) (also alleging "[there was] great urgency to get these articles in almost exact proximity to sales/issuances of stock by . . . CytRx [in the Secondary

---

[17]  Plaintiffs do not allege that these press releases or conference calls included any false statements about aldoxorubicin or the phase two test results.

**E-FILED**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-1956-GHK (PJWx) | Date | July 13, 2015 |
|---|---|---|---|
| Title | *In Re CytRx Corporation Securities Litigation* | | |

Offering]").)  Once management started making announcements about investment risks, stock value, and the public offerings, it is misleading to omit a full explanation regarding how and why the Company's stock price was so dramatically increasing.  *See Ansell v. Laikin*, 2011 WL 3274019, at *4 (C.D. Cal. Aug. 1, 2011) ("Defendant represented in the Tender Offer that past and future stock price fluctuations were due to factors beyond the Company's control, but did not disclose that Defendant had been manipulating the stock price with the help of the stock promoter.  Next, by failing to mention his scheme but listing several other risks in the 'questions and answers' section of the Tender Offer, Defendant misled investors into believing that the Tender Offer had disclosed all known risks of investing in the Company.").

In sum, the CCAC identifies four potentially actionable false statements "made" by Kriegsman or Caloz.  As Haen is not implicated in any of the actionable false statements, Plaintiffs' Rule 10b-5(b) claim against him is **DISMISSED with leave to amend**.

**b.      Scienter**

To survive dismissal, the CCAC must include allegations establishing a strong inference that Kriegsman and Caloz knew the actionable statements were false or misleading when made.

**i.      Kriegsman**

As for statements rendered false or misleading because of the alleged DreamTeam promotion scheme, Plaintiffs allege that Kriegsman made such statements with scienter because he personally "reviewed, edited and approved articles he understood would be published online by DreamTeam, Defendant Meyer and/or Mr. Mylant."  (CCAC at ¶ 31.)  The CytRx Defendants counter that Plaintiffs have not sufficiently alleged that Kriegsman was involved in the purported DreamTeam scheme, as the Company article edits revealed by Pearson bore only the electronic signatures of Defendant Haen and Kriegsman's executive assistant.[18]  (Mot. at 13.)  But, Plaintiffs also allege that Kriegsman's assistant's responsibilities were limited to "scheduling appointments and conference calls[,] coordination of all business and personal travel of the CEO [], [and] management of expenses and monthly reconciliation."  (CCAC at ¶ 71 n.12.)  It is highly unlikely that an assistant with these responsibilities would be making substantive edits to the DreamTeam articles rather than merely forwarding Kriegsman's edits to DreamTeam.  (*See id.* at ¶ 80 (substantive changes bearing Kriegsman's assistant's signature).)

---

[18] The CytRx Defendants also try to discount the Pearson report as the "speculation of a short-seller blogger," ignoring the fact that Pearson had firsthand experience with DreamTeam and the Company, offered concrete facts in support of his allegations, and that publishers removed DreamTeam articles soon after Pearson's Report came out.  (*See* Mot. at 6.)  Plaintiffs also claim to have interviewed both Mylant and Pearson as part of their investigation before filing the CCAC.  (CCAC at ¶ 2.)

*E-FILED*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-1956-GHK (PJWx) | Date | July 13, 2015 |
|----------|------------------------|------|----------------|

| Title | *In Re CytRx Corporation Securities Litigation* |
|-------|--------------------------------------------------|

Even if not directly involved in editing the DreamTeam articles, taken together, Plaintiffs' allegations are sufficient to raise a strong inference that Kriegsman knew about the scheme. First, Kriegsman is on the Board of Galena, another company allegedly involved in the exact same type of scheme, and sold his shares in that company soon "before the stock faltered following negative press related to the online-article controversy." (*See id.* at ¶ 97 (emphasis omitted).) Second, CytRx paid DreamTeam $65,000 for a year's worth of stock promotion, which included fourteen paid promotions for CytRx. (*Id.* at ¶ 67.) Third, CytRx is a small company with only seventeen employees, which raises the inference that Kriegsman was aware of what his employees, including Haen and his own assistant, were doing to promote company stock. *See Batwin v. Occam Networks, Inc.*, 2008 U.S. Dist. LEXIS 52365, at *34 (C.D. Cal. July 1, 2008) ("[I]t is also pertinent that Occam at all relevant times, was a relatively small company, with 80 to 100 employees."). Thus, we are unpersuaded by the CytRx Defendants' argument that, here, "the surreptitious nature of the transactions creates an equally strong inference that the [scheme] would have deliberately been kept secret—even within the company." *See Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 746-47 (9th Cir. 2008). Especially with high officials such as Kriegsman, Defendants' asserted inference is hardly reasonable.

We also conclude that Plaintiffs have sufficiently alleged scienter as to Kriegsman's statement in the 2013 Annual Report regarding the timing of the release of material nonpublic information. This statement was made approximately three months after Kriegsman received "925,000 stock options . . . (more than double the amount awarded to him in all of 2012, which generated over $3 million for [him] in one day)."[19] (CCAC at ¶ 86.) These purportedly spring-loaded options were granted to Kriegsman *one day* before the announcement of what Kriegsman himself deemed "clearly the most important news in our Company's history." (*Id.* at ¶ 151 (emphasis omitted).) Regardless of Kriegsman's personal involvement in the purported spring-loaded stock option scheme, the misleading nature of his later pronouncement about Company stock options should have been "obvious from the operations of the company." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1001 (9th Cir. 2009); *Berson*, 527 F.3d at 988 n.5, 989 (internal quotation marks omitted) (allowing inference of scienter when statements involved "the company's largest contract with one of its most important customers" and it was "absurd to suggest that top management was unaware" of the situation). Taken together, Plaintiffs' allegations

---

[19] Contrary to the CytRx Defendants' argument, the fact that Kriegsman or Caloz did not have the opportunity to exercise these options before the purported DreamTeam scheme was revealed is not dispositive. [*See* Dkt. 96-1, at 19:16-20 (Vice Chancellor Laster noting, when denying the CytRx Defendants' Motion to Dismiss the derivative suit based on these options, that "even guys who rob a bank know to lay low for a while and not to go out and spend a bunch of money that would call attention to themselves. I mean, it's sort of like shooting up a flare if you do that, isn't it?").]

**E-FILED**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-1956-GHK (PJWx) | Date | July 13, 2015 |
|---|---|---|---|
| Title | *In Re CytRx Corporation Securities Litigation* | | |

raise a strong inference of scienter as to Kriegsman[20] at the time of each of his alleged false or misleading statements.

### ii.    Caloz

We conclude that Plaintiffs have sufficiently alleged scienter as to the only actionable false statement made by Caloz. Like Kriegsman, Caloz's receipt of 150,000 stock options the day before the announcement of the most important news in company history raises a strong inference that he was aware of the falsity of his 2013 Annual Report statement regarding said options. (*See* CCAC at ¶ 86.) Moreover, as CytRx's CFO, Caloz would surely have been aware of the unprecedented nature of a grant of 2.9 million shares, as this number represented "the largest director grants *ever* made to CytRx insiders and nearly doubled the amount of compensation that each of the directors had received in 2012, and were *four times* the compensation each director had received in 2011." (*See id.* at ¶ 93 (emphasis in original).)

Accordingly, Defendants' Motion as to Plaintiffs' Rule 10b-5(b) claim against Kriegsman, Caloz, and CytRx for statements contained in company press releases, filings, or communications with investors is **DENIED**.

### 2.    Rules 10b-5(a) and (c)

CytRx, Meyer, Kriegsman, and Haen can only be "liable as part of a fraudulent scheme based upon misrepresentations and omissions under Rules 10b-5(a) or (c) when the scheme also encompasses conduct beyond those misrepresentations or omissions." *See WPP Luxembourg*, 655 F.3d at 1057. The CytRx Defendants argue that we should dismiss Plaintiffs' scheme liability claim because it includes "verbatim recitation of Plaintiffs' omissions claims" and because Plaintiffs failed to plead scienter.[21] (Mot. at 16-17; Reply at 16.)

Plaintiffs' scheme liability allegations include the following: First, that "[d]uring the Class Period, Defendants CytRx, Meyer, Kriegsman and Haen participated in the preparation of and/or disseminated or approved the false [and misleading] statements specified above." (CCAC at ¶ 199.) They allegedly did so in a calculated fashion: "on days where CytRx itself made an announcement, the articles were used to highlight and amplify the news" and "during quiet periods where the Company was not making public statements, the promotional articles maintained the artificial inflation in the price of the Company's securities." (*Id.* at ¶ 64.) Second, these Defendants "engaged and participated in a

---

[20] By extension, the CCAC raises an inference of scienter as to corporate Defendant CytRx. *See Nordstrom, Inc.*, 54 F.3d at 1435 (noting that the knowledge and intent of directors and officers can be imputed onto the corporate defendant).

[21] CytRx Defendants do not challenge this claim on any other grounds. Thus, we only address the arguments Defendants raised against this claim.

*E-FILED*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-1956-GHK (PJWx) | Date | July 13, 2015 |
|---|---|---|---|
| Title | *In Re CytRx Corporation Securities Litigation* | | |

continuous course of conduct to conceal the truth." (*Id.* at ¶ 200.)  Third, "when the Company's share price reached sufficient heights," these Defendants "consummate[d] the Secondary Offering with artificially inflated shares of CytRx's common stock" and "award[ed] themselves and members of [the Board] with massive amounts of perfectly-timed stock option grants."  (*Id.* at ¶ 8 (emphasis omitted).)

We conclude that such allegations are sufficient to survive dismissal.  First, the Rule 10b-5(b) "maker" limitation described in *Janus* is inapplicable to scheme liability claims.  *See S.E.C. v. Monterosso*, 756 F.3d 1326, 1334 (11th Cir. 2014) ("The case against Monterosso and Vargas did not rely on their 'making' false statements, but instead concerned their commission of deceptive acts as part of a scheme to generate fictitious revenue for GlobeTel.  Therefore, *Janus* has no bearing on this case."); *S.E.C. v. Sells*, 2012 WL 3242551, at *7 (N.D. Cal. Aug. 10, 2012) ("Allowing liability for Defendants' alleged conduct under Rule[s] 10b-5(a) and (c) would not make *Janus* meaningless because *Janus* did not address these sections, nor are these sections concerned with material misstatements or omissions, the subject addressed in *Janus*.").

Second, Plaintiffs are not merely attempting to re-label a "misstatement" or "omission" claim as a "scheme" claim.  While the purported scheme certainly involved allegedly false and misleading statements, it also included conduct beyond said statements, including the hiring of promoters, planning and editing well-timed article releases with targeted content to artificially inflate the value of company stock and raise revenue, and covering up the Company's involvement.  *Cf. JAC Holding Enters., Inc. v. Atrium Capital Partners, LLC*, 997 F. Supp. 2d 710, 735 (E.D. Mich. 2014) (allowing scheme liability claim when "[t]he conduct charged comprises not just specific false statements . . . , but also the planning and carrying out of a comprehensive scheme, by specific steps, to mislead the buyers as to JAC's value . . ."); *Swack v. Credit Suisse First Boston*, 383 F. Supp. 2d 223, 239 (D. Mass. 2004) ("[Plaintiff] alleged not just that Wolfenberger issued one or two misleading research reports, but rather that over time he worked extensively with Dachis to issue bullish research reports (and 'work' Razorfish stock in conference calls and elsewhere) with the deliberate aim of boosting Razorfish's market price artificially.  This adequately states a 'scheme' . . . under Rule[s] 10b-5(a) and (c).").  Moreover, Haen and Kreigsman were not alleged to have been passive participants in this scheme; they purportedly actively edited articles and added bullish statements about the Company.  *Cf. Abbate*, 2011 WL 9698215, at *2 (concluding that the plaintiffs failed to allege a deceptive act when they alleged only that the defendants "knew—or were reckless in not knowing—that" statements made by a third party about the company were false); *In re Coinstar Inc. Sec. Litig.*, 2011 WL 4712206, at *11 (W.D. Wash. Oct. 6, 2011) (rejecting scheme claim when the plaintiff's only conduct allegations involved the defendants' "mere attendance at the November conferences" where false statements by other executive officers occurred).  Viewing the allegations in context, this case is distinguishable from other cases in which courts found scheme allegations were merely veiled false statement claims.  *See, e.g.*, *WPP Luxembourg*, 655 F.3d at 1058 (rejecting "fraudulent scheme" claim that "allegedly involved the Defendant-Appellees planning together to not disclose the Founders' sale of securities in the secondary offering, and then not disclosing those sales [because] fundamentally, this is an omission claim").

Third, Plaintiffs' scienter allegations are sufficient to survive dismissal.  As described above,

*E-FILED*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-1956-GHK (PJWx) | Date | July 13, 2015 |
|---|---|---|---|
| Title | *In Re CytRx Corporation Securities Litigation* | | |

Plaintiffs have properly alleged scienter as to Kriegsman and CytRx regarding the DreamTeam scheme. As for Haen, Plaintiffs' allegations raise a strong inference that he was directly involved in the purported scheme. According to DreamTeam authors Meyer and Mylant, management approved and edited the articles they wrote about CytRx. (*See* CCAC at ¶¶ 16, 75.) Plaintiffs' allegations demonstrate that one of these people was likely Haen. (*See id.* at ¶ 71 (drafts Pearson received included Haen's electronic signature); *id.* at ¶ 72 (Meyer stating that he "think[s] the guy who makes the changes [was Defendant] David Haen, Biz Development"); *id.* at ¶ 74 (Pearson alleging that Haen conceded "that CytRx had provided 'some new or original content' to DreamTeam's writers, including Defendant Meyer and Mr. Mylant").) Accordingly, the CytRx Defendants' Motion as to Plaintiffs' scheme liability claim is **DENIED**.

### C.    Legal Standard Regarding Securities Act Claims

#### 1.    Section 11

Section 11 imposes liability on "every person who signed [a] registration statement" that contains "untrue statements of material fact or [omissions of] a material fact required" to make the statements therein not misleading. 15 U.S.C. § 77k(a) (also imposing liability on "every underwriter with respect to [the] security [at issue]"). Liability under this section is broad, requiring plaintiffs to prove only that they had purchased shares from a registration statement that contained a material misstatement or omission. In order to bring a Section 11 claim, plaintiffs must allege they purchased securities from the offending registration or prospectus. *Hertzberg v. Dignity Partners*, 191 F.3d 1076, 1080-82 (9th Cir. 1999).

#### 2.    Section 12

Liability is imposed under Section 12 on "any person who offers or sells a security by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact required" to make the statements therein not misleading. 15 U.S.C. § 77l(a)(2). Section 12 expressly limits recovery to only those purchasers who purchase their shares from a seller who makes use of false or misleading statements. 15 U.S.C. § 77l(a)(2) (seller "shall be liable to the person purchasing such security from him").

### D.    Securities Act Claims Analysis

Plaintiffs bring Section 11(a) claims against all of the individual CytRx Defendants, except Haen, and the Underwriter Defendants. They also bring Section 12(a)(2) claims against CytRx and the Underwriters. Both sets of Defendants move to dismiss these claims.

#### 1.    Applicable Pleading Standard

**E-FILED**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-1956-GHK (PJWx) | Date | July 13, 2015 |
|---|---|---|---|
| Title | *In Re CytRx Corporation Securities Litigation* | | |

Although a heightened pleading standard does not normally apply, Section 11 and 12 claims that "sound in fraud" must be pled with particularity under Federal Rule of Civil Procedure 9(b). *Rubke*, 551 F.3d at 1161. To determine whether such claims "sound in fraud," we must conduct a "close examination of the language and structure of the complaint, whether the complaint allege[s] a unified course of fraudulent conduct and rel[ies] entirely on that course of conduct as the basis of a claim." *Id.* (internal quotation marks omitted). But, when a "complaint employs the exact same factual allegations to allege violations of section 11 [and section 12] as it uses to allege fraudulent conduct under section 10(b) of the Exchange Act, we can assume that it sounds in fraud." *Id.*

Plaintiffs argue their Section 11 and 12 claims should not be subjected to a higher pleading standard because (1) they specify that "[t]he Underwriter and Director Defendants are not alleged to have engaged in fraudulent conduct and are liable here only under the non-fraud provisions of the Securities Act" and (2) their fraud claims are alleged only against certain Defendants. (*See* CCAC at ¶ 57; Opp'n at 36-37.) While "nominal efforts" to "disclaim[] any allegations of fraud" are insufficient, *see In re Stac Electronics Sec. Litig.*, 89 F.3d 1399, 1405 n.2 (9th Cir. 1996), we conclude that Plaintiffs' Securities Act claims do not sound in fraud and are subject to Rule 8, not Rule 9(b).[22] Like the plaintiffs in *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1162-63 (C.D. Cal. 2008), Plaintiffs have "stripped" their Securities Act allegations of fraud and only "levie[d] fraud allegations against a select few defendants" based upon "specifie[d] unique, particularized facts as to those defendants." Specifically, only Kriegsman, Caloz, Haen, and CytRx are accused of perpetuating the DreamTeam promotion scheme and/or making false or misleading statements in violation of the Exchange Act. Plaintiffs' theory of Securities Act liability is not based upon a unified course of fraudulent conduct. Instead, Plaintiffs allege that the Securities Act Defendants failed to conduct adequate due diligence to discover said fraud and acted negligently in signing a Registration Statement with statements that were rendered false or misleading by the fraud's existence. (*See, e.g.*, CCAC at ¶¶ 211-13.)

      **2.**      **Standing**

Defendants argue that Plaintiffs lack standing to bring their Section 11 and Section 12 claims. Plaintiffs allege the following regarding their standing:

- "Lead Plaintiff Deepak Gupta purchased CytRx securities during the Class Period." (CCAC at ¶ 25.)
- "Named plaintiffs Randall S. Pettit and Diane D. Pettit purchased CytRx common stock

---

[22] Even if Plaintiffs' Securities Act claims were subject to Rule 9(b), they would survive dismissal because they identify overlapping false statements and claim they are misleading for the same reasons as those identified in their Section 10b claims. (*See* CCAC at ¶¶ 168-69.) As Plaintiffs' Section 10(b) allegations were sufficient to meet PSLRA's heightened pleading standards, Plaintiffs' similar Securities Act falsity allegations are sufficient under Rule 9(b).

*E-FILED*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-1956-GHK (PJWx) | Date | July 13, 2015 |
|---|---|---|---|
| Title | *In Re CytRx Corporation Securities Litigation* | | |

during the Class Period, including pursuant to and/or traceable to the Secondary Offering."  (*Id.* at ¶ 26.)

• "Mr. and Ms. Pettit purchased over 9000 shares of CytRx common stock on February 5, 2014 at the Secondary Offering price of $6.50.  The Pettit's [sic] purchased their Secondary Offering shares before CytRx announced the closing of the Secondary Offering on February 5, 2014."  (*Id.* at ¶ 27.)

        **a.**      **Section 12(a)(2)**

Defendants argue that these standing allegations are insufficient to maintain a 12(a)(2) claim. We agree.  Many courts have found that, under *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561 (1995),[23] only plaintiffs who have purchased shares directly in a public offering (versus the aftermarket) can bring a claim under this Section.  *See, e.g.*, *Yung v. Lee*, 432 F.3d 142, 148 (2d Cir. 2005)  (internal quotation marks omitted) ("[P]urchasers in private or secondary market offerings are precluded from bringing actions under Section 12(a)(2)."); *In re Levi Strauss & Co. Sec. Litig.*, 527 F. Supp. 2d 965, 983 (N.D. Cal. 2007) ("The court concludes that based on *Gustafson*, § 12(a)(2) does not extend to after market transactions."); *In re Century Aluminum Co. Sec. Litig.*, 749 F. Supp. 2d 964, 976 (N.D. Cal. 2010) (same); *Primo v. Pac. Biosciences of California, Inc.*, 940 F. Supp. 2d 1105, 1124 (N.D. Cal. 2013) (same and listing cases in agreement).  Here, only the Petitts make Secondary Offering allegations, and they allege only that they purchased "pursuant to and/or traceable to the Secondary Offering."  (*See* CCAC at ¶ 26; *see also id.* at ¶ 5 ("Plaintiffs' Securities Act claims are based on their purchases of CytRx common stock pursuant to and/or traceable to the Registration Statement used in connection with the spot secondary offering the Company announced on January 31, 2014 (the 'Secondary Offering')."); *id.* at ¶ 219 ("Plaintiffs purchased CytRx's common stock pursuant to and/or traceable to the defective Prospectus.").)  Such wishy-washy allegations are insufficient to demonstrate that Plaintiffs have Section 12 standing—either the Petitts purchased shares directly from one of the Section 12 Defendants in the Secondary Offering or they did not.  *Compare In re Century Aluminum Co. Sec. Litig.*, 749 F. Supp. 2d 964, 976 (N.D. Cal. 2010) (dismissing Section 12 claim in which "Plaintiffs allege that they purchased 'pursuant to and/or traceable to the offering'") *and In re Prestige Brands Holding, Inc.*, 2006 WL 2147719, at *9 (S.D.N.Y. July 10, 2006) (rejecting Section 12 claim in which plaintiffs alleged "merely that they bought shares 'traceable to' or 'in connection with' an IPO") *with Maine State Ret. Sys. v. Countrywide Fin. Corp.*, 2011 WL 4389689, at *11 (C.D. Cal. May 5, 2011) ("Plaintiffs have alleged that they purchased some Certificates 'directly from the Section 12 Underwriter Defendants in the Offerings . . . .'").  As the CytRx Defendants point out, beyond conclusorily stating "Mr. and Mrs. Pettit bought their shares in the Secondary Offering," "Plaintiffs ignore . . . this argument" in their Opposition.  (*See* Opp'n at 28; Reply at 22.)  Without more, Plaintiffs have not alleged facts that plausibly show they actually purchased in the Secondary Offering (versus the aftermarket) and have standing under this Section.

---

[23] This case stated in dicta that Congress intended Section 12 liability to be "limited to public offerings."  *Gustafson*, 513 U.S. at 578.

*E-FILED*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-1956-GHK (PJWx) | Date | July 13, 2015 |
|---|---|---|---|
| Title | *In Re CytRx Corporation Securities Litigation* | | |

Plaintiffs' Section 12(a)(2) claim against CytRx is also deficient because they fail to properly allege that CytRx is a "seller" as defined under this Section. "A[n issuer] is a statutory seller, or sells securities, if [it] either passes title of the security to the purchaser, *or* solicits the sale of the security." *In re Bare Escentuals, Inc. Sec. Litig.*, 745 F. Supp. 2d 1052, 1073 (N.D. Cal. 2010). As Plaintiffs do not allege that CytRx passed title directly to them, they must allege "active solicitation coupled with a motivation, at least in part, to benefit one's own financial interests or those of the securities owner." *See In re Nat'l Golf Properties, Inc.*, 2003 WL 23018761, at *3 (C.D. Cal. Mar. 19, 2003) (citing *Pinter v. Dahl*, 486 U.S. 622, 649 (1988)). Plaintiffs do not allege any facts that suggest CytRx actively solicited sales under the Secondary Offering, beyond participation of some directors in a road show, which is insufficient. *See Maine State Ret. Sys.*, 2011 WL 4389689, at *9 ("Even participation in road shows to promote the sale of stock does not constitute active solicitation . . . ."). Accordingly, Plaintiffs' Section 12(a)(2) claim is **DISMISSED**.

### b.      Section 11

Unlike Section 12, Plaintiffs can demonstrate Section 11 standing in two ways: "First, plaintiffs could prove that they purchased their shares directly in the secondary offering itself. . . . Second, plaintiffs could prove that their shares, although purchased in the aftermarket, can be traced back to the secondary offering." *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1106 (9th Cir. 2013). As discussed above, Plaintiffs have not pled that they purchased their shares directly from the Secondary Offering, so we must determine whether their traceability allegations are plausible. The CytRx Defendants argue that Plaintiffs have failed to allege traceability and likely cannot because this was CytRx's second public offering and on the first day of the "Offering, there were 30,608,392 CytRx shares already on the market issued under earlier registration statements." (Mot. at 21; CytRx Defs.' RJN, Ex. 1 at S-8, S-26, S-27.) With so many outstanding shares, it will be difficult for Plaintiffs to "prove that the shares they purchased came from the pool of shares issued in the secondary offering, rather than from the pool of previously issued shares." *See In re Century Aluminum Co. Sec. Litig.*, 729 F.3d at 1106, 1108 (internal quotation marks omitted) (affirming dismissal when "obvious alternative explanation" is that the plaintiffs' shares "could instead have come from the pool" of "49 million shares of Century Aluminum common stock [that] were already in the market").

Thus, the CCAC must "allege facts from which we can reasonably infer that their situation is different." *See id.* at 1108. In alleging the Pettits purchased shares during the offering period at the secondary offering price, Plaintiffs have met that burden. *Compare Feyko v. Yuhe Int'l, Inc.*, 2013 U.S. Dist. LEXIS 96529, at *7-8 (C.D. Cal. July 10, 2013) (concluding that allegations that the plaintiffs bought shares at the secondary offering price during the relevant period were sufficient) *with In re Century Aluminum Co. Sec. Litig.*, 729 F.3d at 1106 (rejecting claim, in part, because "none of the plaintiffs bought shares at the offering price of $4.50 per share"). Thus, Plaintiffs' standing allegations are sufficiently plausible to survive dismissal.

### 3.      Material Misstatements and Omissions

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-1956-GHK (PJWx) | Date | July 13, 2015 |
|---|---|---|---|
| Title | *In Re CytRx Corporation Securities Litigation* | | |

To successfully assert a Section 11 claim, Plaintiffs must allege that the Registration Statement contained material misstatements or omissions. *See* 15 U.S.C. § 77k(a). Plaintiffs allege the following:

- "The Registration Statement failed to disclose CytRx's promotion efforts and the extent to which the Company had been involved in reviewing, editing and approving the promotional articles touting CytRx. The Company failed to inform investors that it was paying DreamTeam to have laudatory articles published that would result in CytRx's securities to trade [sic] at artificially inflated levels at the time of the Secondary Offering." (CCAC at ¶ 168.)
- "The 'Underwriting Agreement' CytRx filed with the SEC in connection with the Secondary Offering incorrectly represented that the Registration Statement 'complied in all material respects with the Securities Act' and that the Prospectus 'will not[] contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading.'" (*Id.* at ¶ 169.)
- "The Registration Statement provided certain Risk Factors that failed to disclose the risks associated with defendants' undisclosed paid stock promotion scheme. The Registration Statement purported to discuss the volatility in the Company's stock price without disclosing that it had been significantly and substantially impacted by the paid articles touting CytRx." (*Id.*)

We conclude that, for the same reasons discussed above, Plaintiffs have properly pled that the first and third of these statements are misleading in light of the alleged DreamTeam stock promotion scheme. *See Ansell*, 2011 WL 3274019, at *4. As for the second, Plaintiffs have not sufficiently alleged that the Underwriting Agreement was incorporated by reference into the Registration Statement. (*Compare* Opp'n at 21 (claiming that the Underwriting Agreement was contained within a "press release on Form 8-K dated January 31, 2014, that was incorporated by reference into the Registration Statement") *with* CytRx Defs.' RJN, Ex. 1 at S-40 (solely purporting to incorporate by reference Company Form 8-Ks filed on "January 3, 2013, July 16, 2013, October 9, 2013, December 11, 2013, January 6, 2014, January 30, 2014 and January 31, 2013").) Thus, we cannot conclude that this purported misstatement is actionable under Section 11.

### 4. Due Diligence

The Underwriter Defendants argue that we should dismiss Plaintiffs' claim against them because they have a due diligence defense that is clear from the face of the CCAC. (Underwriter Mot. at 14.) Under Section 11, underwriters can escape liability by proving they "had, after reasonable investigation, reasonable ground to believe and did believe . . . that the statements therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(b)(3). "[T]he standard of reasonableness shall be that

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-1956-GHK (PJWx) | Date | July 13, 2015 |
|---|---|---|---|
| Title | *In Re CytRx Corporation Securities Litigation* | | |

required of a prudent man in the management of his own property."  15 U.S.C. § 77k(c); *In re Software Toolworks Inc.*, 50 F.3d 615, 621 (9th Cir. 1994) (internal quotation marks and modifications omitted) (noting that due diligence is, "in effect, a negligence standard").  This typically means that this defense is "generally a fact issue, rarely suitable for summary judgment, let alone a motion to dismiss." *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d at 1175.

But, in certain situations, a due diligence defense is clear from the face of a complaint as a matter of law.  *See id.*  The Underwriter Defendants argue that this is such a situation because (1) "Plaintiffs themselves concede that the Underwriters conducted adequate and reasonable due diligence into CytRx's business and operations"; (2) "the Underwriters obtained written verification from CytRx management that they had not taken any action 'directly or indirectly' to manipulate the price of the shares"; and (3) "DreamTeam utilized numerous tactics to conceal the fact that it was even publishing the alleged articles."  (Underwriters' Mot. at 16.)  We disagree.  We cannot say from the face of Plaintiffs' Complaint that it is clear the Underwriter Defendants conducted a reasonable investigation or that they reasonably believed the statements contained within the Registration Statement were not misleading.  First, Plaintiffs' CCAC does not contain any concession that the Underwriter Defendants conducted adequate due diligence.  It merely alleges the due diligence steps the Underwriter Defendants "purportedly conducted" and claims that in light of such steps, they "should have discovered the material omissions contained in the Registration Statement."  (CCAC at ¶¶ 173-74.)

Second, the cases that the Underwriter Defendants cite to support due diligence-based dismissal involve accounting-related misstatements.  In that context, "underwriters may reasonably rely on auditors' statements, absent red flags that the underwriters were in a position to see."[24]  *See In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d at 1175; *Feyko v. Yuhe Int'l, Inc.*, 2013 WL 816409, at *8 (C.D. Cal. Mar. 5, 2013) ("[U]nderwriters occupy a special place in Section 11 jurisprudence because they are allowed to rely on auditors' work, absent red flags.").  Here, in contrast, the Underwriter Defendants relied on management's assurances that they were not manipulating stock, which is insufficient to establish a due diligence defense as a matter of law.  *Cf. In re Dynegy, Inc. Sec. Litig.*, 339 F. Supp. 2d 804, 872 (S.D. Tex. 2004) ("[T]hey argue that they did not need to conduct an investigation because they reasonably relied on representations made by Dynegy's managers. Reliance on company managers does not entitle board members to dismissal based on due diligence."); *Software Toolworks*, 50 F.3d at 621, 626 (concluding "summary judgment regarding the Underwriters' diligence . . . was [] inappropriate" when they "did little more than rely on Toolworks' assurances that the transactions were legitimate").  Third, the fact that DreamTeam writers and management allegedly

_____

[24] For similar reasons, we reject the Underwriter Defendants' argument that Plaintiffs failed to plead "specific red flags" that the Underwriters were in a position to see.  (Underwriters' Reply at 6.)  A lack of "red flags" can support dismissal only when an underwriter reasonably relied on auditor statements and assurances.  *See, e.g.*, *Software Toolworks*, 50 F.3d at 623-24 (discussing "red flags" in context of underwriters "blindly" relying on auditors' assessments of revenue statements).

E-FILED

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-1956-GHK (PJWx) | Date | July 13, 2015 |
|---|---|---|---|
| Title | *In Re CytRx Corporation Securities Litigation* | | |

concealed the stock promotion scheme cannot alone support dismissal. At this point, the allegations of the CCAC do not show, as a matter of law, that the underwriters could not have discovered the alleged scheme.[25]

### E.   Control Person Liability Claims

Plaintiffs also bring control person liability claims against certain Defendants under Section 20 of the Exchange Act and Section 15 of the Securities Act. "To establish 'controlling person' liability, the plaintiff must show that a primary violation was committed . . . ." *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1161 (9th Cir. 1996). As Plaintiffs have properly pled underlying violations under the Exchange and Securities Acts, we need only determine whether Plaintiffs have alleged claims against those with "control." "In general, the determination of who is a controlling person . . . is an intensely factual question." *See Arthur Children's Trust v. Keim*, 994 F.2d 1390, 1396 (9th Cir. 1993); *Howard v. Everex Sys.*, 228 F.3d 1057, 1065 n.9 (9th Cir. Cal. 2000) (internal quotation marks omitted) (defining control as "[t]he possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise"); *see also Loritz v. Exide Techs.*, 2014 U.S. Dist. LEXIS 111491, at *41-42 (C.D. Cal. Aug. 7, 2014) (internal quotation marks omitted) (concluding that "control person liability claims can generally only be dismissed at the pleading stage if a plaintiff fails to adequately plead a primary violation").

### 1.   Section 20(a)

Plaintiffs assert their Section 20(a) claims against Kriegsman, Caloz, and Haen—CytRx's CEO, CFO, and Vice President of Business Development respectively. Plaintiffs allege that these individuals are subject to control liability for underlying Rule 10b-5 violations because of "their high-level positions with the Company, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance." (CCAC at ¶ 204.) Given these Defendants' high level positions and the fact that the false statements alleged could be found in company press releases or financial statements, it is certainly plausible that these Defendants would have the requisite "control," especially in a company as small as CytRx. *Cf. Wool v. Tandem Computers Inc.*, 818 F.2d 1433, 1441 (9th Cir. 1987), *overruled on other grounds*, ("[W]here, as here, the corporate officers are a narrowly defined group charged with the day-to-day operations of a public corporation, it is reasonable to presume that these officers had the power to control or influence the particular transactions giving rise to the securities violation."). This is

_____

[25] Contrary to the Underwriter Defendants' argument, just because the Pearson Report stated that the Underwriters would "feel duped" by the scheme (*see* Underwriters' RJN Ex. 2, at 6) does not mean that we must find, as a matter of law, that they were in fact "duped" or that it was reasonable for them to have been so "duped." (*See* Underwriters' Mot. at 16.)

*E-FILED*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-1956-GHK (PJWx) | Date | July 13, 2015 |
|---|---|---|---|
| Title | *In Re CytRx Corporation Securities Litigation* | | |

especially true given that Plaintiffs have successfully alleged primary liability against each of these Defendants, as it would be illogical to conclude that they were not in control of their *own* potential Exchange Act violations. Thus, Plaintiffs' control allegations are sufficient, and Defendants' Motion as to this claim is **DENIED**.

### 2.      Section 15

Plaintiffs assert their Section 15 claims against Kriegsman, Caloz, Haen, and the Director Defendants. They allege that these Defendants had control because each of them "served as an executive officer or director of CytRx prior to and at the time of the offerings" and "had the power, influence and control over the operation and management of the Company and the conduct alleged herein." (CCAC at ¶ 222.) We again conclude that Plaintiffs have made sufficient control allegations against Kriegsman, Caloz, and Haen. As for the Director Defendants, while "[a] director is not automatically liable as a controlling person," *see Arthur Children's Trust*, 994 F.2d at 1396-97, Plaintiffs are merely alleging that these Defendants had "control" over a Registration Statement they signed, not the day-to-day conduct of the entire company. Other courts "have presumed that [] director[s] exercise[] actual authority and control, at least over the contents of and/or release of th[e] statements [they sign]." *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 555 (N.D. Cal. 2009) (noting that this "makes sense" because "the authority to sign and certify the contents of a registration statement implies the authority to effectuate changes to that statement by withholding certification"); *see also In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1037 (C.D. Cal. 2008) (citing cases and stating that "persuasive authority indicates that an officer or director who has signed financial statements containing materially false or misleading statements qualifies as a control person"). We too conclude that there is at least a reasonable and plausible inference of control at this stage in the proceedings, especially since all of the Director Defendants are also subject to primary liability for Securities Act violations. Thus, the CytRx Defendants' Motion as to this claim is **DENIED**.

### F.      Plaintiffs' Section 20(b) Claim

Section 20(b) of the Exchange Act states that "[i]t shall be unlawful for any person, directly or indirectly, to do any act or thing which it would be unlawful for such person to do under the provisions of this chapter or any rule or regulation thereunder through or by means of any other person." 15 U.S.C. § 78t. Plaintiffs assert this claim against Haen and Kriegsman for promoting stock "by means of Defendant Meyer, DreamTeam and Mr. Mylant." (CCAC at ¶ 208.) In their briefing, both Plaintiffs and the CytRx Defendants treat this claim as one and the same as a Section 20(a) claim. (*See* Opp'n at 42; Mot. at 25.) Thus, we will allow Plaintiffs' Section 20(b) claim to proceed for the same reasons and **DENY** the CytRx Defendants' Motion as to this claim.[26]

----

[26] While Defendants failed to object to Plaintiffs' claim on this ground, we note that it is unclear whether Section 20(b) provides a private right of action. *See S.E.C. v. Stringer*, 2003 WL 23538011, at

*E-FILED*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-1956-GHK (PJWx) | Date | July 13, 2015 |
|---|---|---|---|
| Title | *In Re CytRx Corporation Securities Litigation* | | |

### G.    Conclusion

Based on the foregoing, Defendants' Motions are **GRANTED in part** and **DENIED in part** as follows:

(1) The CytRx Defendants' Motion as to Plaintiffs' Rule 10b-5(b) claim is **GRANTED** as to Defendant Haen and as to all other named Defendants on the statements found in DreamTeam articles.  This Motion as to Plaintiffs' Rule 10b-5(b) claim against Kriegsman, Caloz, and CytRx is **DENIED** in all other respects.

(2) The CytRx Defendants' Motion as to Plaintiffs' Rules 10b-5(a) and (c) claim is **DENIED**.

(3) Both Motions as to Plaintiffs' Section 12(a)(2) claim are **GRANTED**.

(4) Both Motions as to Plaintiffs' Section 11(a) claim are **DENIED**.

(5) The  CytRx Defendants' Motion as to Plaintiffs' Sections 15, 20(a), and 20(b) control person liability claims is **DENIED**.

The CytRx Defendants argue that Plaintiffs should not be allowed to amend because they were given "weeks after these cases were consolidated to prepare another complaint," citing a case that held "[w]here the plaintiff has previously been granted leave to amend and has subsequently failed to add the requisite particularity to its claims, the district court's discretion to deny leave to amend is particularly broad."  (Reply at 25 (quoting *Zucco Partners, LLC*, 552 F.3d at 1007).)  We are not persuaded. Allowing Plaintiffs to consolidate their complaints is not equivalent to dismissing with leave to amend. Plaintiffs should be given a proper chance to amend their dismissed claims, as we cannot say at this time that doing so would be clearly futile.

Should Plaintiffs elect to file a First Amended CCAC ("FACCAC"), they **SHALL** do so **within 30 days hereof** in compliance with this Order.  Plaintiffs' failure to file a FACCAC will be deemed their admission that amendment is futile, and, in that event, their dismissed claims will be dismissed with prejudice, and Defendants **SHALL** answer the remaining claims **within 14 days thereafter**.  If Plaintiffs file a FACCAC, Defendants **SHALL** respond to it **within 30 days thereafter**.

### IV.    Motion to Substitute

---

*6 (D. Or. Sept. 3, 2003) ("Unlike Section 20(a), Section 20(b) is specifically geared toward government enforcement actions."); 5B *Disclosure & Remedies Under the Sec. Laws* § 11:8 ("Even [if] no private right of action exists, Section 20(b) is an available remedy for SEC and criminal actions.").

**E-FILED**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 14-1956-GHK (PJWx) | Date | July 13, 2015 |
|---|---|---|---|
| Title | *In Re CytRx Corporation Securities Litigation* | | |

Defendant Selter was on CytRx's Board of Directors and signed the Company's Registration Statement. (CCAC at ¶ 46.) Plaintiffs assert claims only for violations of Sections 11 and 15 of the Securities Act against Selter. (*See id.* at ¶¶ 215-24.) On November 10, 2014, the CytRx Defendants filed a Notice of Death of Party Pursuant to Federal Rule of Civil Procedure 25 ("Notice") regarding Selter's death. [Dkt. 80.] Defendants' Notice identifies Shirley Selter as Selter's "representative." On February 2, 2015, Plaintiffs filed a Motion to Substitute Ms. Selter as a Defendant in this action ("Motion"). [Dkt. 98.] Plaintiffs' Motion is unopposed. Federal Rule of Civil Procedure 25(a)(1) states:

> If a party dies and the claim is not extinguished, the court may order substitution of the proper party. A motion for substitution may be made by any party or by the decedent's successor or representative. If the motion is not made within 90 days after service of a statement noting the death, the action by or against the decedent must be dismissed.

Plaintiffs' claims against Selter are not extinguished, and Plaintiffs' Motion has been timely filed.[27] Because Plaintiffs' Motion is unopposed, there is no indication that Ms. Selter is not Selter's legal "representative." *See Mallonee v. Fahey*, 200 F.2d 918, 919 (9th Cir. 1952) ("Rule 25(a)(1) applies only to the substitution of legal representatives."); *Sequoia Prop. and Equip. Ltd. P'ship v. United States*, 2002 WL 32388132, at *2 (E.D. Cal. June 3, 2002) (citations omitted) ("Generally, the deceased's legal representative (e.g., executor or administrator) is the proper party to be substituted. However, once the estate has been distributed, distributees are also proper parties for substitution."). Moreover, Local Rule 7-12 provides that "[t]he failure to file any required paper, or the failure to file it within the deadline, may be deemed consent to the granting or denial of the motion." Thus, Plaintiffs' Motion is **GRANTED**, and Shirley Selter is substituted for Marvin Selter as a Defendant in this action.

### IT IS SO ORDERED

:

_____   _____

Initials of
Deputy Clerk              AB for Bea

---

[27] No timely motion has been filed as to Defendant Link, however. Thus, Plaintiffs' claims against him are **hereby DISMISSED without prejudice**. *See* Fed. R. Civ. P. 25(a)(1).